**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

| | |
|---|---|
| JAMES HARRIS, RICK KETCHAM and ADAM MANSKE, Each Individually and on Behalf of All Others Similarly Situated,<br><br>       Plaintiffs,<br><br>v.<br><br>EXPRESS COURIER INTERNATIONAL, INC.<br><br>       Defendant. | Case No. 5:16-cv-5033-TLB |

---

**EXPRESS COURIER INTERNATIONAL, INC.'S (N/K/A LSO FINAL MILE) ("LSO") MEMORANDUM IN SUPPORT OF MOTION TO DECERTIFY FLSA COLLECTIVE ACTION**

---

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION AND ARGUMENT SUMMARY ............................................ 1

II.    BACKGROUND ................................................................................................... 5

    A.    Procedural Background and Standard of Review ...................................... 5

    B.    LSO's Operation ........................................................................................ 6

    C.    Plaintiffs ................................................................................................... 7

III.   ARGUMENT ...................................................................................................... 12

    A.    No efficient or manageable way to try the independent contractor reclassification issue exists ...................................................................... 12

    B.    Discovery belies existence of policies common to Plaintiffs ................... 22

    C.    Plaintiffs have not offered any basis on which to demonstrate the liability or damage elements of their overtime claim .......................................... 25

    D.    No efficient or manageable method for trying the FLSA Minimum Wage claim on a collective action basis exist .................................................... 30

IV.   CONCLUSION ................................................................................................... 33

    APPENDIX A ...................................................................................................... i

# TABLE OF AUTHORITIES

## Cases

*Andel v. Patterson-UTI Drilling Co.*, 280 F.R.D. 287 (S.D. Tex. 2012) ...........................13, 25

*Anderson v. Mt. Clemons Pottery Co.,* 328 U.S. 680 (1946) ...............................................28, 30

*Armstrong v. Wheels Assured Delivery Syst., Inc.,* 2016 WL 1270208 (S.D. Ind. Mar. 30, 2016)....................................................................................................................................13

*Bamgbose v. Delta-T Group, Inc.,* 684 F. Supp. 2d 660 (E.D. Pa. 2010)..............13, 14, 16, 21

*Beecher v. Steak N Shake Operations, Inc.*, 904 F. Supp. 2d 1289 (N.D. Ga. 2012) ............... 4

*Bonnetts v. Arctic Exp., Inc.*, 7 F.Supp. 2d 977 (S.D. Ohio 1998) ...........................................20

*Bouaphakeo v. Tyson Foods, Inc.,* 765 F.3d 791 (8th Cir. 2014).............................................. 5

*Bouthner v. Cleveland Const., Inc.,* 2012 WL 738578 (D. Md. Mar. 5, 2012)........................13

*Browning*, 885 F. Supp. 2d 590 (E.D.N.Y. 2012) ......................................................14, 20, 22

*Carrera v. UPS Supply Chain Solutions, Inc.*, 2012 WL 12860750 (S.D. Fla. Sept. 14, 2012) ..........................................................................................................................13, 18, 20

*Christianson v. NewPark Drilling Fluids, LLC,* 2015 WL 1268259 (S.D. Tex. Mar. 19, 2015) ..........................................................................................................................16, 19, 21

*Demaurao v. Limo Inc.*, 2011 WL 9191 (M.D. Fla. Jan. 3, 2011) ...................................1, 5, 13

*DeSouza v. EGL Eagle Global Logistics LP*, 596 F. Supp. 2d 456 (D. Conn. 2009) ..............24

*Dole v. Snell*, 875 F.2d 802 (10th Cir. 1989) .........................................................................14

*Douglas v. First Student, Inc.*, 888 F. Supp. 2d 929 (E.D. Ark. 2012)........................... passim

*FedEx Home Delivery v. N.L.R.B*, 563 F.3d 492 (D.C. Cir. 2009)...............................19, 22, 24

*Harrison v. Delguerico's Wrecking & Salvage, Inc.,* 2016 WL826824, (E.D. Pa. Mar. 2, 2016) ............................................................................................................................................30

*Hensley v. MacMillan Bloedel Containers, Inc.*, 786 F.2d 353 (8th Cir. 1986) .....................30

*Hernandez v. Fresh Diet, Inc.*, 2014 WL 5039431 (S.D.N.Y. Sept. 29, 2014) .......12, 13, 15, 16

*Hinojos v. Home Depot, Inc.*, 2006 WL 3712944 (D. Nev. Dec. 1, 2006)................................33

*Hoffman-La Roche Inc. v. Sperling*, 493 U.S. 165 (1989) .......................................6, 7

*In re Fedex Ground Package Sys., Inc. Employment Practices Litig.*, 662 F. Supp. 2d 1069 (N.D. Ind. 2009).........................................................................................13

*Krupicki v. Eagle One, Inc.,* 2014 LEXIS U.S. Dist. 46038 (E.D. Ark. Apr. 3, 2014).....passim

*Layton v. DHL Exp. (USA), Inc.*, 686 F.3d 1172 (11th Cir. 2012) .........................................22

*Lochridge v. Lindsey Mgmt. Co., Inc.*, 2013 WL 12069066 (W.D. Ark. Dec. 10, 2013) .......... 6

*Luxama v. Ironbound Express, Inc.*, 2012 WL 5973277 (D.N.J. June 28, 2012)..............14, 18

*Luxama v. Ironbound Express, Inc.*, 2013 WL 3286081 (D. N.J. June 27, 2013)..................14

*Marshall v. Amsted Industries, Inc.*, 2010 WL 2404340 (S.D. Ill., June 16, 2010) ...............14

*Martin v. Citizens Fin. Group, Inc.*, 2013 WL 1234081, at *7 (E.D. Pa. Mar. 27, 2013) .......32

*Moba v. Total Transp. Svc. Inc.*, 16 F. Supp. 3d 1257, 1265-66 (W.D. Wash. 2014)........14, 21

*Mooney v. Aramco Svc. Co.*, 54 F.3d 1207 (5th Cir. 1995) ....................................................... 5

*Peña v. Handy Wash, Inc.*, 2015 WL 11713032 (S.D. Fla. May 22, 2015).................12, 19, 26

*Pfaahler v. Consultants for Architects, Inc.*, 2000 WL 198888 (N.D. Ill. Feb. 8, 2000)..........13

*Pfohl v. Farmers Ins. Group*, 2004 WL 554834 (C.D. Cal. Mar. 1, 2004) ...............................13

*Rios v. Current Carrier Corp.*, 2015 WL 1443058 (D. Mass. Mar. 30, 2015).........................27

*Rojas v. Garda CL Southeast, Inc.*, 2015 WL 5084135 (S.D. Fla. Aug. 28, 2015)..............3, 30

*Saleen v. Waste Mgmt., Inc.*, 2009 WL 1664451 (D. Minn. June 15, 2009)............................ 4

*Scott v. NOW Courier*, 2012 WL 1072751 (S.D. Ind. Mar. 29, 2012)......................................14

*Shady Grove Orthopedic Assoc., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010) .............4, 6, 26

*Solis v. Velocity Express, Inc.*, 2010 WL 3259917 (D. Ore. 2010) ..........................................20

*Spellman v. Am. Eagle Express, Inc.*, 2013 WL 1010444 (E.D. Pa. Mar. 14, 2013)..13, 14, 17, 19

*Thiessen v. Gen. Elec. Capital Corp.,* 267 F.3d 1095 (10th Cir. 2001) .................................... 5

*United States v. Klinghoffer Bros. Realty Corp.*, 285 F.2d 487 (2d Cir. 1960) ................30, 32

*Vasquez v. American Bar-Trench, Inc.*, 2014 WL 297414 (S.D. Tex. Jan. 23, 2014).............13

*White v. 14051 Manchester Inc.*, 301 F.R.D. 368 (E.D. Mo. May 30, 2014) ...................25, 33

*Williams v. Central Transport Int'l, Inc.,* 830 F.3d 773 (8th Cir. 2016) ................................29

*Zavala v. Wal-Mart Stores Inc.*, 691 F.3d 527 (3d Cir. 2012) .................................................. 6

*Zents v. Baylor Trucking Co.*, 2013 WL 1500678 (N.D. Ohio Apr. 13, 2013) .........................20

## Statutes

29 U.S.C. § 203(e)(1) ...........................................................................................................25

29 U.S.C. § 206(a) ...............................................................................................................31

29 U.S.C. § 213(b)(1) ............................................................................................................. 3

29 U.S.C. § 216(b) ............................................................................................................5, 6

29 U.S.C. 213(b) ..................................................................................................................29

## Regulations

49 C.F.R. § 376.12 ...............................................................................................................21

49 C.F.R. Part 376 ............................................................................................................7, 21

## Other Authorities

*Have Truck, Will Drive: The Trucking Industry and the Use of Independent Owner-Operators Over Time*, 35 Transp. L.J. 115 (2008) ................................................................ 7

## I.      INTRODUCTION AND ARGUMENT SUMMARY

1,042 individuals have filed consents to join this case, each asserting two claims against LSO for alleged violations of (1) the FLSA overtime law and (2) the FLSA minimum wage law. The issue before the Court is whether Plaintiffs have developed a trial plan to adjudicate the claims of each of the 1,042 individuals without modifying any party's rights under the FLSA or Constitution. With just 18 of the 1,042 Plaintiffs having explained the basis for their claims, it is apparent there is no way to efficiently adjudicate these claims, and in turn the Court must decertify the FLSA collective action here.

First, as explained in Section III(A) below, before addressing whether any Plaintiff has a FLSA overtime and minimum wage claim, they must demonstrate LSO is his or her employer. That question involves a fact-intensive analysis of each individual's work experience incapable of a "one-size-fits-all" resolution.[1]  Even though less than 2% of the Plaintiffs have testified, their testimony reveals significant variations between Plaintiffs' experiences on issues impacting resolution of the economic-realities test used to assess independent contractor status under the FLSA. Examples of those variations include:

(1)      *Freedom to work for other companies in addition to LSO*: Springdale-Plaintiff James Harris testified "[i]t wouldn't have been profitable to" and Nashville-Plaintiff Sean Burns stated "I don't think you can." *Harris* 29:18-30:1; *Burns* 60:3-9.[2] Oklahoma City-Plaintiff Thomas McHargue testified he transported products for "BeavEx"—a competitor of LSO—"during the day" and made "home deliveries" for dialysis patients "maybe a week at the most every month" while contracting with LSO because it made business sense and "he could make some extra income." *McHargue* 33:10-34:4; 44:14-20; 62:12-63:3.

---

[1] *See Parties Joint Rule 26 Report* at 5 (Plaintiffs' opining that "[t]he primary legal issue with respect to liability in this case—whether Plaintiffs and similarly situated drivers were 'employees' or 'independent contractors'—requires this Court to engage in [a] fact intensive analysis.")(ECF No. 21), *accord Demaurao v. Limo Inc.*, 2011 WL 9191, at *3 (M.D. Fla. Jan. 3, 2011)(denying FLSA conditional certification because "[t]he economic realities test is fact intensive and requires individualized analysis.").

[2] Cited deposition pages along with other documents referenced in this Memorandum are attached as exhibits to the brief. For a listing of the exhibits, please see *Exhibit Index* (ECF No. 106-1).

(2)     *The purported degree of supervision over work performed*: Plaintiff Burns went directly to a customer location—not an LSO warehouse—to begin making deliveries and went directly home at the end of the day, called LSO dispatch in the morning to check-in but otherwise had no regular communication with the company, rarely saw any LSO management, and for the past "six, seven years or more" has not used a scanner (or any other device to communicate with LSO during the day regarding deliveries). *Burns* 18:1-19:15, 27:11-30:5, 47:21-48:19. Plaintiff Harris testified he had to report to the LSO warehouse every morning and evening, constantly communicated with LSO, and was tracked by LSO via a GPS scanner. *Harris* 26:19-27:13, 40:8-16, 49:23-50:5, 62:24-63:17, 111:23-112:7, 119:7-17.

(3)     *Training*: When asked "[d]id you go through any type of training while at" LSO Springdale-Plaintiff Rick Ketcham responded "No." *Ketcham* 98:1-3. Mobile-Plaintiff Bryan Thompson testified his branch manager "trained me by taking me as a ride-along for the first two-weeks" on his delivery route. *B. Thompson* 160:25-161:15.

(4)     *Investment in equipment:* Fort Worth-Plaintiff Ryan Robinson and his father, Ricky Robinson, formed a limited liability company through which they operated several vehicles (and employed other drivers).  *Robinson* 7:20-8:13, 16:22-23, 29:7-21, 29:25-30:16; 32:2-33:13, 107:25-108:19. New Orleans-Plaintiff Rufus Davis owned two cargo vans, using one "for backup in case, you know, they were low [on] vans and I had to have one for backup." *Davis* 22:12-23:7. Plaintiff Burns uses his personal vehicle for deliveries too, and also purchased the car his daughter—another LSO Contractor—uses to deliver products for Amazon. *Burns* 13:22-14:22, 15:16-17:21. Tulsa-Plaintiff Nikko Henderson, on the other hand, said LSO dictated where he had to get his truck. *Henderson* 12:9-13:8, 126:1-12, 128:19-25.

That each Plaintiff had a different relationship with LSO underscores the absence of common proof capable of determining whether any were LSO's employee. The policies on which Plaintiffs have relied cannot deliver a uniform employment outcome in light of the varied experiences discussed in Section III(B). Moreover, there is no basis on which to

-2-

predict the evidence that the remaining 1,024 plaintiffs who have not yet been deposed will provide on this inquiry. Memphis-Plaintiff Tim Coradini exemplifies this: Plaintiffs' lawyers classified him as a "happy camper" after submitting a declaration in support of LSO's motion to deny conditional certification and identifying himself AS an independent contractor, yet is now a Plaintiff in this case. *Reply in Support of Second Motion for Certification of Collective Action* at 1 (ECF No. 32); ECF No. 31-6 (Tim Coradini Declaration); ECF No. 94.

Second, even if Plaintiffs had a method to ascertain who of the 1,042 were LSO employees, for the reasons identified in Section III(C), there is no method to resolve the liability elements of their overtime claims. No Plaintiff can recover for unpaid overtime without first demonstrating that they worked more than 40 hours per week, and for each that did, the amount of overtime for which they are owed. *Douglas v. First Student, Inc.*, *888 F. Supp. 2d 929, 934 (E.D. Ark. 2012)*("to establish liability under the FLSA for any particular week, plaintiffs must demonstrate they worked more than forty hours that week. Thus, the determination of the number of hours worked by each class member each week is a threshold issue of liability"). The Plaintiffs who have testified eviscerate the Complaint's blanket allegations that Plaintiffs worked "fifty and fifty-five hours per week." *Compl.* at 9 (ECF No. 1).

No Plaintiff identified any uniformity to the hours they worked and explained that they frequently had different schedules from week-to-week. *Carpenter* 36:8-24, 68:13-71:1; *B. Thompson* 129:18-130:10. Some explained that they did work in excess of 40 hours per week, but also provided testimony that would subject them to the FLSA overtime Motor Carrier Act Exemption because the loads they delivered were interstate in nature and their vehicles exceeded 10,000 gross vehicle weight rating. *Brewer* 25:13-22; *see also* 29 U.S.C. § 213(b)(1). Because "[e]ach plaintiff's case requires consideration of different background facts and different testimony based [on] each driver's work activities[, f]ailing to decertify the conditionally-certified class will unfairly and prejudicially require [LSO] to prepare for and present hundreds of different trials simultaneously." *Douglas*, 888 F.Supp.2d at 934; *see also Rojas v. Garda CL Southeast, Inc.*, 2015 WL 5084135, at *6 (S.D. Fla. Aug. 28, 2015)

(decertifying FLSA collective action because "determination of whether an employee is covered by the FLSA or the MCA requires an individual factual inquiry regarding the actual work performed by each individual employee.").

Third, the elements of Plaintiffs' minimum wage claim are not susceptible to collective adjudication as discussed in Section III(D). Beyond demonstrating an employment relationship, each of the 1,042 Plaintiffs must produce evidence of (1) the work related expenses they incurred; (2) the pay they received for the work they performed; and (3) evidence that that pay, net of expenses, was less than the federal minimum wage for each hour worked. The complexities that attend this determination are evident. There is no uniformity among the Plaintiffs regarding (1) the amount they worked; (2) the compensation, and therefore effective hourly rate each received; or (3) the work-related expenses they incurred and whether those expenses had the effect of bringing their effective hourly wage below the federal minimum wage. *See Beecher v. Steak N Shake Operations, Inc.*, 904 F. Supp. 2d 1289, 1298-1300 (N.D. Ga. 2012)(denying FLSA conditional certification involving minimum wage and overtime claims because "individualized nature of the claims" would require "mini-trials" "resulting [in] litigation [that] could easily become unmanageable.").

The fact that each Plaintiff was classified as an independent contractor does nothing to establish *any* of the elements of their claims. Such superficial similarities have no bearing on the economic-realities test, what hours the individual actually worked, or the expenses the individual incurred. Nor can this Court disregard the absence of class-wide evidence in the name of expediency. The FLSA collective action, like Rule 23, is a procedural device courts may use to efficiently adjudicate multiple claims, but it cannot alter the proof necessary for each Plaintiff to prevail on his or her own claim. *See Shady Grove Orthopedic Assoc., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 408 (2010); *Saleen v. Waste Mgmt., Inc.*, 2009 WL 1664451, at *8 (D. Minn. June 15, 2009)("a collective is simply a procedural device aimed at facilitating, in an efficient and cost effective way, the adjudication of numerous claims in one action.").

In other words, regardless of whether the individual class member's claims are tried together or separately, Plaintiffs cannot establish liability on their claims without producing evidence that (1) each of them was misclassified, (2) that each of them worked overtime, and (3) that each of them incurred expenses which reduced the individual's average hourly pay below minimum wage. Discovery demonstrates answers to these questions will require participation of each Plaintiff at trial, which "eviscerates all notions of judicial economy" contemplated when a court conditionally certifies an FLSA class. *Demaurao*, 2011 WL 9191, at *4. LSO respectfully requests that the Court decertify the conditional-FLSA class.

## II.    BACKGROUND

### A. Procedural Background and Standard of Review

On September 19, 2016, the Court "conditionally certified as a collective action pursuant to 29 U.S.C. § 216(b)" a class of "individuals who worked for [LSO] as drivers, couriers, or owner-operators any time after February 11, 2013; never subcontracted any of their work for [LSO]; and contracted during the relevant time period directly with [LSO] under the company's standard 'Owner-Operator Agreement.'" ECF No. 34, pp. 10-11 (Sept. 19, 2016). Notices went out to 3,726 individuals, and 1,042 opted into the lawsuit as Plaintiffs.

As the conditional certification order indicates, the Court took no consideration of the evidence at the collective action certification stage in this case, electing instead to wait until the decertification motion filing to "make [] a factual determination on the similarly situated question." *Id.*, p. 6 (citing *Mooney v. Aramco Svc. Co.*, 54 F.3d 1207, 1213-14 (5th Cir. 1995)).

The decertification stage of an FLSA collective action utilizes a much "stricter standard of 'similarly situated'" than the conditional certification analysis. *Thiessen v. Gen. Elec. Capital Corp.,* 267 F.3d 1095, 1102-03 (10th Cir. 2001). Factors courts consider at the decertification stage include "(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; [and] (3) fairness and procedural considerations." *Bouaphakeo v. Tyson Foods, Inc.,* 765 F.3d 791, 796 (8th Cir. 2014)(quoting *Thiessen,* 267 F.3d at 1103).

This analysis requires a comparison of the differences and similarities between the individual plaintiff's circumstances that are relevant to resolution of the claims. *Douglas,* 888 F. Supp. 2d at 933. Plaintiffs must demonstrate by a preponderance of the evidence that they have an efficient and manageable method to try the case as a collective action.[3]

In other words, at this juncture, Plaintiffs are obligated to do more than identify common evidentiary themes or policies—they must explain how they will introduce evidence to establish the claims of *each* of the 1,042 claimants. Like a class action, the collective action available under 216(b) is simply a form of joinder that "enables a federal court to adjudicate claims of multiple parties at once, instead of in separate suits." *Shady Grove,* 559 U.S. at 408; *cf. Hoffman-La Roche Inc. v. Sperling,* 493 U.S. 165, 170 (1989) (holding that "Section 216(b)'s affirmative permission for employees to proceed on behalf of those similarly situated" provides courts with "procedural authority to manage the process of joining multiple parties in a manner that is orderly, sensible, and not otherwise contrary to statutory commands or the provisions of the Federal Rules of Civil Procedure."). Plaintiffs have failed to identify any method for adjudicating the question of each Plaintiff's classification, let alone the elements of any of their FLSA overtime and minimum wage claims.

**B. LSO's Operation**

Costs associated with the coordination of movement and storage of goods from the point of origin to the end consumer accounted for approximately 8.3% ($1.45 trillion) of America's gross domestic product in 2014. *Butcher Decl.*, Ex. A (ECF No. 31-1, 31-2). LSO provides various supply-chain management services to help businesses reduce transportation costs, increase efficiency in product movement, and allow the customer to focus on their core business. *Webb Decl.* ¶ 3 (ECF No. 31-3). Between 2013 and March 2017, close to a thousand customers mainly in the healthcare, financial services, office products, pharmaceuticals,

---

[3] *See Lochridge v. Lindsey Mgmt. Co., Inc.,* 2013 WL 12069066, at *2 (W.D. Ark. Dec. 10, 2013)(citing *Zavala v. Wal-Mart Stores Inc.,* 691 F.3d 527, 536 (3d Cir. 2012) for proposition that Plaintiffs' burden of proof at second state of FLSA inquiring and concluding preponderance of evidence is correct burden of proof).

auto parts, and manufactured goods industries contracted with LSO for these services across LSO's 56 facilities in 48 cities around the United States. *See id.* ¶¶ 2, 4.

When LSO creates a transportation solution for a customer, it considers the costs associated with transporting the customer's products, the number of deliveries in a geographic area, frequency of delivery, product size, need for specific delivery dates and or times; based on this information LSO determines what it deems the most efficient delivery process and the equipment necessary to transport the customer's product. *Id.*, ¶ 9. No single solution fits every customer's needs. Rather, variations in customer requirements, the product being transported, timing, distance, and frequency of deliveries dictate the optimal mix of rates and method of pay; type of vehicle that can service the account; and regulatory requirements of each customer.

LSO does not, however, own or operate cars or delivery trucks needed to complete customer's deliveries; instead it facilitates the actual delivery through Contractors who own the vehicles necessary to effectuate the deliveries and provide qualified drivers who transport the products under LSO's motor-carrier authority. *Id.*, ¶ 10. LSO memorializes its relationships with Contractors through federally regulated Owner-Operator Agreements. 49 C.F.R. Part 376 (Federal Truth-in-Leasing Regulations, which apply to motor carriers' leasing of commercial motor carrier equipment and related professional truck driving services from independent contractors); *see also* Douglas C. Grawe, *Have Truck, Will Drive: The Trucking Industry and the Use of Independent Owner-Operators Over Time*, 35 Transp. L.J. 115 (2008)(addressing historical use of independent contractor truck drivers operating under another company's motor carrier authority).

### C. Plaintiffs

The 1,042 Plaintiffs are current and former Contractors that operated out of approximately forty different facilities. LSO noticed 27 of these Plaintiffs depositions during the Phase One Schedule of discovery and served 100 with written discovery. Only 18 of the Plaintiffs actually appeared for their depositions.

Of the 18 Plaintiffs who sat for depositions:

- five testified they owned corporate entities (one of those five withdrew their opt-ins)[4];

- five used their equipment to service non-LSO customer's deliveries[5];

- one hired other drivers to complete his deliveries[6];

- one for a portion of the proposed class period did not contract with LSO but was hired and paid by an LSO Contractor to complete deliveries[7]; and

- six purchased or leased vehicles specifically for delivering product.[8]

Testimony on the frequency of communication with LSO, freedom to turn down work, and alleged uniforms also spanned a wide spectrum, as did testimony on the number of hours worked and mileage driven in a day. *E.g., Appendix A* §§ 1-13 (providing example testimony comparisons on these discrete factual topics). These variations are consistent with the differences in the customers served, locations where work is performed, decisions each Contractor makes in running their business, and ultimately the experiences of each Contractor.

For instance, Ricky Robinson began contracting with LSO starting in October 2015; decided "[f]or tax purposes" along with his son—Plaintiff Ryan Robinson—to form RJR Couriers LLC in August 2016; expanded the business to a four vehicle operation; and reports that RJR Couriers, LLC now pays expenses for the operation, including wages Ricky and Ryan decide they and other RJR Couriers's drivers should receive. *Robinson* 7:3-8:13, 29:22-30:20, 32:7-33:13, 53:12-23, 105:19-110:3. Three months after his deposition, Ricky Robinson withdrew as an opt-in Plaintiff, but his son Ryan Robinson remains.  ECF Nos. 44, 50, 102.

---

[4] *Robinson*  7:3-8:13, 29:22-30:20; *Renne*  95:19-96:22; *Bright*  15:4-16:7; *Ketcham*  19:19-20:8; *Brewer* 12:11-20; ECF No. 102.

[5] *Bright* 26:8-19; *Renne* 34:24-35:9; *McHargue* 32:20-34:6, 44:14-45:11, 62:12-63:3; *Blassingame* 31:1-13;  *Williams* 15:22-16:25, 65:14-68:4.

[6] *Robinson* 103:25-109:21.

[7] *B. Thompson* 28:3-30:9.

[8] *Mulloy* 24:13-26:25; *Robinson* 30:17-33:5; 51:15-52:25; *Carpenter* 32:18-34:4; *Henderson* 11:16-13:14, *Ketcham* 65:24-66:20, *Renne* 32:18-22.

Some Contractors reported that their operations did not lend themselves to expansion. For example, Plaintiff Harris elected not to hire a second driver or operate another truck—according to Harris, "it was not possible to actually" do this because such an operation "would have probably lost 500 bucks a week." *Harris* 137:5-138:8.

Plaintiff Brewer owned her own logistics company—Global Logistics & Investments—but testified she performed work for LSO independent of her company. *Brewer* 12:11-24, 102:2-19, 129:17-131:1, 135:23-136:2; and Deposition Ex. 7. She did so because she thought Contractors could not drive for other companies while under contract with LSO. *Brewer* 103:6-104:3. Plaintiff McHargue did exactly that. McHargue drove for BeavEx—one of LSO's competitors—when he was not making deliveries for LSO. *McHargue* 33:10-34:6, 44:14-46:5, 61:12-63:6, 66:21-68:1. McHargue's *actual experience* cannot be squared with his interrogatory responses in which he makes no mention of the work performed for other companies. *McHargue Ans. to Rog. No. 5*.

Neither Plaintiff McHargue nor Plaintiff Brewer is a current Contractor with LSO. Plaintiff McHargue's contract terminated after LSO lost the bank business he was servicing. *McHargue* 39:15-17. Plaintiff Brewer testified LSO terminated her contract in late February 2014 after she "couldn't make it to the dock in two days" because of "a personal issue." *Brewer* 26:12-25.  The personal issue was her third-DWI arrest along with an assault charge that occurred on February 25, 2014 and resulted in jail time. *Brewer* 128:1-25.  In addition, to these arrests, Plaintiff Brewer also disclosed that she had been convicted of check fraud for which she served a three-year prison sentence, but did not disclose other theft convictions in deposition.  *Brewer* 126:16-128:4; DEF016634-DEF016666.

Pensacola-Plaintiff Joseph Renne no longer contracts with LSO either, and, like McHargue, reported making deliveries for multiple other companies while contracting with LSO. *Renne* 15:3-16:8, 20:22-21:13, 22:15-22. Contractors also identified different types of work they performed while contracting with LSO, including taxi driver (Tyler-Plaintiff Lonnie Moore), Uber driver (Little Rock-Plaintiff Mario Moreno) and courier for SCS (Nashville-Plaintiff Mark Davis).  *Moore Ans. to Rog. No. 5*; *Moreno Ans. to Rog. No. 5*; *Davis*

*Ans. to Rog. No. 5*; *see also* [Appendix A § 7](#) (providing example testimony comparisons on ability to work for other companies while contracting with LSO). Still another, NPlaintiff Davis testified he drove for a competitor of LSO's, Velocity, while under contract, but asserts LSO "leased [him] out to" Velocity. *Davis* 49:7-50:5, 76:10-78:8. Atlanta-Plaintiff Amanda Ryte likewise provided interrogatory responses indicating she performed no other work while driving for LSO, yet her Schedule C tax filing lists Uber and LSO as her principal businesses. *Ryte Ans. to Rog. No. 5*; Harris_Ryte,Amanda_0005-0008. Ryte has not testified yet in the case, so it is unknown if she would vouch for the accuracy of her tax information or interrogatory responses.

While Plaintiff Burns testified he never provided delivery services to other companies, he also explained that he barely had any contact with anyone from LSO. According to Burns, he (i) would go directly to the customer location—Vanderbilt University in Nashville—to begin making deliveries for the day and when finished would go straight home; (ii) in the mornings called dispatch "to give them my driver number [and say] I'm checking in," but otherwise would not communicate with anyone from LSO on a regular basis; (iii) found time during the day to visit Planet Fitness in-between deliveries for "thirty [to] 40 minute" workouts "three times a week;" (iv) has no recollection of all-driver meetings with LSO management occurring; (v) would not take additional deliveries when offered and did so without repercussion; and (vi) has not used a scanner (or any other device to communicate with LSO during the day regarding deliveries) in the past "six, seven years or more." *Burns* 18:1-19:25, 44:19-46:2, 48:4-19, 58:10-12, 67:13-68:3.

Plaintiff Harris had a different story about his experience, testifying he (i) went to LSO's Springdale facility each morning to get his deliveries for the day and returned to that facility each evening; (ii) had continuous contact "throughout the day" with LSO via a combination of phone calls and texts occurring "on average of 20, 30 times a day;" (iii) could never take breaks because "[t]he routes were stacked on top of each other;" (iv) attended all-driver meetings required by the Springdale branch manager; (v) could not turn down deliveries in his opinion without termination; and (vi) believed LSO scanners were used to "follow [him]

by the GPS" throughout the day.  *Harris* 34:5-35:25, 48:14-21, 50:21-25, 51:11-52:22, 131:13-132:4, 119:7-120:10

Oklahoma-City-Plaintiff Raymond Bright echoed Plaintiff Harris's testimony about there not being enough time during the day for breaks along with the use of scanners that purportedly tracked his every move.  *Harris* 119:13-120:2, 131:13-132:4; *Bright* 44:16-46:17. Despite these claimed limitations, Plaintiff Bright owned and operated a dry cleaning business with 4 retail locations at the same time as he was contracting with LSO.  *Bright* 15:20-16:7, 44:16-46:17. Bright used the Dodge Sprinter van he used for his dry cleaning business occasionally while making LSO deliveries.  *Bright* 26:8-19, 27:13-23, 29:3-8, 50:16-52:7.

Plaintiff Ketcham has, over the span of 20 years, contracted with four different courier companies to provide delivery services and markets himself on Facebook as an independent contractor available to provide delivery services.  *Ketcham* 6:24-7:8, 9:7-11:11,16:4-17:22, 21:15-22:2; DEF016667. Prior to contracting with LSO Ketcham purchased a Dodge Sprinter, which he uses exclusively for making deliveries.  *Ketcham* 19:19-20:8, 65:24-67:7. In 2010, Ketcham formed Ketcham Enterprises, LLC, and although it remains in operation today he asserts the company had no relationship with LSO, a position at odds with the W-9 form Ketcham filled out containing an FEIN number for Ketcham Enterprises, LLC. *Ketcham* 20:21-21:11; DEF000719.

Chattanooga-Plaintiff Darrell Carpenter did not have a side business like Plaintiff Bright, reported no deliveries for other companies while contracting with LSO as Plaintiff McHargue did, unlike Ricky and Ryan Robinson only operated a single vehicle, and, in contrast to many other Plaintiffs, worked at night.  *Carpenter* 16:2-9, 18:23-19:14, 32:18-33:25.  Carpenter learned of the opportunity with LSO from an acquaintance who asked Carpenter to take over her deliveries for a two-month period.  *Carpenter* 28:17-29:14. When the acquaintance returned from her two-month absence—Carpenter is "not really sure" what she did during the two-months away—Carpenter decided to contract directly with LSO

and service a route he thought would generate more pay than he had earned working for his acquaintance. *Carpenter* 29:20-30:10, 31:10-32:17, 34:21-36:7.

The variations in experience also extended to other areas that bear directly on elements of the economic realities test, including (1) whether LSO provided any training,[9] (2) uniform requirements,[10] (3) vehicle appearance requirements,[11] and (3) pay terms.[12]

## III.   ARGUMENT

### A. No efficient or manageable way to try the independent contractor reclassification issue exists

Whether an individual is considered an independent contractor or an employee under the FLSA is determined by the "economic reality test," which assesses the following factors: "(i) the degree of control exercised by the alleged employer over the business operations, (ii) the relative investments of the alleged employer and employee, (iii) the degree to which the employee's opportunity for profit and loss is determined by the employer, (iv) the skill and initiative required in performing the job, (v) the permanency of the relationship, and (vi) the degree to which the alleged employee's tasks are integral to the employer's business." *Krupicki*, 2014 U.S. Dist. LEXIS 46038 at *10. Courts assess each circumstance on a totality of the circumstances basis. *E.g.*, *Hernandez v. Fresh Diet, Inc.*, 2014 WL 5039431, at *2 (S.D.N.Y. Sept. 29, 2014).

Courts consistently decertify FLSA collective actions where, as here, there is no uniformity in plaintiffs' testimony as to facts bearing on the resolution of the economic realities test. *Peña v. Handy Wash, Inc.*, 2015 WL 11713032, at *3 (S.D. Fla. May 22,

---

[9] *E.g.*, *Henderson* 107:11-25 (no training); *Brewer* 47:8-48:5 (2-3 days of training learning protocols, plus a ride-along with another driver for 1-2 days); *see also Appendix A*, § 9 (providing example testimony comparisons on training).

[10] *E.g.*, *Brewer* 43:25-44:15, 45:12-24 (logo shirt, khaki pants, walking shoes); *McHargue* 21:23-22:10 (polo shirt only requirement); *see also Appendix A*, § 13 (providing example testimony comparisons on uniform requirements).

[11] *E.g.*, *Robinson* 51:15-25 (2010 or newer white cargo van required); *Bright* 29:9-14 (unaware of any requirements other than capacity for freight); *see also Appendix A*, § 14 (providing example testimony comparisons on issue of vehicle appearance requirements).

[12] *E.g.*, *Davis* 51:15-21 (paid by the piece for weekly route and paid flat rate for hotshot); *Joseph* 107:10-20 (paid based on a percentage of the job plus a portion of the fuel reimbursement); *see also Appendix A*, § 10 (providing example testimony comparisons on issue of pay terms for Contractor work).

2015)(citing *Carrera v. UPS Supply Chain Solutions*, 2012 WL 12860750 (S.D. Fla. Sept. 14, 2012) for proposition that "courts have typically denied collective certification of FLSA actions which allege employee/independent contractor misclassification" and proceeding to deny certification because of the "significant factual distinctions among the Plaintiffs which make a collective action inappropriate and unmanageable"); *Spellman v. Am. Eagle Express, Inc.*, 2013 WL 1010444 (E.D. Pa. Mar. 14, 2013)(decertifying FLSA collective action involving courier company drivers); *Hernandez*, 2014 WL 5039431, at *6 (decertifying FLSA collective action in case alleging misclassification of delivery drivers as independent contractors because disparity in testimony on control factor "greatly complicate[s] the use of representative proof either to prove the correctness of [Defendants independent contractor classification] or to rebut such a showing.")(citing *Stevens v. HMSHost Corp.*, 2014 WL 4261410, at *7 (E.D. N.Y. Aug. 27, 2014).[13]

---

[13] These individualized issues also resulted in denial of collective action certification outright in decisions that considered evidence at the opt-in notice phase of the proceeding. *See also Armstrong v. Wheels Assured Delivery Syst., Inc.*, 2016 WL 1270208, at *6 (S.D. Ind. Mar. 30, 2016)(denying conditional certification because "facts here related to [the purported employer's] alleged control over the" individuals "underscore the individualized nature of Plaintiff's contractual arrangement and compensation entitlements, and thus do not lend themselves to class-wide relief."); *Vasquez v. American Bar-Trench, Inc.*, 2014 WL 297414, at *3 (S.D. Tex. Jan. 23, 2014)("Courts in this district have generally held that the economic realities test is not appropriate for determination at the notice stage of FLSA class certification."); *Andel v. Patterson-UTI Drilling Co.*, 280 F.R.D. 287, 295-96 (S.D. Tex. 2012)(recognizing that "[t]he economic realities test 'is highly dependent on the particular situation presented,' and thus requires a fact intensive analysis" and proceeding to deny conditional certification); *Demaurao*, 2011 WL 9191, at *3 (denying FLSA conditional certification because "[t]he economic realities test is fact intensive and requires individualized analysis."); *Bamgbose v. Delta-T Group, Inc.*, 684 F. Supp. 2d 660, 669-71 (E.D. Pa. 2010)(denying conditional certification in independent contractor misclassification case because the court would need to consider each contractor's distinct relationship with the alleged employer under the economic realities test); *In re Fedex Ground Package Sys., Inc. Employment Practices Litig.*, 662 F. Supp. 2d 1069,1083 (N.D. Ind. 2009)(denying conditional certification because "the FLSA requires the court to apply an economic realities test" requiring court consideration of "the actual history of the parties' relationship," necessitating an individualized examination of the multiple factors" not conducive to class treatment); *Bouthner v. Cleveland Const., Inc.*, 2012 WL 738578, at *5-7 (D. Md. Mar. 5, 2012)(denying conditional certification in case involving allegation that defendant "systematically misclassif[ied] employees as independent contractors"); *Pfohl v. Farmers Ins. Group*, 2004 WL 554834, at *10 (C.D. Cal. Mar. 1, 2004)(denying conditional certification because "the exempt or non-exempt status of hundreds of independent contractor adjusters would need to be determined on an employee-by-employee basis" which "would be inefficient and impractical, thereby defeating the purpose of a collective action"); *Pfaahler v. Consultants*

-13-

The absence of uniformity on facts that will guide the resolution of the economic realities test compels decertification here.

1. *The degree of control exercised by the alleged employer*: An alleged employer's degree of control in the FLSA employment classification analysis requires an examination of the <u>*actual*</u> control exerted by the defendant, not its right to control. *See Dole v. Snell*, 875 F.2d 802, 806 (10th Cir. 1989); *see also Spellman*, 2013 WL 1010444, at *3 ("the test for determining whether a worker is an employee or an independent contractor under the FLSA requires an individualized examination of the worker's actual relationship with the alleged employer.").[14]  As demonstrated by the following examples, there is no uniformity among the 18 Plaintiffs who have testified, let alone the remaining 1,024 who have not.

- *Degree of supervision and instructing the worker on how to perform his duties:* The greater the degree of supervision, control over hours worked, and instruction provided on how to perform the job, the more likely it is an employment relationship exists. *See Luxama*, 2012 WL 5973277, at *4 (D. N.J. June 28, 2012); *Bamgbose*, 684 F. Supp. at 669).

---

*for Architects, Inc.*, 2000 WL 198888, at *2 (N.D. Ill. Feb. 8, 2000)("In order to determine who is an independent contractor and who is an employee, the court would be required to make a fact-intensive, individual determination as to the nature of each potential claimant's employment relationship with" the defendant in which case "certification of a collective action under the FLSA is inappropriate"); *see also Scott v. NOW Courier*, 2012 WL 1072751 (S.D. Ind. Mar. 29, 2012)(denying conditional certification in case alleging courier misclassification after noting that "[i]n FLSA cases based on misclassification claims, the precise duties and tasks performed by the employees are directly at issue")(quoting *Marshall v. Amsted Industries, Inc.*, 2010 WL 2404340, at *7 (S.D. Ill., June 16, 2010)).

[14] *E.g.*, *Luxama v. Ironbound Express, Inc.*, 2013 WL 3286081, at *10-12 (D. N.J. June 27, 2013) (finding company did not have control sufficient to render company employer of owner-operators under FLSA when owner-operators could "hire employees to assist with the delivery and pickup of cargo, and were solely responsible for the direction and control of these individuals, including selecting their wages, hours, working conditions, and paying and adjusting their grievances" (quotation omitted)); *Moba*, 16 F. Supp. 3d at 1264 (control factor weighed in favor of independent contractor status because company did not have right to control drivers under lease provisions and drivers were not on-call); *Browning v. CEVA Freight, LLC*, 885 F. Supp. 2d 590, 601 (E.D.N.Y. 2012)(finding motor carrier did not exercise impermissible control over commercial vehicle owner-operators when motor carrier did not mandate a fixed schedule and operators received "complete freedom regarding the days and times that they would operate their vehicles").

Plaintiff Burns, rarely saw any LSO management, would typically speak with an LSO employee only once during the day in the morning, and did not utilize a scanner (or any other device from LSO that would purportedly allow supervision). *Burns* 18:1-19:15, 27:11-30:5. Plaintiff Harris on the other hand testified that he had to report to the LSO warehouse in the morning and evening, constantly communicated with LSO and was tracked by LSO via a GPS scanner. *Harris* 34:5-35:25, 111:23-112:3, 119:7-17. The other Plaintiffs testified to similarly varied experiences. *See Brewer* 55:7-56:22 (had to check-in and check-out daily with dispatcher in Tennessee); *Davis* 57:8-12 (did not have to return to the warehouse when done with last delivery but would call dispatch to report he was finished); *B. Thompson* 86:15-21 (other than scanning package, he did not check-in with anyone at warehouse because no one was present); *Williams* 70:18-71:7 (picked-up directly from customer's pharmacy terminal and supervisor at pharmacy would check paperwork when returned); *see also* Appendix A §§ 1, 3, 8; *see Hernandez,* 2014 WL 5039431 at *5 (decertifying collective action, in part, because "some drivers testified that [the alleged employer] maintained minimal contact with and supervision over them such that they were free to perform their deliveries in the manner they saw fit . . . while another testified that [the putative employer] was in constant, real-time contact with him").

- *Degree of control over the worker's schedule and training.* Multiple Plaintiffs testified that they received no training before they started making deliveries for LSO. *E.g.*, Ketcham ("Q: Did you go through any type of training while at [LSO]? A: No."); *see also* Appendix A § 9 (example testimony on degree of control over Contractor schedule and training).  Other Plaintiffs testified to a minimal amount of training.  *Mulloy* 44:8-12 (ride-along only); *see also* Appendix A § 9. Still others testified to days and weeks of training on specific routes and protocols for handling packages.  *Brewer* 47:8-48:5 (completed 2-3 days of initial training plus 1-2 days of ride along); *B. Thompson* 160:25-161:15, 162:11-164:21 (trained and completed ride-along for two-week period for medical specimen route).

Control over scheduling also depended on the Plaintiff testifying. Plaintiff Carpenter, for example, began delivering for LSO after an acquaintance, Karen, asked him to take over

for "[a]bout two months" before she returned and took back over her route. *Carpenter* 28:25-30:14. Others reported difficulty in taking time off. *See Appendix A § 9*. These variations also extended to Plaintiffs testimony regarding the ability to accept or reject work. *Id*., *see Bamgbose*, 684 F. Supp. 2d at 670 (declining to certify collective action, in part, because of "opposing evidence with respect to the worker's control over his or her schedule, demonstrating that this control varies with the worker and the client.").

- *Freedom to work for others:* The "option to work for other companies in addition to" the alleged employer suggests an absence of control indicative of an independent contractor relationship. *Christianson v. NewPark Drilling Fluids, LLC,* 2015 WL 1268259, at *3 (S.D. Tex. Mar. 19, 2015) (assessing in the context of control factor the independent contractor's "option to work for other companies in addition to" the defendant). Whether the freedom to work for others existed depended upon the Plaintiff testifying. *Appendix A § 7* (providing example testimony comparisons on freedom to work for others while contracting with LSO).

Plaintiff Harris said he could not work for others because the 55 hours he averaged per week left no time to do so and "[i]t wouldn't have been profitable to." *Harris* 29:18-30:14. Meanwhile, Plaintiff McHargue delivered for BeavEx, a competitor of LSO's, and "might have done some … home deliveries" for dialysis patients "maybe a week at the most every month to make extra income." *McHargue* 33:10-34:6, 44:14-46:5, 61:12-63:6, 66:21-68:1. Other Plaintiffs testified to similar contrasting experiences. *Roper* 46:3-18 (could not have done anything but be on-call for hotshot pharmaceutical deliveries); *Renne* 14:24-15:10, 31:15-32:7, 34:24-35:9 (drove total of 70 hours per week for LSO and two other courier companies); *Williams* 15:22-16:25, 65:14-68:4 (drove a taxi during same time she delivered routes for LSO); *see also Appendix A § 7*.

- *Ability to negotiate for work or turn down work without repercussion:* Negotiating for work and turning down work without repercussion are both indicative of independent contractor status. *Christianson,* 2015 WL 1268259, at *3 (assessing in the context of control factor the independent contractor's "freedom . . . in negotiating day rates, choosing which work to accept and which to decline").

Plaintiff Harris said "if you refused to take [a delivery] you would be terminated" during his deposition, a position at odds with Ketcham's testimony that he turned down work and that another contractor, Ned, would as well. *Harris* 92:15-20; *Ketcham* 33:23-25, 82:22-83:11; *see also* DEF000982-983, ¶8 (stating he took deliveries the manager gave him from other drivers). He also testified that "it wasn't possible" to negotiate with LSO on a delivery rate because of "corporate policy." *Id.* 76:24-78:16. He attempted to reconcile his testimony with his prior written statement that another driver received 2.5 times more than he did for the same delivery, explaining that the pay differential must have resulted from the Springdale branch manager "playing favorites." *Id.* 80:25-82:24; DEF000982-983, ¶4.

Some Plaintiffs testified that they risked termination if they turned down a delivery opportunity. *Bright* 79:4-11 (bulletin board said "You don't deliver the freight, we'll find someone that will"); *see also Appendix A § 2*.   Other Plaintiffs described some negative reactions or slow work after declining work. *Carpenter* 25:19-26:5; *B. Thompson* 72:13-73:10 (was taken off the call list for turning down a run).   Still others like Plaintiff Williams, who ran hot-shots, testified that she turned-down runs when she was tired.   *Williams* 63:19-23; *see also Webb Decl*. ¶¶6-8 (explaining difference between "On-Demand Delivery, which are sometimes referred to as a 'hot shot' delivery", a Scheduled Delivery, and Distribution Delivery).   Plaintiff Roper, who similarly ran on-call hot-shots, testified that she could give her run to another driver.   *Roper* 41:17-20.   Plaintiff Burns would just ignore messages LSO would text Contractors asking if anyone would take an extra stop, but would often adjust his schedule to accommodate requests directly from the customer—Vanderbilt University—to "change something up." *Burns* 23:20-24:3; 51:14-52:1.

Such variation in "the testimony of collective class members [about] the ability of drivers to refuse certain routes without negative repercussions" illustrates "the need for individualized examinations of" LSO's purported control. *Spellman*, 2013 WL 1010444, at *4 (E.D. Pa. Mar. 14, 2013).

• *Whether the individual or the alleges employer retained authority over operation of the equipment*: Cases addressing employment classification disputes in the transportation

industry consider the individual's ability to select the pickup and delivery routes, choose where to finance and repair the vehicle; and elect where to obtain insurance along with gas and oil stops. *E.g.*, *Luxama*, 2012 WL 5973277 at *4.

Springdale-Plaintiff Manske performed maintenance and repairs on the vehicle he used for LSO deliveries, while Tulsa-Plaintiff Henderson said he was required to lease a vehicle through a third-party and all maintenance was scheduled. *Manske* 28:25-29:8; *Henderson* 12:5-22. Fort Worth-Plaintiff Ryan Robinson's dad, selected the insurance that would cover his company's trucks and purchased a more expensive policy for better coverage. *Robinson* 32:15-37:13. Plaintiff Bright elected an insurance policy that provided the best rate. *Bright* 20:17-25.

- *Ability to use substitute drivers to run routes*: An individual who can hire others to perform the work suggests an independent contractor relationship exists. *Luxama*, 2012 WL 5973277 at *5. Plaintiff Harris testified he could not hire others. *Harris* 137:19-138:8. Plaintiff Carpenter knew first-hand that he could—before contracting with LSO he was hired by an LSO Contractor to perform her routes. *Carpenter* 28:17-29:14. Plaintiff Brian Thompson similarly worked for and was paid by another driver for a period of time. *B. Thompson* 28:3-29:18. That "some couriers use helpers or substitutes to complete deliveries [while o]thers use no subcontractors whatsoever" militates in favor of decertification. *Carrera*, 2012 WL 12860750, at *9.

2. *Worker's investment*: When an individual has an investment in the equipment necessary to complete services and operate a business it suggests an independent contractor relationship exists. *See, e.g., Krupicki v. Eagle One, Inc.,* 2014 LEXIS U.S. Dist. 46038, at *17 (E.D. Ark. Apr. 3, 2014)(concluding "investment factor" indicated the plaintiff-driver was properly classified as an independent contractor given he "purchased a 2003 Chevrolet Express van to make some of his deliveries" and "was required to pay for fuel, maintenance[,] repairs, and insurance").

Again, there is no uniformity in the evidence the Plaintiffs provided. *Burns* 13:22-16:10 (purchased two cars, one for his daughter who drives for LSO); *Robinson* 27:1-13, 29:7-24,

30:17-33:5 (leased and purchased several vehicles along with son for multiple driver operation and more cargo); *Davis* 22:12-23:7 (owned two cargo vans, one for a back-up); *Henderson* 12:5-22 (LSO mandated lease of box truck from Bush Leasing); *Coradini Decl.* ¶ 5 ("I maintain more than one vehicle so that I will always have one to drive and one for back-up for my routes. At times, I have as many as three vehicles. I have modified my current vehicles so that there is no passenger seat and replaced it with a desk for purposes of using it for work while I am on the road."); *see also Appendix A* § 6. These differences militate in favor of decertification. *See Peña*, 2015 WL 11713032, at *4-10 (granting motion to decertify where plaintiffs operated their own vehicles, leased-to-own vehicles from the putative employer, or leased vehicles owned by the putative employer); *Spellman*, 2013 WL 1010444, at *5 (E.D. Penn Mar. 14, 2013)(finding the investment factor could weight in favor of or against employment status because of varying testimony where plaintiffs "used cars they already owned, while others purchased cargo vans to be eligible to perform a broader range of deliveries").

3. *The degree to which the employee's opportunity for profit or loss is determined by the employer*: A worker who can generate a profit or loss as a result of their services is generally an independent contractor. *Christianson*, 2015 WL 1268259, at *4 (need for individualized analysis of, *inter alia*, opportunity for profit or loss factor in economic realities test requires denial of collective action certification); *see also FedEx Home Delivery v. N.L.R.B.*, 563 F.3d 492, 497 (D.C. Cir. 2009).   Plaintiffs' testimony point to varying opportunities for profit and loss, including differences in pay terms, control over routing and scheduling, the size of their vehicles to carry different amounts of cargo, as well as the decision to add vehicles and hire drivers to operate those vehicles. *E.g.*, DEF000982 (Plaintiff Harris complaining that he receives "$26.37" for certain work and another Contractor receives "$78.00 for the same route and probably more"); *Robinson* 27:1-13, 29:7-24, 30:17-33:5 (leased and purchased several vehicles along with son for multiple driver operation and more cargo); *Carpenter* 32:18-34:4 (purchased Chevy HHR to make deliveries because "Chevrolet parts [are] sometimes [] cheaper to repair" and "it was a – an SUV, and

that gave me more room to load things. They also said that they would – [LSO] said they would pay me more if I had an SUV.") *see also* Appendix A §§ 6,7, 9-10; *Krupicki*, 2014 U.S. Dist. LEXIS 46038, at *18.[15]

4.   *The skill and initiative required in performing the job*: A driver that manages the order of deliveries or route to take for a delivery in order to maximize profits and minimize losses, as well has the ability to reject work that may not be profitable, is generally considered an independent contractor.  *Browning*, 885 F. Supp. 2d at 608-609 (quoting *Bonnetts v. Arctic Exp., Inc.*, 7 F.Supp. 2d 977, 981-82 (S.D. Ohio 1998) (in the transportation industry, driving a vehicle with "loads of cargo requires a significant degree of skill," including skill in handling the vehicle and detailed knowledge of the roadways); *Solis v. Velocity Express, Inc.*, , 2010 WL 3259917, at *6 (D. Ore. 2010)(citing cases finding that driver's ability to select preferred route and, thus, control the time spent working was indicative of independent contractor status). The degree of skill and initiative Plaintiffs reported varied widely.  *Brewer* 83:6-85:13 (every day she delivered to the same locations for DHL in the order and per the mapped route, although she had discretion on how to incorporate pharmaceutical deliveries to save fuel and time); *Bright* 39:2-18, 40:14-41:12 42:7-44:15 (used program to determine efficient order of stops, used GPS to sometimes determine best roads to take, maintained discretion to change the route and incorporate residential customers when efficient to do so); *see also* Appendix A § 11.

5.   *The permanency of the relationship*: Courts consider the exclusivity, length, and continuity of the relationship in assessing the degree of permanence factor. *Zents v. Baylor Trucking Co.*, 2013 WL 1500678, at *9-10 (N.D. Ohio Apr. 13, 2013) (that owner-operator worked only a "short duration" of seven weeks for motor carrier "weighs in favor of a finding

---

[15]  Where opt-in Plaintiffs display divergent opportunities for profit and loss compels decertification is appropriate.  *See* Carrera, 2012 WL 12860750, at *8 (decertifying collective action and citing *Andel*, 280 F.R.D. at 294, for proposition that "ability to control his opportunities for profit and loss also varied significantly, including how much he spent on equipment and supplies, whether or not he purchased general liability insurance, and whether or not he paid an assistant to help with bookkeeping," militating in favor of decertification ).

that [the owner-operator] is an independent contractor."); *Christianson*, 2015 WL 1268259, at *4 (denying conditional certification, in part, because of permanency of the relationship analysis was not susceptible to adjudication through representative evidence given differences on time periods worked and variety of schedules proposed class members worked).

Plaintiff Harris provided services exclusively for LSO; Plaintiff McHargue—among others—did not.  *Harris* 29:18-30:14; *McHargue* 33:10-34:6, 44:14-46:5, 61:12-63:6, 66:21-68:1, *see also Appendix A § 7*.   Some Plaintiffs worked a day or two in total; others have spent years contracting with LSO. *M. Thompson* (worked a week); *Robinson* 38:2-39:9 (first contracted in 2015 and is still driving for LSO); *Webb Decl.* ¶25; *see also Appendix A § 12*.

6.   *The degree to which the alleged employee's tasks are integral to the employer's business*: Integration of a worker's services into the business operation of the putative employer's business tends to suggest an employment relationship exists. *Krupicki*, 2014 U.S. Dist. LEXIS 46038 at *10.   Because this inquiry contemplates an assessment of LSO's business *vis-à-vis* the Contractors service, LSO acknowledges an evaluation of this factor might be possible without need for the testimony of each Plaintiff; however, "a collective action . . . cannot be maintained when the class appears similarly situated with respect to only one factor." *Bamgbose*, 684 F. Supp. 2d at 672 (denying collective action certification after noting this factor conceivably could be evaluated on a representative basis).

Moreover, whether Contractors are integral to LSO's business is of less moment than in other contexts. Motor carriers have engaged the services of independent contractors to provide vehicles and perform deliveries for decades and the federal government regulates their relationship.   *See* 49 C.F.R. Part 376 (authorizing and regulating a motor carrier's transportation of property using the equipment and services of others and mandating, at 49 C.F.R. § 376.12, that such services be provided under a written contract); *Krupicki*, 2014 U.S. Dist. LEXIS 46038 at *10 (finding plaintiff failed to meet burden of proof of employee status, despite finding that "integral" factor favored plaintiff as delivery driver); *Moba v. Total Transp. Svc. Inc.,* 16 F. Supp. 3d 1257, 1265-66 (W.D. Wash. 2014)(disregarding factor

entirely in independent contractor analysis); *Browning*, 885 F. Supp. 2d at 610 (finding independent contractor drivers were integral to logistics company's business, but that "this factor only weighs slightly in favor of" an employment finding and "would not prevent this Court from finding, as a matter of law, that the Plaintiffs are independent contractors"); *FedEx Home Delivery*, 563 F.3d at 502 (indicating the integral to business factor is not "determinative . . . in the face of more compelling countervailing factors").[16]

### B. Discovery belies existence of policies common to Plaintiffs

Beyond demonstrating the same types of variations that lead numerous courts to conclude FLSA independent contractor disputes are not amenable to collective resolution, Plaintiffs' testimony belies the existence of purported policies Plaintiffs claimed were common to every Contractor, including:

1. *Plaintiffs claimed LSO "Requir[es] all drivers/couriers to use communication equipment compatible with [LSO's] operating system" Brief in Support of Motion for Certification of Collective Action*, p.16 (ECF No. 25). During Plaintiff Harris' deposition he provided the foundation for the belief that all contractors used and/or were charged for scanners—LSO was not "stupid enough to have different requirements." *Harris* 88:16-89:1. Several Plaintiffs testified that they completed their deliveries without communication equipment like a scanner. *Carpenter* 39:25-40:3; *Ketcham* 93:25-94:2; *McHargue* 21:15-22; *Renne* 55:22-56:23; *B. Thompson* 89:14-19. Plaintiff Davis testified that he had been required to use a scanner when delivering for one customer, but that the customer he currently drove for did not require a scanner. *Davis* 67:13-68:3. Plaintiff Burns had similar testimony. *Burns* 67:13-68:3.

---

[16] *See also Layton v. DHL Exp. (USA), Inc.*, 686 F.3d 1172, 1180 (11th Cir. 2012)(analyzing integral nature of business factor in context of FLSA joint employment inquiry, and casting doubt on drivers being integral to a supply-chain-management operation given "Drivers performed most of their work away from DHL's facilities and supervision; they did not work side-by-side with other DHL employees. Drivers also operated vehicles not owned by DHL, and they were not contractually restricted from using those vehicles to serve other companies needing delivery services").

2.  *Plaintiffs claimed "Defendant also implements at least some common training programs designed to obtain compliance from all Drivers".* ECF No. 25, p.16.  Plaintiffs supported this assertion with citations to a Launch 180 Program referenced on LSO's website. ECF No. 24-8, p.12; *see also Compl.* ¶31-36. When asked "[a]re you familiar with the Launch 180 program" Plaintiff Carpenter responded "no, sir." *Carpenter* 40:19-21. Others were similarly quizzical, and for good reason: LSO never implemented it. *Moyer* 49:7-20, 88:23-89:13; *Carpenter* 40:19-21; *Blassingame* 34:5-7; *Burns* 48:20-22; *Ketcham* 97:24-25. And given the variation in testimony from Plaintiffs both at the same location and at different branches regarding training, no such "common training programs exist." ECF No. 25, p. 16; *see also* Appendix A § 9.

For example, the three Springdale Plaintiffs who were deposed each gave different testimony on the amount of training they received. *Ketcham* 98:1-3; 106:22-25 (no training); *Harris* 148:13-20 (training took only a few minutes and a few words to explain); *Manske* 97:13-21 (two hours of training spread over three days).  Tulsa Plaintiffs gave opposite views of training.  *Roper* 92:12-19 (completed two days of training); *Henderson* 107:14-108:1 (no training).  Oklahoma City Plaintiffs likewise had no congruency.  *McHargue* 21:7-9 (no training); *Bright* 113:12-114:1 (couple hours training on first day of work).

3.  *Plaintiffs claimed LSO required written permission from before driving for other companies.* ECF No. 25, p.16. *None* of the Plaintiffs who drove for other companies claims to have been required to obtain permission.  Plaintiff Renne testified that he was not sure if he informed LSO that he was driving for other companies, but no one ever told him he could not drive for other companies.  *Renne* 112:4-114:24. Plaintiff McHargue testified that he was free to drive for another company while he contracted with LSO, so he did. *McHargue* 33:10-20; *see also* Appendix A § 7.

4.  *Plaintiffs claimed that "Defendant require[d] all Drivers to wear photo identification badges" and "created a Uniform and Grooming Expectations policy for Drivers to follow."* ECF No. 25, p. 5. When present, uniform requirements are generally afforded little emphasis because they typically emanate from customer mandates and are "ancillary

to [a contractor's] independent driving." *E.g.*, *FedEx Home Delivery*, 563 F.3d at 518 (D.C. Cir.. 2009); *DeSouza v. EGL Eagle Global Logistics LP*, 596 F. Supp. 2d 456, 464-65 (D. Conn. 2009).

Pardoning the pun, the Plaintiffs provided no uniformity regarding uniform and grooming requirements. Two Plaintiffs testified that they were not aware of any such grooming standards. *Davis* 70:12-21 (not aware of any grooming standards other than logo shirt and cap); *Renne* 94:12-23 (received no standards for appearance other than logo shirt). As for uniforms, testimony spanned the spectrum from no uniform requirement at all to a hat, shirt, pants, and shoes requirement. *See Appendix A § 13*.

5.  *Plaintiffs claimed that LSO "subject[ed] [Contractors] to common policies regarding pay"* ECF No. 25, p.18.  Plaintiff Harris admitted during his deposition that he knows that at least one driver was paid more than him for the same work, but denies that drivers negotiated their pay.  *Harris* 74:23-78:11. Others testified that they did attempt to negotiate with LSO regarding their pay.  *Henderson* 63:11-25; 92:9-22; *Davis* 52:6-15.  Indeed, Plaintiff Henderson would ask for a rate increase and when declined by LSO, would simply not accept the work.  *Henderson* 63:11-25.

Nor did Plaintiffs' testimony reveal a "uniform" pay policy. *See generally Appendix A § 10*. Three Plaintiffs testified that they were paid by the piece delivered.  *Henderson* 45:20-46:19 (paid by the piece); *Bright* 47:15-21 (paid by the piece); *Robinson* 28:16-21 (paid by piece).  Four Plaintiffs were paid flat rates for each stop, route or delivery.  *Williams* 40:5-20, 41:25-42:10 (paid flat rate for route); *Ketcham* 75:18-76:10 (paid per stop); *Brewer* 39:10-13 (paid flat rate, by the mile).  Five Plaintiffs testified that they were paid differently depending on the product delivered or customer being serviced.  *Harris* 97:1-98:15 (paid by piece for office products, paid flat rate plus per stop for pharmaceutical deliveries, stop plus arrangement for post office deliveries and returns); *Manske* 60:24-61:17 (paid per piece for office products, flat rate for pharmaceutical route);  *B. Thompson* 67:25-68:15, 69:3-18, 138:11-22 (paid per stop or per mile, depending on product being delivered); *Davis* 51:15-21 (paid by the piece for weekly route and paid flat rate for hotshot); *Roper* 37:11-23 (paid

flat rate for in-town deliveries and per mile for out-of-town deliveries); *McHargue* 28:15-22 (weekly route pay).  Plaintiff Renne gave unique testimony that he was paid a percentage of the job plus a portion of the fuel reimbursement.  *Renne* 107:10-20.

6.  *Plaintiffs claimed that* "*Defendant even retained the right to permanently paint lettering, advertisements, slogans or designs on the vehicles [and] required [Contractors] to keep their vehicle in a clean appearance.*" ECF No. 25, p. 16.  As with their other assertions, Plaintiffs' papers do not match the experience the *actual Plaintiffs* reported, which varied depending on the Plaintiff testifying.  *Blassingame* 35:2-36:13 (placard in dash when made deliveries, noting some vehicles had magnetic signs but he never received them); *Davis* 85:11-13 ("Did you ever have to – did Express ever inspect your vehicle?; A: No."); *Mulloy* 44:8-24 (corporate policy "to have van washed. They had to inspect it. It had to be clean.") *see also* Appendix A § 14.

The absence of uniform policies, procedures, or plans that violate the law belie Plaintiffs' efforts to proceed on a representative basis. *White v. 14051 Manchester Inc.*, 301 F.R.D. 368, 376 (E.D. Mo. May 30, 2014)("The Court decertifies this action because it would be untenable for this case to proceed on a collective basis when there is no uniform policy, nor shared experience and, consequently, representative testimony could not be presented regarding any shared experience."); *Andel*, 280 F.R.D. at 280 (denying conditional certification after considering evidence and concluding "[s]imply put, because the named plaintiffs cannot clearly be deemed FLSA employees without individualized analysis, neither can the putative plaintiffs. As such, certifying a [collective] action under these facts would be inappropriate and, quite simply, would not promote judicial economy.").

### C. Plaintiffs have not offered any basis on which to demonstrate the liability or damage elements of their overtime claim

Even if Plaintiffs' relationships had lent themselves to a uniform resolution of the misclassification question, that is only the first element Plaintiffs must establish and has no bearing on the remaining elements of either their FLSA overtime or minimum wage claims. *See* 29 U.S.C. § 203(e)(1)(FLSA only applies to an "employee").  The remaining

elements of proof each Plaintiff must establish to recover on the overtime claim are (1) that the individual worked over 40 hours in a given pay period (the liability determination), and (2) the number of hours over 40 that individual worked (the damages determination). *Douglas*, 888 F.Supp.2d at 934 ("to establish liability under the FLSA for any particular week, plaintiffs must demonstrate they worked more than 40 hours that week. Thus, the determination of the number of hours worked by each class member each week is a threshold issue of liability"). Because the FLSA collective action is a form of joinder that cannot alter substantive rights of the parties in litigation, each Plaintiff must proffer evidence to establish the liability and damages elements of their claim to recover. *See Shady Grove*, 559 U.S. at 408; *Douglas*, 888 F.Supp.2d at 934.

Plaintiffs have offered no details for how any liability or damages determination on the overtime claim could occur in an efficient and manageable way. Discovery destroys any suggestion that either inquiry is susceptible to resolution on a representative basis. *See Peña*, 2015 WL 11713032, at *10 ("the Court cannot ignore the significant factual distinctions among the Plaintiffs which make a collective action inappropriate and unmanageable"); *Douglas*, 888 F. Supp. 2d at 936 (granting motion to decertify "due to the disparate facts of each plaintiff and [defendant's] individualized defenses, it would be very difficult to appropriately adjudicate the claims of the named plaintiffs and the approximately 256 opt-in plaintiffs collectively" because "[e]ach plaintiff['s] case requires consideration of different background facts and different testimony based each driver's activities").

In *Douglas* the court recognized that because of differences in each driver's routes, duties performed, and the inability of one driver to "testify as to how long another driver's route took to complete, this inquiry will necessarily require individualized testimony from each driver." *Douglas*, 888 F.Supp.2d at 934. These same impediments to resolving liability exist here. Plaintiffs explained they had no knowledge of how many days or hours any other Contractor worked or even whether they worked at all. Plaintiff Blassingame, for example,

when asked if he had documents that would explain what occurred or any given day or whether individual's testimony is needed to make that determination, responded:

> A: None that I have. And – and I challenge anyone, including [LSO], to come back now and look at this or any other and tell you what a day is like. Because, you know, as we've kind of alluded to here, every day was – it's a different experience at [LSO]. The only –the only standard is, is that you report to work and you do what's asked.
> Q: And the only way to know what the experience was like each day would be to ask each of the drivers individually?
> A: Pretty much.

*Blassingame* 62:23-63:18.

Plaintiff Bright likewise knew nothing about what other Contractors were doing:

> Q. Do you know what other drivers were doing at any given point?
> A. No. I don't really know anything about other drivers.

*Bright* 30:10-13.

Others, such as Plaintiff Renee, testified work frequently varied with each day being different than the other before:

> Q.   Was every day that you drove for [LSO] different than the one before?
> A.   Yes.
> Q.   The locations that you were delivering to were different?
> A.   Yes.
> Q.   The distances you were driving were different?
> A.   Yes.
> Q.   The packages you were delivering were different?
> A.   They may be computer parts, but different varieties, different types of computer parts.
> Q.   And also what was different was whether or not you were making deliveries on the same day for Hackbarth or Courier Express, right?
> A.   Could be, yeah.
> Q.   And the time of day when you were making deliveries was different each day.
> A.   Yes.

*Renne* 82:2-83:2.

Such variations are inherent in the transportation work each Plaintiff performs that impedes resolution of the claims on a representative basis here. *See Rios v. Current Carrier Corp.*, 2015 WL 1443058, at *2 (D. Mass. Mar. 30, 2015)(denying conditional certification,

in part, because Plaintiffs "worked alone as couriers out on the road" and had little interaction with other drivers); *Douglas,* 888 F.Supp.2d at 935 (granting the court decertification motion because "each driver's testimony concerning how long his or her routes and other duties took one week have no bearing on how long another driver's duties took that week.  This is shown by the deposition testimony of various drivers signifying variations from one person to another.").

Testimony at trial is the only way to ascertain whether any Plaintiff worked more than 40 hours in a week.  While Plaintiffs may suggest some lesser form of evidentiary submission, Section 216(b) does not obviate or relax the federal rules of evidence.[17] Affidavits and declarations submitted without cross-examination are hearsay in an individual case and remain hearsay in a collective action.

The Plaintiffs' testimony in this case demonstrates the need for such cross examination. Plaintiff Carpenter signed an interrogatory claiming he worked 60-70 hours per week on average.  *Carpenter Ans. to Rog. No. 1.*  During his deposition he told a different story.  On cross-examination, Carpenter testified "there's times a week would go by and there were no deliveries," and that "a very big fluctuation with schedules and hours" existed.  *Carpenter* 36:16-24; 37:10-15.  When his lawyer conducted the examination, Carpenter decided "a roundabout estimation [of] maybe 55 hours" per week if slow weeks were excluded on direct examination from his lawyer.  *Carpenter* 68:13-25. After being asked on re-cross how many weeks in a year "you typically average the 55 hours in a week," Carpenter testified "I don't even know if I can estimate that right now" and proceeded to provide the following testimony regarding the slow weeks he had with few, if any, deliveries:

---

[17] *Anderson v. Mt. Clemons Pottery Co.,* 328 U.S. 680 (1946), holds no different. In that case, the United States Supreme Court held that an employer's failure to maintain legally required records of the amount of time worked limited the extent to which the employer could challenge the *precision* of the amount of work the employee claimed to have worked for purposes of establishing the amount of damages. It did not eliminate the employer's right to cross examine the employee about the basis for his estimate or relieve him of his obligation to provide that estimate under oath and in court.

Q. And how frequently did that occur in which there were slow weeks with not as many deliveries?

A. It – it's somewhat of a guess, but maybe three to four times every six months, maybe. I – I'm  -- I'm not really clear on what that would be. I'm not really sure.

Q. So it could have be three to four weeks out of every six months?

A. Maybe.

Q. But it could be more.

A. Maybe.

*Carpenter* 70:15-71:2.

Plaintiff Renne similarly gave a higher estimate of weekly hours in his interrogatory answer than his deposition testimony. *Renne Ans. to Rog No. 1* (50-60 hours per week); *Renne* 31:21-32:7 (50 hours per week for six months and 12 hours per week for another six months).  Many other Plaintiffs rebutted the Complaint's assertion that drivers worked 50-55 hours per week as well. *Compl.* ¶ 69; *e.g., Bell Ans. to Rog. No. 1* (10-15 hours per week); *Burns Ans. to Rog. No. 1* (30 hours per week); *see also Appendix A § 4*.

Moreover, some Plaintiffs would not be entitled to overtime even if they are found to be employees and worked more than 40 hours in a week. The FLSA's Motor Carrier Act Exemption precludes drivers who operate commercial motor vehicles to transport goods in interstate commerce. 29 U.S.C. 213(b); *see also Williams v. Central Transport Int'l, Inc.,* 830 F.3d 773 (8th Cir. 2016)(addressing history of Motor Carrier Act Exemption in context of case involving worker with responsibility for loading trailers); *Krupicki,* 2014 U.S. Dist. LEXIS 46038 at *23-30 (concluding that the MCA Exemption applied to plaintiff—a Contractor who contracted with EagleOne, which now operates as part of LSO following LSO's purchase of the company—and plaintiff was therefore exempt from overtime).

Plaintiffs have acknowledged the difference in vehicle sizes depending on the Contractor—Plaintiff Brewer testified she drove a box truck registered with the FMCSA, Plaintiff Ryan Robinson drove a box truck, and others recalled Contractors with box trucks who made deliveries. *Brewer* 133:2-16; *Robinson* 31:5-13; *Harris* 114:2-18; *Bright* 48:6-10; *Henderson* 129:1-7; *Ketcham* 77:9-11; *Blassingame* 74:12-17; *Manske* 45:3-11; *B. Thompson* 155:4-8.  Whether any Plaintiff operated one of these trucks and transported product in interstate commerce such that the MCA Exemption would apply creates an individualized

defense impeding the efficient resolution of FLSA claims on a representative basis. *E.g.,*
*Harrison v. Delguerico's Wrecking & Salvage, Inc.*, 2016 WL826824, at \*\*6-8 (E.D. Pa. Mar.
2, 2016)(decertifying FLSA collective action, in part, hearing of individualized Motor Carrier
Act exemption defense); *Rojas,* 2015 WL 5084135, at \*6 (decertifying FLSA collective action
because "determination of whether an employee is covered by the FLSA or the MCA requires
an individual factual inquiry regarding the actual work performed by each individual
employee.").

### D. No efficient or manageable method for trying the FLSA Minimum Wage claim on a collective action basis exist

Plaintiffs allege that "[a]fter deducting for expenses related to the operation of Plaintiffs'
vehicle in the course of performing job duties for [LSO], Plaintiffs' pay regularly fell below
the" FLSA minimum wage. *Compl.* ¶ 73. During the course of discovery, Plaintiffs have
indicated their intent to prove liability and damages on this claim using this formula: "(1)
Weekly Pay – Miles Driven Per Week x IRS Mileage Rate = True Gross Pay Per week; (2)
True Gross Pay Per Week/Hours Worked Per Week = True Net Pay Per Hour; (3) (Minimum
Wage – True Net Pay Per Hour) x Hours Worked Per Week = Total Unpaid Minimum Wages
Per Week." *See, e.g., Burns Ans. to ROG No. 1.*

As an initial matter, Plaintiffs efforts to use the *Mt. Clemens* decision as support for
estimating expenses to calculate possible minimum wage violations is improper. *Mt.*
*Clemens* teaches that a plaintiff may use estimates to prove damages for an FLSA violation
only when (1) the employer fails to keep records required by the FLSA, and (2) the
employer's liability has already been determined. 328 U.S. 680. Neither of these *Mt.*
*Clemens* conditions exist here: the FLSA imposes no obligation on an employer to obtain or
maintain vehicle expense records or an employee's mileage, and Plaintiffs have not
established liability —that is, proving a given individual's wages fell below minimum wage
in any given work week because of vehicle expenses actually incurred as a result of the
work. *Hensley v. MacMillan Bloedel Containers, Inc.*, 786 F.2d 353, 357 (8th Cir.
1986)(quoting *United States v. Klinghoffer Bros. Realty Corp.*, 285 F.2d 487, 490 (2d Cir.

1960))(holding that no violation of 29 U.S.C. § 206(a) occurs "so long as the total weekly wage paid by an employer meets the minimum weekly requirements of the statute, such minimum weekly requirement being equal to the number of hours actually worked that week multiplied by the minimum hourly statutory requirement.").

And the vehicle expenses Plaintiffs incurred varied significantly by the individual. Plaintiff Ryan Robinson since April 2016 has not paid any expenses according to his father, Ricky Robinson, because all expenses were run through the company they started, RJC Couriers. *Robinson* 7:3-19, 29:25-30:16. Plaintiff Burns drives 100 miles per day by his estimation, spends the majority of his time walking to make deliveries, and uses the same car for personal use and deliveries. *Burns* 13:22-14:14, 19:12-20:23. Still others like Plaintiff Brewer did not pay for her vehicle either, and her 16-foot box truck gas and maintenance expense presumably exceeded those incurred by Plaintiff Burns in the operation of is Toyota Camry. *Brewer* 125:23-25. And yet others who were not deposed, but provided discovery responses had drastically different estimates on miles driven as-between interrogatory responses and documents submitted with tax forms in support of mileage reimbursements. *Compare, e.g., Fowler Ans. Rog. 1* (estimating 345 miles/week (17,940 miles/year)), *Overbay Ans. Rog. 1* (estimating 1,500 miles/week (78,000 miles/year)), and *Harris_Fowler,Ronald_1-2* (31,700 miles driven), *Harris_Overbay,Curtis_6-7, 38-39* (26,420 miles in 2013, and 4,910 miles in 2014).[18]

The number of hours worked varied too. Some worked part-time. E.g., *M. Thompson* 30:12-21; *Renne* 31:15-32:4; *see also* [Appendix A § 4](#). Others claimed to work over 40 hours per week, but on cross-examination acknowledge some of that time involved making deliveries for other companies, working out at a fitness club, eating lunch, or running personal errands. [Appendix A § 4](#). None of this information would have come to light

---

[18] *See also compare Ryte Ans. Rog. 1* (1,500 miles/week (78,000 miles/year)), Martin Ans. Rog. 1 (500 miles/week (26,000 miles/year)), *and Harris_Martin,Stephanie_10-11* (63,165 miles/year), *Harris_Ryte (Webb),Amanda_6-7* (13,903 (Jan-May 2014)).

without cross-examination. *Id.* (comparing interrogatory responses to information obtained in depositions).

Again, this testimony contrasts with other testimony that drivers were not allowed such free time. *Mulloy* 41:8-18; *Harris* 131:13-132:4; *Williams* 90:11-22. And while Plaintiffs have refused to provide a trial plan, any attempt here to substitute estimates for live testimony would eviscerate LSO's due process rights, preventing LSO from exploring as to each Plaintiff for each pay period the (1) hours worked; (2) type of vehicle driven; (3) whether the vehicle was driven for personal use also; (4) how many miles the individual drove; and (5) vehicle expenses (gas, oil, maintenance, and insurance) incurred.

The absence of each Plaintiff's live testimony would also obstruct LSO from challenging the credibility of each Plaintiff on issues that impact the resolution of each of their claims. In an individual trial, LSO could raise Plaintiff Brewer's criminal record involving crimes of dishonesty to challenge her credibility on the number of hours worked and miles driven. DEF016634-016666. *Martin v. Citizens Fin. Group, Inc.*, 2013 WL 1234081, at \*7 (E.D. Pa. Mar. 27, 2013)(decertifying collective action, in part, because "individualized defenses" like questions about an opt-in plaintiff lying "about being fired from a previous bank for theft . . . would not help the fact-finder assess the credibility of any other Plaintiff" and accordingly creates "practical implications of resolving the myriad credibility disputes at play" that "destroy the efficiency sought to be gained through a collective action."). Likewise, LSO would have the opportunity in individual trials to question the variations in mileage reported to the IRS vis-à-vis interrogatory responses here by Plaintiffs Ryte, Webb, Fowler, and Overbay. Such discrepancies extend to the employment misclassification element of Plaintiffs claims as well given, for example, variations in Plaintiff Ryte's interrogatory responses and tax records regarding work performed for other companies while contracting with LSO. Ryte Ans. to Rog. No. 5; Harris_Ryte, Amanda_000007-8. LSO "has a right to attack the accuracy of testimony" and "[g]iven the individualized inquiry involved in this

line of credibility questioning and the distraction that this questioning would pose to the underlying issues" decertification is required.  *White*, 301 F.R.D. at 377.[19]

## IV.   CONCLUSION

The fact-intensive analysis attendant to resolution of the economic-realities test, overtime claim, and minimum wage claim are incapable of representative adjudication here. The collective action procedural mechanism cannot alter how each Plaintiff's claims are processed, and the evidence collected to date shows that each Plaintiff's testimony about their personal experience matters to the resolution of their claims. The Court must decertify the FLSA collective action.

---

[19] *See also Hinojos v. Home Depot, Inc.*, 2006 WL 3712944, at *3 (D. Nev. Dec. 1, 2006)( "The Court does not believe that this action would be manageable at trial because of the need for individualized determinations to resolve the claims of each plaintiff. In particular, the Court is concerned about the contradictions between plaintiffs' declarations and their deposition testimony, which show the importance of cross-examination of each plaintiff. This suggests the need for separate mini-trials to resolve each individual's claim. Such a result is the antithesis of collective action treatment and would overwhelm the judicial system and eliminate any judicial efficiency that might be gained through a collective approach.").

Respectfully submitted,

**EXPRESS COURIER INTERNATIONAL, INC.**

By:*/s/Adam C. Smedstad*
     Adam C. Smedstad
     *Pro Hac Vice*
     asmedstad@scopelitis.com
     Andrew Butcher
     *Pro Hac Vice*
     abutcher@scopelitis.com
     SCOPELITIS, GARVIN, LIGHT, HANSON
       & FEARY, P.C.
     1850 M Street, N.W., Suite 280
     Washington, DC 20036-5804
     Telephone: 202-551-9030
     Facsimile: 202-296-9433

     Emily A. Quillen
     *Pro Hac Vice*
     equillen@scopelitis.com
     SCOPELITIS, GARVIN, LIGHT, HANSON
       & FEARY, P.C.
     801 Cherry Street, Suite 1075
     Fort Worth, Texas 76102
     Telephone: (817) 869-1700
     Facsimile: (817) 878-9472

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 14, 2017, upon electronically filing the foregoing document, a copy of same was served on all counsel of record via the court's ECF system.

/s/ Emily A. Quillen

## Appendix A: Example comparison of Plaintiffs' testimony

| Section | Example Discovery Response |
|---------|---------------------------|
| § 1 (example comparison on frequency of communication with LSO) | **Brewer** 55:7-56:22 (had to check-in and check-out daily with dispatcher in Tennessee); **Davis** 57:8-23 (did not have to return to the warehouse when done with last delivery but would call dispatch to report he was finished); **Manske** 20:12-17 (required to call-in to branch manager with progress reports throughout the day); **McHargue** 22:22-24:7 (had communication with dispatch once or twice per week, but otherwise took his mail and bank runs each week day); **Robinson** 101:9-16 (occasionally would get call from branch manager or dispatcher when a customer would call and ask about a particular package); **B. Thompson** 86:15-21 (other than scanning package, he did not check-in with anyone at warehouse because no one was present); **P. Williams** 70:18-71:7 (picked-up directly from customer's pharmacy terminal and supervisor at pharmacy would check paperwork when returned). |
| § 2 (example comparison of testimony on freedom to turn down work) | **Bright** 79:4-11 (bulletin board said "You don't deliver the freight, we'll find someone that will"); **Harris** 92:15-20 (declared "if you refused to take [a delivery] you would be terminated" during his deposition, a position at odds with his prior written statements that other drivers did refuse deliveries without repercussion); **Ketcham** 32:20-33:15 (might be found insubordinate for turning down work); **Robinson** 28:22-29:6, 123:1-16 (as long as his zip code was covered, he was free to take a day off and distribute any of this packages among himself, his son, Plaintiff Ryan Robinson, or any of the drivers he hired to work with him); **Roper** 41:17-20 (she could give her run to another driver); **B. Thompson** 72:13-73:10 (was taken off the call list for turning down a run); **Williams** 63:19-23 (turned-down runs when she was tired). |
| § 3 (example comparison of testimony on use of scanners or other handheld devices) | **Burns** 47:32-48:19 (Q. Do you use a scanner at all with your deliveries? A. I have before. Q. How long ago was it that you were using a scanner? A. Let's see, it had to be before Vanderbilt, so it's been years ago." Q. And do you currently have any kind of communication device that you use to – to communicate with [LSO]? A. No, not anymore. At one point, they had – they made us all get Nextels to call in and so . . . Q. And how long ago was it that you stopped using the Nextel? A. It's – it's been awhile. Like I said, I've been with Vanderbilt six, seven years or more. I don't – I'm not sure. It's been while. Q. So the only device that you're using to communicate with [LSO] is your cell phone? A. Yes."); **Brewer** 32:3-7, 41:11-18 (was provided a scanner and paper manifest that was used to keep all of her delivery records); **Carpenter** 39:25-40:3 (never used a scanner); **Davis** 67:13-68:3 (used a scanner in the past but customer he |

| | |
|---|---|
| | currently drove for did not require a scanner); *Harris* 70:5-71:15 (used a scanner to keep track of hours, obtain his manifest, and track packages); *Ketcham* 93:25-94:2 (never used a scanner); *McHargue* 21:15-22 (not required to obtain any special equipment to track packages); *Renne* 55:22-56:23 (was notified of deliveries via printed requests at the terminal, not a scanner); *M. Thompson* 29:14-19 (required to obtain a signature directly on the delivery documents, not a scanner). |
| § 4 (example comparison of testimony/discovery responses on hours worked) | *Bell Ans. to Rog. No. 1* (10-15 hours per week); *Burns Ans. to Rog. No. 1* (30 hours per week); *M. Davis Ans. to Rog No. 1* (20 hours per week, dropped to 3-4 hours per week); *Moore Ans. to Rog. No. 1* (16-30 hours per week); *Moreno Ans. to Rog. No. 1* (70-80 hours per week); *M. Thompson* 30:12-21 (30 hours for one week total); *Renne Ans. to Rog No. 1* (50-60 hours per week); *Renne* 31:21-32:7 (50 hours per week for six months and 12 hours per week for another six months). |
| § 5 (example comparison on mileage driven) | *Bell Ans. to Rog No. 1* (500-600 miles per week); *Carpenter Ans. to Rog No. 1* (500-1,000 miles per week); *Davis Ans. to Rog No. 1* (200 miles per week); *McHargue Ans. to Rog No. 1* (1,200 miles per week); *Moore Ans. to Rog No. 1* (500-700 miles per week); *Moreno Ans. to Rog. No. 1* (1,000 miles per week); *Burns* 20:20-23 (used to drive 340 miles per day, now drive almost 100 miles per day); *Ketcham* 88:7-11 (700-800 miles per week); *Manske* 52:21-53:1 (270-400 miles per week); *Ryte Ans. to Rog. No. 1* (1,500 miles per week); *Harris_Ryte(Webb),Amanda_5-6* (13,903 annual miles). |
| § 6 (example comparison of testimony in Contractor's investment in the business) | *Blassingame* 31:1-13 (used same vehicle for "Blassco Deep Dog" mobile kitchen business and he did for making LSO deliveries); *Brewer* 25:13-22 (had 16-foot box truck before beginning to deliver for LSO, and also used vehicle for home building business); *Bright* 15:24-16:7, 26:8-27:23, 29:9-14, 50:6-23, 51:13-52:7 (owns RM Bright Cleaners, LLC and DLM Bright, LLC with four locations in Oklahoma City, and uses on occasion same Sprinter Van vehicle for cleaner company as he does making deliveries for LSO); *Burns* 13:22-16:10 (purchased two cars, one for his daughter who drives for LSO); *Carpenter* 32:18-34:4 (purchased Chevy HHR to make deliveries because "Chevrolet parts [are] sometimes [] cheaper to repair" and "it was a – an SUV, and that gave me more room to load things. They also said that they would – Express said they would pay me more if I had an SUV."); *Coradini Decl.* ¶ 5 ("I maintain more than one vehicle so that I will always have one to drive and one for back-up for my routes. At times, I have as many as three vehicles. I have modified my current vehicles so that there is no passenger seat and replaced it with a desk for purposes of using it for work while I am on the road."); *Davis* 22:12-23:7 (owned two cargo vans, one for a back-up); *Harris* 135:7-25, 114:2-18 (drove three different sedans while contracting with LSO, but knew of another driver who operated a box truck); *Henderson* 12:5-22 (LSO mandated lease of box truck from Bush Leasing); *Ketcham* 26:5-8, 65:24-68:5 (had van from prior delivery work when he began contracting with LSO, purchased van initially "so I could haul the pharmaceutical stuff when I was in Joplin that required more room than a small van. I wouldn't have to make so many trips back to the |

| | |
|---|---|
| | warehouse" and ability to haul more product with van resulted in higher pay possibilities); *McHargue* 12:2-7, 52:18-53:9 (had cargo van, which was necessary to make deliveries he accepted, and also served as his personal vehicle); *Renne* 32:8-33:9 (purchased station wagon to make deliveries for LSO, which was good making deliveries in his opinion because "it had a turbo charger in it" was "[m]uch more" fuel-efficient "than you'll think"); *Robinson* 27:1-13, 29:7-24, 30:17-33:6 (leased and purchased several vehicles along with son for multiple driver operation and more cargo); *Manske* 24:24-25:2 (required by LSO to have a white cargo van); *B. Thompson* 30:10-33:16 (purchased Chevy Durango mainly because it was "a family car" but also wanted something big enough "so I could do Staples"). |
| § 7 (example comparison of testimony on Contractor's ability to work for other companies while contracting with LSO) | *Davis* 49:7-50:5, 76:10-78:8 (drove for a competitor of LSO's, Velocity, while under contract, but asserts LSO "leased [him] out to" Velocity); *Harris* 29:18-30:14 (believed that Contractors could not drive for other companies while under contract with LSO); *McHargue* 33:10-34:6, 44:14-46:5, 61:12-63:6, 66:21-68:1 (drove for BeavEx—a competitor of LSO's—during free time he had in between two routes he ran for LSO in Oklahoma City, as well as additional work delivering dialysis equipment approximately a week out of every month); *Moore Ans. to Rog. No. 5* (worked a taxi driver); *Moreno Ans. to Rog. No. 5* (worked for Uber); *Mulloy* 13:15-14:7 (had a part time job on Saturday at a liquor store); *Renne* 14:24-15:10, 31:15-32:7, 34:24-35:9 (drove total of 70 hours per week for LSO and two other courier companies); *Roper* 46:3-18 (could not have done anything but be on-call for hotshot pharmaceutical deliveries); *Ryte Ans. to Rog. No. 5* (performed no other work while driving for LSO); *Harris_Ryte,Amanda_0005-0008* (Schedule C tax filing lists Uber and LSO as her principal businesses); *Williams* 15:22-16:25, 65:14-68:4 (drove a taxi during same time she delivered routes for LSO). |
| § 8 (example testimony on degree of supervision and instructing the Contractor on how to perform duties) | *Brewer* 55:7-56:22 (had to check-in and check-out daily with dispatcher in Tennessee); *Burns* 18:1-19:15, 27:11-30:5 (rarely saw any LSO management, and would typically speak with an LSO employee once during the day at the LSO facility); *Davis* 57:8-19 (did not have to return to the warehouse when done with last delivery but would call dispatch to report he was finished); *Harris* 26:19-27:13, 40:8-16, 49:23-50:5, 62:24-63:17, 111:23-112:7, 119:7-17 (every day he had to report to the LSO warehouse in the morning and evening, constantly communicated with LSO and was tracked by LSO via a GPS scanner); *Manske* 20:12-22 (required to call-in to branch manager with progress reports throughout the day); *McHargue* 22:22-24:7 (had communication with dispatch once or twice per week, but otherwise took his mail and bank runs each week day); *Robinson* 101:9-16 (occasionally would get call from branch manager or dispatcher when a customer would call and ask about a particular package); *B. Thompson* 86:15-21 (other than scanning package, he did not check-in with anyone at warehouse because no one was present); *Williams* 70:18-71:7 (picked-up directly from customer's pharmacy terminal and supervisor at pharmacy would check paperwork when returned). |

| | |
|---|---|
| § 9 (example testimony on degree of control over the Contractor's schedule and training) | ***Brewer*** 47:8-48:5 (completed 2-3 days of initial training plus 1-2 days of ride along); ***Bright*** 113:12-114:1 (couple hours training on first day of work); ***Carpenter*** 37:4-15 (had a large fluctuation in schedule and hours depending on what needed to be delivered); ***Davis*** 68:20-69:11 (received training on how to use palm pilot but not on loading or communicating with customers); ***Harris*** 124:3-7, 148:13-20 (training took only a few minutes and a few words to explain, instructed on how to handle drugs and spills and how to load product); ***Henderson*** 107:14-108:1 (no training); ***Ketcham*** 98:1-3, 106:22-15 (no training); ***McHargue*** 21:7-9 (no training); ***Mulloy*** 44:8-12 (ride-along only); ***Renne*** 99:8-21 (watched an online training video for separating medical specimens, which he never utilized for any deliveries); ***B. Thompson*** 160:25-161:15, 162:11-164:21 (trained and completed ride-along for two-week period for medical specimen route, but did not receive training for office supply deliveries); ***M. Thompson*** 46:21-47:7 (no training). |
| § 10 (example testimony on differences in pay terms) | ***Brewer*** 39:10-13 (paid by the mile); ***Burns*** 25:7-26:17 (negotiated a pay increase); ***Bright*** 47:15-21 (paid by the piece no matter what the weight); ***Davis*** 51:15-21 (paid by the piece for weekly route and paid flat rate for hotshot); ***Henderson*** 45:20-46:19 (paid by the piece); ***Ketcham*** 75:18-76:10 (paid per stop on a range of $50 to $100 per stop); ***Manske*** 60:24-61:17 (paid per piece for office products, flat rate for pharmaceutical route); ***McHargue*** 28:15-22 (weekly route pay); ***Renne*** 107:10-20 (paid a percentage of the job plus a portion of the fuel reimbursement); ***Robinson*** 28:16-21 (paid by piece, compensation changed daily); ***Roper*** 37:11-23 (paid flat rate for in-town deliveries and per mile for out-of-town deliveries); ***B. Thompson*** 67:25-68:15, 69:3-18, 138:11-22 (paid per stop or per mile, depending on product being delivered); ***Williams*** 40:5-20, 41:25-42:10 (paid flat rate for route); ***DEF000982*** ¶4 (statement from Harris that his branch manager "paid me about $26.37 for that 5 hours of work" and "paid Zack [another Contractor] at least $78.00 for the same route and probably more. According to my information, she pays Bob $78.00, but then Zack <u>always</u> gets more")(emphasis in original). |
| § 11 (example testimony on skill and initiative required in performing the job) | ***Blassingame*** 16:16-25 (LSO "offered mobility" and "promised nice wages in return for a good day's work"); ***Brewer*** 83:6-85:13 (every day she delivered to the same locations for DHL in the order and per the mapped route, although she had discretion on how to incorporate pharmaceutical deliveries to save fuel and time); ***Bright*** 39:2-18, 40:14-41:12 42:1-44:15 (used program to determine efficient order of stops, used GPS to sometimes determine best roads to take, maintained discretion to change the route and incorporate residential customers when efficient to do so); ***Burns*** 49:8-52:6 (order of stops was mapped out by LSO with timed delivery window, occasionally took stops out of order to satisfy the customer or with approval from LSO); ***Carpenter*** 42:6-43:9 (customer did not like when he would make deliveries out of order, although sometimes he took deliveries out of order without permission from LSO to do so); ***Harris*** 56:22-58:2, 129:9-23 (order of deliveries were designated and not possible to deviate from the order due to timed delivery window, given turn-by-turn directions on how to get to some locations, specific customer took priority); |

| | |
|---|---|
| | ***Henderson*** 32:9-33:13, 34:4-16 (free to determine order of stops and route to take to complete deliveries so long as done by 5:00 p.m.); ***Ketcham*** 26:5-8, 49:17-19, 57:12-25 (applied for position because it was the kind of work he had been doing and had a van, determined efficient delivery sequence for office supply products but told to deliver in order of deliveries on manifest for pharmaceutical products); ***Manske*** 74:23-76:3 (he determined efficient order of deliveries but branch manager had the "final say" to disapprove order of deliveries when he tried to incorporate residential deliveries before commercial deliveries were complete); ***McHargue*** 50:15-51:5 (took bank deliveries in same order every day and it never changed); ***Mulloy*** 36:7-37:9, 51:7-20, 97:15-23 (required to take deliveries in order of manifest, branch manager trained on what roads to take, had to follow map from LSO); ***Renne*** 113:25-114:24 (application listed prior experience as a driver for five years); ***Robinson*** 34:1-13, 49:23-50:6, 58:25-59:22 (left FedEx for new opportunity at LSO, he determines the order of stops and route most efficient way to make deliveries, believes not everyone can read a map in order to be good at driving like him); ***Roper*** 30:11-31:17 (able to determine order of deliveries for out-of-town runs, but not in-town runs); ***B. Thompson*** 99:16-100:12, 101:9-21 (free to take deliveries in any order, was more efficient as he became more familiar with work); ***M. Thompson*** 43:9-44:24 (some deliveries took priority due to deadlines but otherwise free to determine route); ***Williams*** 60:9-22 (manifest dictated order and route). |
| § 12 (example testimony on permanency of relationship) | ***Brewer*** 26:12-25, 108:13-16 (drove for approximately 9 months, terminated for "personal issue" when could not show up to dock for two days); ***Burns*** 17:3-11, 61:7-17 (daughter drove part-time for LSO to help pay bills); ***Carpenter*** 28:17-29:14 (first worked as a substitute for another driver who asked him to cover job for about two months); ***Harris*** 29:18-30:14, 122:16-17 (provided services exclusively for LSO for 20 months); ***McHargue*** 33:10-34:6, 44:14-46:5, 61:12-63:6, 66:21-68:1 (provided services for other companies when "had free time and could make the extra runs," including making deliveries for one of LSO's competitors during 18 months with LSO); ***Mulloy*** 94:12-16 (understood was accepting a permanent position with LSO); ***Robinson*** 6:18-20, 38:2-39:9 (first contracted in 2015 and he and son, Plaintiff Robinson, are still driving for LSO); ***B. Thompson*** 25:4-26:10 (drove for approximately 15 months, vehicle broke down, drove part time, then started driving full time again when got new vehicle); ***M. Thompson*** 16:12-16, 17:18-20, 25:15-24 (drove for one week for LSO, wanted a job to meet people but quit when did not like how far she was driving). |
| § 13 (example testimony on uniforms and grooming) | ***Blassingame*** 43:16-21, 45:4-47:12 (logo shirt, khaki pants were required, but uniform "wasn't adhered to" until approximately four months into contract because "[t]hey just wasn't as stringent about enforcing it"); ***Brewer*** 43:25-44:21, 45:12-24 (logo shirt, khaki pants, walking shoes, and "proper hair"); ***Bright*** 59:23-60:24, 62:21-63:3 (polo shirt only, any bottoms so long as no holes, with "neat, professional appearance"); ***Burns*** 39:18-41:17 (testified LSO told him to wear shirt with logo on it or a solid colored shirt, along with khaki pants, but said no repercussions for not wearing khaki pants but it was "frowned upon |

| | |
|---|---|
| | if you don't wear that [logo] shirt"); **Carpenter** 49:20-50:8 ("Q. Were you – did you have a uniform that you wore while delivering for Express? A. I had an [LSO] shirt and an [LSO] badge and khaki pants. Q. Did you ever deliver product while not wearing the uniform? A. Yes, sir. Q. And were there any repercussions for doing so? A.   Not really with me.  I was -- a lot of times, I'm -- when I show -- showed up at the warehouse, most the management was gone, so I -- I -- they never said nothing to me about it."); **Davis** 70:12-21 (Q. Were you ever told, other than the cap or the [LSO] shirt that you were told to wear, did they ever give you any guidelines for how you should look in appearance? A. No, no. Q. None? A. No. Q. So no grooming standards? A. Correct."); **Harris** 127:7-18 ("Q.   And what was that dress code? A   Well, all drivers have to wear khaki pants, clean shoes, clean close toed shoes, you have to wears socks and you have to wear royal blue pullover T-shirt and if you wear a cap, it has to be an Express cap.  You cannot wear a Cardinals cap or any other type of cap.  You have to buy one from Express and wear theirs.  And if you don't wear the blue shirts, they will order from – that they have, the ones with Express printed on them, they will order them for you and charge you for them even though you don't want them because they were very poor quality."); **Henderson** 43:4-16, 44:14-45:6 (logo shirt, blue or tan pants, plain hat with no logo, and closed toe shoes but was allowed to drive without logo shirt although might be asked "Where's your shirt?"); **Ketcham** 99:8-21 (logo shirt and cap, did not wear shirt he contends was required for about a month while on order); **Manske** 42:17-43:7 (blue polo shirt with logo, black slacks, black boots, logo cap were required); **McHargue** 21:23-22:10 (polo shirt only requirement, could wear any pants and shoes); **Mulloy** 46:7-47:10 (logo shirt required and not permitted to work without it, no tattoos or piercings allowed); **Renne** 94:12-24 (received no standards for appearance other than logo shirt, would change shirts in car when drove for different company); **Robinson** 85:17-21, 117:9-15 (logo shirt, black pants or shorts, logo cap); **Roper** 18:16-19:25 (logo shirt, any bottoms if no holes, closed toed shoes, "[t]hey didn't want us to look like we just rolled out of bed."); **B. Thompson** 170:25-173:7 (logo shirt and nametag at medical clinic but did not wear logo shirt when he drove office supply route because it was so hot, and when asked if he could "wear any pants that you wanted as long as they were presentable" he responded "[w]ell yeah. I mean, as long as you don't look like a bum trying to deliver stuff."); **M. Thompson** 41:15-42:15 (asked if there was "anything you were required to wear while you were out making deliveries" and responded "[w]ell, at the time they had told me that I would probably need something that stated their name on it, but I was new, and I wore just appropriate clothing" and went on to say she never wore a shirt with LSO's name on it, and further that "I had a nametag, but I don't recall if I wore it or not."). |
| § 14 (example testimony on vehicle appearance standards) | **Blassingame** 35:2-36:13 (placard in dash when made deliveries, noting some vehicles had magnetic signs but he never received one); **Brewer** 70:17-71:3 (sign was required but does not know if she received one); **Bright** 30:16-25 (magnetic sign was required); **Davis** 67:24-68:4 (placard was required on truck), 85:11-13 ("Did you ever have to – did [LSO] ever inspect your vehicle?; A: No."); **Harris** 149:11-150:8 (magnetic sign required and would be written up |

by LSO in an inspection for not having a sign); **Manske** 24:23-25:2, 92:1-25 (magnetic sign was required for all drivers, and "[i]t was required for the job to have a white cargo van"); **Mulloy** 44:8-24 (corporate policy "to have van washed. They had to inspect it. It had to be clean."); **Robinson** 51:15-21, 114:22-115:13 (two magnetic signs required on van, and "I was told that I had to have a 2010 or newer white cargo can so I just went out and found a cargo van. That was why I have the cargo van."); **Roper** 20:5-8 (no signage required); **Williams** 66:13-67:8 (no signage required for vehicle, but told could not drive her vehicle she used as a taxi because the taxi sign was painted on the side).

4835-7414-3808, v. 23