**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

| | |
|---|---|
| JAMES HARRIS, RICK KETCHAM and ADAM MANSKE, Each Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>EXPRESS COURIER INTERNATIONAL, INC.<br><br>Defendant. | Case No. 5:16-cv-5033-TLB |

**EXPRESS COURIER INTERNATIONAL, INC.'S (N/K/A LSO FINAL MILE) ("LSO") MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR RULE 23 CLASS CERTIFICATION**

# TABLE OF CONTENTS

I.  INTRODUCTION ........................................................................................ 1

II.  BACKGROUND ......................................................................................... 3

  A.  LSO's operations in Arkansas .................................................... 3

  B.  Plaintiffs and purported class members.................................... 4

III.  ARGUMENT .............................................................................................. 8

  A.  Rule 23 standards ........................................................................ 8

  B.  Plaintiffs' claims are not manageable ..................................... 12

  C.  Plaintiffs' Motion fails to satisfy commonality...................... 16

  D.  Plaintiffs' Motion makes no showing regarding their ability to satisfy Rule 23's requirements with respect to the liability elements of their AMWA overtime or minimum wage claims .......................................... 18

  E.  Plaintiffs have not demonstrated that any aspect of the Section 203(6) Definition is susceptible to classwide adjudication.............................. 20

IV.  CONCLUSION........................................................................................ 28

## TABLE OF AUTHORITIES

Other Authorities

*Amador v. Logistics Express, Inc.*, 2010 WL 3489038 (C.D. Cal. Aug. 27, 2010) ...... 21

*Ayala v. U.S. Xpress Enters.*, 2016 WL 7586910 (C.D. Cal. Dec. 22, 2016) .............. 16

*Bennett v. Hayes Robertson Group, Inc.*, 880 F. Supp. 2d 1270 (S.D. Fla. 2012) ...... 20

*Blades v. Monsanto Co.*, 400 F.3d 562 (8th Cir. 2005) ........................................... 9, 18

*C.C.E., Inc. v. NLRB*, 60 F.3d 855 (D.C. Cir. 1995) .................................................... 26

*Califano v. Yamasaki,* 442 U.S. 682 (1979) ................................................................. 9

*Carrera v. Bayer Corp.*, 727 F.3d 300 (3d Cir. 2013) .................................................. 11

*Carter v. Primary Home Care of Hot Springs, Inc.*, 2015 WL 11120563 (W.D. Ark. May 14, 2015) .................................................................................................. passim

*Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013) ...................................................... 9

*Cruz v. Lawson Software, Inc.*, 2010 WL 890038 (D. Minn. Jan. 5, 2010) .......... 13, 15

*David v. Bankers Life & Cas. Co.*, (W.D. Wash. June 30, 2015) ................................ 27

*DeSouza v. EGL Eagle Global Logistics LP*, 596 F. Supp. 2d 456 (D. Conn. 2009) .. 23

*Douglas v. First Student, Inc.*, 888 F. Supp. 2d 929 (E.D. Ark. 2012) ................... 2, 19

*Ebert v. General Mills, Inc.*, 823 F.3d 472 (8th Cir. 2016) ................................. 1, 9, 20

*Edwards v. Publishers Circulation Fulfillment*, 268 F.R.D. 181 (S.D.N.Y. 2010) .... 27

*Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804 (2010) ........................ 1, 10

*FedEx Home Delivery v. NLRB*, 563 F.3d 492 (D.C. Cir. 2009) ........................... 23, 26

*Gariety v. Grant Thornton, LLP*, 368 F.3d 356 (4th Cir. 2004) ................................. 12

*Gray v. FedEx Ground Package System, Inc.*, 799 F.3d 995, (8th Cir. Aug. 21, 2015) .................................................................................................................... 14

*Helmert v. Butterball, LLC,* 805 F. Supp. 2d 655 (E.D. Ark. July 27, 2011) ............. 16

*Hensley v. MacMillan Bloedel Containers, Inc.*, 786 F.2d 353 (8th Cir. 1986)...... 2, 19

*In re Bridgestone/Firestone Tires Prods. Liab. Litig.*, 288 F.3d 1012 (7th Cir. 2002)
.................................................................................................................. 15, 16

*In re Ford Motor Co.*, 2012 WL 379944 (D.N.J. Feb. 6, 2012) .................................. 18

*In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305 (3d Cir. 2008) ...................... 9

*In re St. Jude Medical, Inc.*, 425 F. 3d 1116 (8th Cir. 2005)................... 10, 12, 13, 14

*Jones v. Corporate Bank Transit of Ky., Inc.*, 2015 WL 12733475 (W.D. Mo. Sept. 22,
2015)............................................................................................................... 1, 27

*Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.*, 313 U.S. 487 (1941) ................................ 13

*Limestone Products Distribution, Inc. v. McNamara*, 71 S.W.3d 308 (Tex. 2002).... 14

*Lockett v. Allstate Ins. Co.*, 364 F. Supp. 2d 1368 (M.D. Ga. 2005) .......................... 26

*McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008)............................ 11, 18

*Meinke v. Southern Paramedic Svc., Inc.*, 2017 WL 157737 (E.D. Ark. Jan. 10, 2017)
............................................................................................................................ 16

*N. Am. Van Lines, Inc. v. NLRB*, 869 F.2d 596 (D.C. Cir. 1989) ............................... 26

*Narayan v. EGL, Inc.*, 285 F.R.D. 473 (N.D. Cal. 2012) ........................................... 27

*O'Feery v. Smith*, 38 P.3d 242 (Okla. Ct. App. 2001) ................................................ 14

*Oplchenski v. Parfums Givenchy, Inc.*, 254 F.R.D. 489 (N.D. Ill. 2008) ................... 27

*Penn v. Va. Int'l Terminals, Inc.*, 819 F. Supp. 514 (E.D. Va. 1993) ........................ 26

*Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943 (6th Cir. 2011) ..................... 15

*Powers v. Lycoming Engines*, 328 F. App'x 121 (3d Cir. 2009) ........................... 12, 15

*Reed v. Industrial Comm'n*, 534 P.2d 1090 (Ariz. Ct. App. 1975) ............................ 26

*Saleem v. Corporate Transp. Group, Ltd.*, 2013 WL 6061340 (S.D.N.Y. Nov. 15,
2013).................................................................................................................. 27

*Scott v. NOW Courier*, 2012 WL 1072751 (S.D. Ind. Mar. 29, 2012) ........................ 27

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010) ....... 12

*Tyler v. Alltel Corp.*, 265 F.R.D. 415 (E.D. Ark. 2010) ........................................ 14, 15

*Uber Tech., Inc., Wage and Hour Employ. Prac.*, 158 F. Supp. 3d, (M.D.L.P. 2016) 14

*United States v. Klinghoffer Bros. Realty Corp.*, 285 F.2d 487 (2d Cir. 1960) ........... 2

*Vengurlekar v. Silverline Techs., Ltd.*, 220 F.R.D. 222 (S.D.N.Y. 2003) .................. 15

*Walker v. Bankers Life & Cas. Co.*, 2008 WL 2883614 (N.D. Ill. July 28, 2008). 27, 28

*Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338 (2011) ................................. 9, 11, 18, 21

*Ware v. U.S.*, 67 F.3d 574 (6th Cir. 1995) ................................................................ 26

*Wilson-McCray v. Stokes*, 2003 WL 22901569 (N.D. Ill. De. 9, 2003) ...................... 25

*Young v. Barbour Trucking Co.*, 856 P.2d 599 (Okla. Ct. App. 1993) ...................... 14

Regulations

29 U.S.C. § 203(e)(1) ............................................................................................... 17

29 U.S.C. § 206(a) ..................................................................................................... 2

Ark. Code Ann. § 11-4-203(3) ............................................................................... 17

Ark. Code Ann. § 11-4-203(6) ......................................................................... 10, 17

Ark. Code Ann. § 11-4-210.................................................................................. 14, 17

Ark. Code Ann. § 11-4-211.................................................................................. 15, 17

Mo. Rev. Stat. § 290.502 ......................................................................................... 14

Mo. Rev. Stat. § 290.505 ......................................................................................... 15

Okla. Stat. tit. 40, § 197.2....................................................................................... 14

Section 203(6)................................................................................................... 20, 21

Tex. Lab. Code Ann. § 62.051 ................................................................................ 14

9

Fed. R. Civ. P. 23 ............................................................................................ 18, 20

12

49 C.F.R. § 382.301 ................................................................................................ 26

49 C.F.R. Part 376 ................................................................................................... 3

Ark. Admin. Code 010.14.1–112................................................................................ 19

13

*Have Truck, Will Drive: The Trucking Industry and the Use of Independent Owner-Operators Over Time*, 35 Transp. L.J. 115 (2008) .................................................... 4

## I.   INTRODUCTION

Plaintiffs seek to certify claims for overtime and alleged minimum wage violations under the Arkansas Minimum Wage Act ("AMWA"). *Compl.* ¶¶ 112-128.[1] Certification of a Rule 23 class requires analyzing Plaintiffs' plan for proving "elements of the underlying cause of action" for each class member at trial without their participation. *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2010). Plaintiffs' Memorandum addresses only one element of their claims—employment classification—and is quite literally silent on how they would prove the remaining elements of their own claims, let alone those of the absent class.[2] Their failure to proffer any evidence or trial plan for adjudicating *any of the liability* elements necessary "[t]o successfully establish the alleged claims" requires denial of Rule 23 certification. *Ebert v. General Mills, Inc.*, 823 F.3d 472, 477-479 (8th Cir. 2016)(finding district court's "deliberate limiting of issues" to fewer than all elements of a claim in order to certify class improper); *see also Jones v. Corporate Bank Transit of Ky., Inc.*, 2015 WL 12733475, at *4 (W.D. Mo. Sept. 22, 2015)(denying Rule 23 certification of drivers state wage law claims and clarifying "Plaintiff's burden is not simply to show that Defendant generally contracted with drivers in a similar fashion. Instead, Plaintiff must demonstrate that Defendant's classification of the putative

---

[1] As referenced in LSO's Answer, the Complaint, starting on page 14, refers to the allegations following paragraph 94 as paragraph 43. For ease of reference and continuity, the Answer continued the sequential numbering that should follow 94. *Answer*, p.22 n. 1 (ECF No. 28). The references in this paper to Complaint paragraphs likewise will refer to the numbering identified in the Answer.

[2] For an individual to recover AMWA overtime, he must demonstrate (1) Arkansas law applies; (2) an employment relationship exists; (3) he worked over 40 hours in a pay period; and (4) the amount of overtime owed. Beyond demonstrating Arkansas law applies and that an employment relationship exists, recovery for an AMWA minimum wage claim requires evidence of (1) the work related expenses the worker incurred; (2) the pay the worker received for the work he performed; and (3) evidence that pay, net of expenses, was less than the Arkansas minimum wage for each hour worked for a given week. Compl. ¶ 98.

class members was inaccurate, and resulted in improper compensation of the putative class members.").

Plaintiffs' Memorandum openly confesses that it addresses nothing but the employment classification element of each claim, explaining that "Plaintiffs do not seek to adjudicate damages on a class-wide basis [and that] Plaintiffs seek only a liability class." *Pls.' Mem.* at 32 (ECF No. 113). This declaration should end the inquiry. There is no reason to engage in the exercise of certifying any class where Plaintiffs do not seek, and the Court could not provide, any redress. Lots of companies have Arkansas employees without injuring them. A liability determination for AMWA overtime and minimum wage claims requires proof as to elements beyond the employment inquiry.[3] Having conceded that they do not seek certification as to anything but the issue of employment status, granting Plaintiffs' Motion would serve no purpose save, perhaps, changing the label that attends their relationship with LSO to employee from independent contractor. No case has ever found a class action to be a superior method of resolving a dispute where even if Plaintiffs succeed they will get no relief.

---

[3] *E.g., Douglas v. First Student, Inc.*, 888 F. Supp. 2d 929, 934 (E.D. Ark. 2012)("to establish liability under the FLSA for any particular week, plaintiffs must demonstrate they worked more than forty hours that week. Thus, the determination of the number of hours worked by each class member each week is a threshold issue of liability"); *Hensley v. MacMillan Bloedel Containers, Inc.*, 786 F.2d 353, 357 (8th Cir. 1986)(*quoting United States v. Klinghoffer Bros. Realty Corp.*, 285 F.2d 487, 490 (2d Cir. 1960)(holding that no violation of 29 U.S.C. § 206(a) occurs "so long as the total weekly wage paid by an employer meets the minimum weekly requirements of the statute, such minimum weekly requirement being equal to the number of hours actually worked that week multiplied by the minimum hourly statutory requirement."); *Carter v. Primary Home Care of Hot Springs, Inc.*, 2015 WL 11120563, at *2 (W.D. Ark. May 14, 2015)(string citing cases for proposition that "[t]he FLSA and the AMWA impose similar minimum wage and overtime requirements on employers and, in cases involving claims brought under both acts, the courts have concluded that their parallel provisions should be interpreted in the same manner.").

## II.   BACKGROUND

### A. LSO's operations in Arkansas

LSO provides various supply-chain management services to help businesses reduce transportation costs, increase efficiency in product movement, and allow the customer to focus on its core business. *Webb Decl*. ¶ 3 (ECF No. 31-3).  LSO contracts with close to a thousand customers nationwide mainly in the healthcare, financial services, office products, pharmaceuticals, auto parts, and manufactured goods industries for these services across LSO's 56 facilities in 48 cities around the United States.  *See id*. ¶¶ 2, 4.

When LSO creates a transportation solution for a customer, it considers the costs associated with transporting the customer's products, the number of deliveries in a geographic area, frequency of delivery, product size, and need for specific delivery dates and or times; based on this information LSO determines what it deems the most efficient delivery process and the equipment necessary to transport the customer's product. *Id*. ¶ 9.  No single solution fits every customer's needs. Rather, variations in customer requirements, the product being transported, timing, distance, and frequency of deliveries dictate the optimal mix of rates and method of pay, the type of vehicle that can service the account, and the regulatory requirements of each customer. *Webb Decl*. ¶¶ 6-8, 13-15 (addressing variations in categories of transportation delivery services offered based on the distinct needs of customers along with the type industry being serviced).

LSO facilitates the delivery of its customers' products through Contractors who own vehicles capable of effectuating the deliveries and provide qualified drivers to transport the products under LSO's motor-carrier authority. *Id*. ¶ 10. LSO memorializes its relationships with Contractors through federally regulated Owner-Operator Agreements. 49 C.F.R. Part 376 (Federal Truth-in-Leasing Regulations,

which apply to motor carriers' leasing of commercial motor carrier equipment and related professional truck driving services from independent contractors); *see also* Douglas C. Grawe, *Have Truck, Will Drive: The Trucking Industry and the Use of Independent Owner-Operators Over Time*, 35 Transp. L.J. 115 (2008)(addressing historical use of independent contractor truck drivers operating under another company's motor carrier authority).

As of June 10, 2016, LSO was contracting with 1,226 Contractors to provide transportation-related services. Of that total, 83 Contractors provided services from one of four Arkansas-based operations in Fort Smith, Little Rock, North Little Rock, and Springdale. *Webb Decl.* ¶¶ 4, 11.

## B. Plaintiffs and purported class members

This lawsuit was filed by three Plaintiffs who provided transportation services out of LSO's Springdale operation. The named Plaintiffs claim they contracted with LSO to provide their equipment and transportation services, but LSO treated them and other Arkansas Contractors as employees. Plaintiffs' AMWA claims for relief turn on their ability not only to demonstrate that LSO similarly misclassified every Contractor who operated in Arkansas, but also that those Contractors worked so many hours that LSO paid them less than the minimum wage for delivery services they performed and owes them overtime. The class Plaintiffs seek to certify is composed of "[e]ach individual who (a) worked for [LSO], as a driver, courier, or owner-operator in Arkansas any time after February 11, 2013, (b) never subcontracted with anyone, or otherwise never hired anyone, to perform any of his or her work for [LSO], and (c) contracted directly with [LSO] under [LSO's] standard "Owner-Operator Agreement." *Pls.' Mem*. at 1.

Plaintiffs' Motion concedes that they are not attempting to proffer any basis on which to determine whether LSO failed to pay any Contractor at least the Arkansas minimum wage, or whether any Contractor worked over 40 hours in a given week

and is owed overtime. Even as to the sole issue for which Plaintiffs seek certification – whether they were properly classified – the evidence in this case dispatches any suggestion that the Contractors who operated in Arkansas had sufficiently similar experiences to allow a uniform resolution of this issue. For example, of the Plaintiffs operating in Arkansas who sat for depositions:

- Two purchased a vehicle specifically for delivering cargo (bearing directly on the investment in his business);[4]

- One never used a scanner (belying the Complaint's allegations of uniform monitoring);[5]

- One received no training (disproving a uniform policy and practice of training to meet customer requirements);[6] and

- One never used any type of signage on her vehicle (showing LSO did not exert control over the appearance of each vehicle).[7]

Testimony on the frequency of communication with LSO, freedom to turn down work, and the existence of a Contractor "uniform" also spanned a wide spectrum among Plaintiffs who worked in Arkansas, as did evidence of the freedom to contract with other companies, the number of hours worked, and mileage driven in a day. *E.g., Appendix A* §§ 1-13 (providing example testimony comparisons on these discrete factual topics). These variations are consistent with the differences in the customers served, locations where work is performed, decisions each Contractor makes in running their business, and ultimately the experiences of each Contractor.

For instance, Plaintiff Harris testified that he reported every day to the LSO warehouse in the morning and evening, and was in constant contact with the

---

[4] *Manske* 24:24-25:2; *Ketcham* 26:5-8, 65:24-65:20.
[5] *Ketcham* 93:25-94:2.
[6] *Ketcham* 98:1-3.
[7] *Roper* 20:5-8. Roper, a Tulsa-based Contractor who delivered into Arkansas on at least one occasion, would fall within Plaintiffs' class definition given she "worked in" Arkansas "any time after February 11, 2013." *Roper* 33:4-9.

Springdale branch manager. *Harris* 26:19-27:13, 40:8-16, 49:23-50:5, 62:24-63:17, 111:23-112:7, 119:7-17.  Plaintiff Roper testified that she did not report to an LSO warehouse or terminal for her deliveries and she turned in her paperwork to another Contractor, not a branch manager. *Roper* 32:19-21, 38:6-39:9, 42:8-43:12.

With respect to the ability to turn down offers of work from LSO, Plaintiff Harris said "if you refused to take [a delivery] you would be terminated" during his deposition, a position seemingly at odds with a prior written statement that he took deliveries other drivers did not accept. *Harris* 92:15-20; DEF000982-983, ¶8 (stating he took deliveries the manager gave him from other drivers). Plaintiff Ketcham testified that he believed that his branch manager would find him insubordinate if he rejected offered work, but proceeded to say that he turned down work and that another contractor, Ned, would as well. *Ketcham* 32:20-33:15, 33:23-25, 82:22-83:11. Plaintiff Roper had a contrary experience because she could give her runs to another Contractor. *Roper* 41:17-20.

Plaintiffs likewise testified about the varying degree of control that they perceived LSO exercised over their schedules.  Plaintiff Manske was told that he had to have his pharmaceutical deliveries done by 10am in order to meet a customer-imposed deadline, while other Contractors were told to deliver pharmaceuticals at any time before 3pm. *Manske* 32:13-33:13. Plaintiff Ketcham explained that *he chose* to arrive at the warehouse an hour early to beat traffic and left the warehouse earlier than other Contractors because their routes were not "as strict."  *Ketcham* 35:23-36:4, 40:23-41:20,  98:1-3.  Later,  Plaintiff  Ketcham  would  finish  his  morning pharmaceutical delivery and return back to the Springdale facility because he wanted to make additional deliveries. *Ketcham* 51:2-53:9. When not driving a pharmaceutical

hot-shot,[8] Plaintiff Roper returned home to sleep, cook, clean, do chores, and take care of her children and acknowledged that LSO placed no restrictions on how she spent her time. *Roper* 35:10-36:10, 45:9-47:11, 56:8-58:14, 59:9-61:9, 69:25-70:7.

Regarding work for other companies while contracting with LSO, Plaintiff Harris testified that he had no time to work for another company while he drove for LSO and "[i]t wouldn't have been profitable to", but he was aware of another contractor who installed tennis courts as a side business. *Harris* 29:18-30:1, 75:14-21. Little Rock-Plaintiff Moreno was able to balance multiple driving positions; he drove for Uber at the same time he contracted with LSO. *Moreno Ans. to Rog. No. 5.*

Regarding the use of communication equipment, Plaintiff Manske used a scanner every day, paid a weekly rental fee for it, and was never given an option to use a smart phone to scan packages. *Manske* 64:22-65:7, 38:23-39:11. Plaintiff Roper initially used a scanner, but switched to a smart phone app to reduce her operational costs. *Roper* 18:3-15, 20:9-22. Plaintiff Ketcham never used a scanner or smart phone app. *Ketcham* 93:25-94:2.

Hours worked and mileage driven varied widely among Plaintiffs who drove in Arkansas. North Little Rock-Plaintiff Barrett estimated that he worked 40 hours and drove 2,000 miles per week. *Barrett Ans. to Rog. Nos. 1, 2.* Springdale-Plaintiff S. Martin and Springdale-Plaintiff Cash each claim to have worked 40-50 hours per week, but their mileage differed—Plaintiff Martin drove 500 miles per week while Plaintiff Cash drove only 75-100 miles per week. *S. Martin Ans. to Rog. No. 1, 2*; *Cash Ans. to Rog. Nos. 1, 2.* Fort-Smith Plaintiff Craig claims he worked 80 hours and drove 2,000 miles per week. *Craig Ans. to Rog. Nos. 1, 2.* Plaintiff Moreno claims he

---

[8] A "hot shot" is an on-demand same-day expedited pick-up and/or delivery service. For example, a pharmaceutical customer might request a hot shot pick-up from a pharmacy and delivery to a patient at a residence or senior care facility. *See Webb Decl.* ¶ 5 (explaining difference between three categories of product delivery services, including on-demand delivery).

worked 70-80 hours per week like Plaintiff Craig, but drove half as far with 1,000 miles per week. *Moreno Ans. to Rog. Nos. 1, 2.* Plaintiffs' testimony is the *sole* source of evidence for the hours each worked and the miles each drove.

Plaintiffs who drove in Arkansas invested varying amounts in their operations. Plaintiffs Harris and Roper each drove their personal cars for their deliveries. *Harris* 135:7-25; *Roper* 13:6-13. In contrast, Plaintiff Manske testified that LSO required him to purchase a white cargo van for deliveries, which he then used for personal use. *Manske* 24:4-25:2. Plaintiff Ketcham drove a cargo van, which he owned at the time he contracted with LSO and only drove it for business purposes. *Ketcham* 26:5-8, 65:24-68:5. Dallas-Plaintiff Brewer testified that a Contractor, Jimmy, owned a "bigger truck" like her (a 16-foot box truck) to transport loads between Arkansas and Texas. *Brewer* 25:13-22, 97:1-6., 99:13-20, 117:14-17.

Plaintiffs also reported providing services for LSO on interstate trips that took them outside of Arkansas. *See Ketcham* 41:25-42:9-17 (Plaintiff Ketcham, a Missouri resident, took out-of-state deliveries at least once a week, and testified other Contractors at the Springdale facility delivered product outside of Arkansas "every day").

Plaintiffs identified other differences in their respective experiences that bear directly on the alleged control LSO exercised, including (1) whether LSO provided any training,[9] (2) uniform requirements,[10] (3) vehicle appearance requirements,[11] and (3) pay terms.[12]

---

[9] *Appendix A § 9.*
[10] *Id.* at § 13.
[11] *Id.* at § 14.
[12] *Id.* at § 10.

## III.   ARGUMENT

### A. Rule 23 standards

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 348 (2011) (*quoting Califano v. Yamasaki,* 442 U.S. 682 (1979)). To justify using the Rule 23 procedural mechanism, a district court must conclude after a "rigorous analysis" the plaintiff has "affirmatively demonstrate[d]" that the requirements of Rule 23(a) along with Rule 23(b)(3) requirements are met. *Wal-Mart,* 564 U.S. at 338, 348.

Numerosity, commonality, typicality, and adequacy make up the Rule 23(a) requirements. Plaintiffs also must establish "through evidentiary proof" the Rule 23(b)(3) requirements that (1) questions of law or fact common to the members of the proposed class predominate over questions affecting individual class members alone, and (2) that a class action is superior to other available methods to resolve the controversy. *Comcast Corp. v. Behrend,* 133 S. Ct. 1426, 1432 (2013).

The Eight Circuit has made clear that it is not enough to establish that a single issue may be capable of classwide resolution; Plaintiffs must demonstrate that they can establish the elements of their claims sufficient to afford the class relief on those claims. *See Ebert,* 823 F.3d at 479 (overturning district court decision that limited its certification order to discrete elements of a claim); *Blades v. Monsanto Co.,* 400 F.3d 562, 569 (8th Cir. 2005)(class certification analysis "necessarily requires an examination of the underlying elements necessary to establish liability for Plaintiffs' claims.").[13]

---

[13] *See also In re Hydrogen Peroxide Antitrust Litig.,* 552 F.3d 305, 311, 312 (3d Cir. 2008)  (the court must examine "the elements of [Plaintiffs'] claim[s] 'through the prism' of Rule 23" and, quoting a 2003 advisory committee note to the amendment of Rule 23, recognizing "a critical need" of the trial court at certification "is to determine how the case will be tried").

For the Arkansas overtime claim, those elements are (1) demonstrating through a choice-of-law analysis that Arkansas law applies to the individual; (2) proof an employment relationship exists; (3) proof the worker exceeded 40 hours in a pay period; and (4) proof of the amount of overtime owed. Beyond demonstrating Arkansas law applies and that an employment relationship exists, recovery for an Arkansas minimum wage claim requires evidence of (1) the work related expenses the worker incurred; (2) the pay the worker received for the work he or she performed; and (3) evidence that pay, net of expenses, was less than the Arkansas minimum wage based on the number of hours worked during that week. *See Compl.* ¶ 98 ("Costs that Plaintiffs incurred" resulted in pay dropping below minimum wage); *see also Erica P. John Fund, Inc.*, 563 U.S. at 809 (Rule 23 analysis requires analysis of "elements of the underlying cause of action"). Plaintiffs' Memorandum offers no evidence or plausible explanation how any of these elements that make up their AMWA overtime and minimum wage claims are capable of classwide resolution without participation of each class member at trial.   These deficiencies render certification inappropriate.

Specifically, Plaintiffs' proposed class would include non-Arkansas residents and Arkansas residents who performed work outside of Arkansas. Plaintiffs' Motion fails to demonstrate that the mandatory choice-of-law analysis this Court must perform would result in the application of Arkansas law to each class member. (Section III(B)). *In re St. Jude Medical, Inc.*, 425 F. 3d 1116, 1120-21 (8th Cir. 2005)("The Supreme Court has held an individualized choice-of-law analysis must be applied to each plaintiff's claim in a class action."). Plaintiffs' request that the Court utilize the "independent contractor" definition from Ark. Code Ann. § 11-4-203(6)[14] to resolve the claims' employee element—as opposed to the economic-realities test consistently

---

[14] LSO refers to this as the "Section 203(6) Definition" in this Memorandum.

applied by Arkansas courts—finds no home in the law and likewise warrants denial of certification (Section III(C)). *E.g.*, *Carter v. Primary Home Care of Hot Springs, Inc.*, 2015 WL 11120563, at *2 (W.D. Ark. May 14, 2015)(string citing cases for proposition that "[t]he FLSA and the AMWA impose similar minimum wage and overtime requirements on employers and, in cases involving claims brought under both acts, the courts have concluded that their parallel provisions should be interpreted in the same manner."); *see also McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 228 (2d Cir. 2008)("When a claim cannot succeed as a matter of law, the Court should not certify a class on that issue."), *abrogated on other grounds by Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639 (2008).

Class certification would be improper even if this Court were to apply the Section 203(6) Definition to resolve the issue of Plaintiffs' classification. Contractors have conflicting testimony on issues Plaintiffs' assert are pertinent to this element of their claim that Plaintiffs cannot pave over without eviscerating LSO's due process rights to examine each individual's experience on facts relevant to the employment classification analysis (Section III(E)). *Carrera v. Bayer Corp.*, 727 F.3d 300, 307 (3d Cir. 2013)("A defendant in a class action has a due process right to raise individual challenges and defenses to claims, and a class action cannot be certified in a way that eviscerates this right or masks individual issues.")

Leaving aside the issue of Plaintiffs' classification, there is no basis to certify the only claims for which Plaintiffs seek relief—their AMWA overtime and minimum wage claims. As discussed above, Plaintiffs have failed to offer any evidence bearing on the elements of their *individual* overtime and minimum wage claims, let alone offer any explanation for how they would prove those claims on behalf of the class. (Section III(D)). Plaintiffs' Motion provided this Court *nothing to analyze* and, as a consequence, no basis on which to conclude that Plaintiffs' have satisfied any of Rule 23 requirements with respect to these claims. *Wal-Mart*, 564 U.S. at 353.

Plaintiffs cannot use Rule 23 to gloss over these evidentiary shortcomings. Rule 23 is a procedural device a court may use to increase efficiency and manageability in the litigation. *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 408 (2010)(recognizing Rule 23 is a procedural mechanism that "merely enables a federal court to adjudicate the claims of multiple parties at once [while leaving] the parties' legal rights and duties intact.").  But it does not alter the quality of evidence required from any class member if trying to prove a claim on an individual basis or relax each class member's substantive burden of proof. *Id.*

Plaintiffs' Motion offers no basis on which to determine whether any Contractor suffered an overtime or minimum wage violation under the AMWA. Having failed to provide such evidence, there is no justification for certifying a class under the Rule 23 procedural mechanism.

## B. Plaintiffs' claims are not manageable

Before determining whether any of their claims are suitable for class treatment, Plaintiffs must first demonstrate to which putative class members (if any) Arkansas law applies. *In re St. Jude Medical, Inc.*, 425 F. 3d at 1120-21.[15] Without a classwide answer to this threshold question, Plaintiffs cannot demonstrate that their proposed class is either ascertainable or, to the extent that it may be, that ascertaining class members would be a manageable task.

Plaintiffs propose a class composed of "[e]ach individual who (a) worked for [LSO], as a driver, courier, or owner-operator in Arkansas any time after February 11, 2013, (b) never subcontracted with anyone, or otherwise never hired anyone, to perform any of his or her work for [LSO], and (c) contracted directly with [LSO] under [LSO's]

---

[15] *See also Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 370 (4th Cir. 2004)("The plaintiffs have the burden of showing that common questions of law predominate, and they cannot meet this burden when the various laws have not been identified and compared."); *Powers v. Lycoming Engines*, 328 F. App'x 121, 124 (3d Cir. 2009) ("A necessary precondition to deciding Rule 23 issues is a determination of the state whose law will apply.").

standard 'Owner-Operator Agreement." *Pls.' Mem.* at 1 (ECF No. 113). Some
Contractors within this definition, such as Plaintiff Ketcham, were not Arkansas
residents and reported frequent deliveries outside the State:

> Q: Were all the deliveries you made in Arkansas?
> A: Yes. Well, let me restrike that, except the computer parts.
> Sometimes we had runes to Wyandotte, Oklahoma and to Branson and
> Kansas City. I never took any to Kansas City, but I took some to
> Branson, so Missouri, yeah, I went to Missouri and Oklahoma.
> Q: How frequent were those computer part deliveries in Oklahoma
> and Missouri? A: For me, once a week probably.
> Q: And you say for me, were there other people that were – you knew
> of that took these computer part deliveries as well?
> A: Yes.
> Q: Do you know how frequently those individuals would make
> deliveries of those computer parts outside of Arkansas?
> A.     Every day.

*Ketcham Dep* 41:25-42:1-17; *see also id.* 16:16-20 (lives in Neosho, Missouri); *see also*
*Brewer* 99:13-20 (Contractor "Jimmy" had a larger truck that he drove between
Dallas and Arkansas); *Roper* 72:1-15 (Plaintiff Roper took a hot shot from Tulsa to
Little Rock, Arkansas); ECF No. 112-05 (Contractor Cannon is a resident of
Oklahoma and worked out of the Fort Smith, Arkansas location).

Prior to applying Arkansas law to any members of the class, the Court must
conduct "an inquiry into which state laws are implicated as to each individual
putative class member." *Cruz v. Lawson Software, Inc.*, 2010 WL 890038, at *10 (D.
Minn. Jan. 5, 2010). As the proponent of class certification, Plaintiffs bear
responsibility for providing the Court a manageable and efficient method for
conducting this inquiry. *See In re St. Jude Medical, Inc.*, 425 F.3d at 1120 ("The
Supreme Court has held an individualized choice-of-law analysis must be applied to
each plaintiff's claim in a class action.").[16]

---

[16] A federal court sitting in diversity must look to the forum state's choice of law rules to
determine the controlling substantive law. *See Klaxon Co. v. Stentor Elec. Mfg. Co. Inc.*, 313
U.S. 487, 496 (1941).

The first step in the choice-of-law analysis is determining whether the law of potentially affected jurisdictions—Arkansas, Texas, Oklahoma, and Missouri—is materially different. *In re St. Jude Medical, Inc.*, 425 F.3d at 1120; *see also Tyler v. Alltel Corp.*, 265 F.R.D. 415, 428-29 (E.D. Ark. 2010)(denying class certification because "the outcome-determinative conflicts between states' unjust enrichment and consumer protection laws in this case are fatal to the satisfaction of Rule 23(b)(3)'s commonality and predominance requirements.").

Arkansas, Texas, Missouri, and Oklahoma apply different tests to determine independent-contractor status, and no consistency exists in these states' minimum wage laws, overtime laws, or exemptions.[17] The manageability issues associated with

---

[17] <u>Independent contractor tests</u>: *Carter*, 2015 WL 11120563 (applying a 5-factor economic realities test requiring that courts "look to the totality of the circumstances" and "degree of control exercised by the employer over the workers" to determine employment status under AMWA); *Gray v. FedEx Ground Package System, Inc.*, 799 F.3d 995 (8th Cir. 2015) (reversing district court determination deeming contractors engaged by defendant to be employees as a matter of law pursuant to an 8-factor control test for purposes of Missouri wage and hour laws); *Limestone Products Distribution, Inc. v. McNamara*, 71 S.W.3d 308, 312 (Tex. 2002)(determining workers' status as an independent contractor or employee in Texas through assessment of "the right to control the progress, details, and methods of operations of the work").Oklahoma has not addressed employment status in the context of wage-and-hour claims. When the employment classification issue arises in other contexts, the test utilized in Oklahoma depends on the setting. E.*g.*, *O'Feery v. Smith*, 38 P.3d 242 (Okla. Ct. App. 2001)(in negligence action against motor carrier explaining that an "independent contractor is one who assents to perform a certain service without the control, supervision, or direction of its employer in all affairs connected with the performance of the service except the result or product of the work"); *Young v. Barbour Trucking Co.*, 856 P.2d 599 (Okla. Ct. App. 1993)(recognizing owner-operator exclusion from workers' compensation act); *see also In re Uber Tech., Inc., Wage and Hour Employ. Prac.*, 158 F. Supp. 3d, 2016 WL 439976, at *1 (M.D.L.P. 2016) ("Although these actions share certain factual issues regarding Uber's classification of drivers as independent contractors and its business practices concerning payment of gratuities and business expenses to drivers, the standards for determining whether independent contractors are employees vary substantially from state to state and involve a broad range of factors which require consideration of distinct aspects of the alleged employer's relationship with plaintiffs.").

<u>Minimum wage laws</u>: Okla. Stat. tit. 40, § 197.2 (no state minimum wage); Tex. Lab. Code Ann. § 62.051 (no state minimum wage law); Mo. Rev. Stat. § 290.502 (minimum wage adjusts each year based on "the increase or decrease in the cost of living"); Ark. Code Ann. § 11-4-210

14

"examining the circumstances of the particular class members" to determine "which putative class members are subject to which state laws" alone warrant denial of certification. *Cruz v. Lawson Software, Inc.*, 2010 WL 890038, at *6 (D. Minn. Jan. 5, 2010).[18]

Plaintiffs' Motion does nothing to address these differences or explain how they will demonstrate to whom Arkansas law applies, and "[t]he Court cannot simply decree" that the AMWA applies to each class member's overtime and minimum wage claims since February 11, 2013. *Cruz*, 2010 WL 890038 at *8. "The Court must conduct an analysis of the plaintiff's particular situation and the state laws that potentially apply. There is no shortcut around following the Eighth Circuit's directive in *St. Jude I* and conducting an individualized choice of law analysis for each putative class member." *Id.*

Plaintiffs' failure to offer any mechanism by which this Court could make these determinations for any Contractor in the proposed class is fatal to their certification request. *Tyler*, 265 F.R.D. at 426; *see also Vengurlekar v. Silverline Techs., Ltd.*, 220

---

(setting minimum wage at $8.50 as of January 1, 2017, $8.00 as of January 1, 2016, and $7.50 as of January 1, 2015).

Overtime laws: Mo. Rev. Stat. § 290.505 (requiring payment to employees "at a rate not less than one and one-half times the regular rate at which he is employed" for hours worked over 40 in a workweek, but excluding employees "who are exempt from federal minimum wage or overtime requirements" from overtime law); Ark. Code Ann. § 11-4-211 (overtime pay "at a rate not less than one and one-half (1 ½) times the regular rate of pay" required for hours worked over 40 hours, but excluding "any employee exempt from the overtime requirements of the federal Fair Labor Standards Act . . . as they existed on March 1, 2006); neither Oklahoma nor Texas have a state overtime pay law requirement.

[18] *In re Bridgestone/Firestone Tires Prods. Liab. Litig.*, 288 F.3d 1012, 1015 (7th Cir. 2002) ("No class action is proper unless all litigants are governed by the same legal rules. Otherwise the class cannot satisfy the commonality and superiority requirements"); *Powers*, 328 Fed. App'x. at 125 ("Irreconcilable conflicts [of law] can be an impediment to certification because they can offset the analysis of the legal commonality, typicality and adequacy requirements of Rule 23(a), and the superiority and predominance factors of Rule 23(b)(3)."); *Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943, 949 (6th Cir. 2011)(affirming district court's striking of class allegations because class claims "are governed by different States' laws, a largely legal determination, and no proffered or potential factual development offers any hope of altering that conclusion, one that generally will preclude class certification").

F.R.D. 222, 232 (S.D.N.Y. 2003) (denying certification of New Jersey wage law claim given "it is far from clear that the New Jersey statute applies to all of the wage claims of the proposed class members" who worked outside New Jersey "[t]hus, whether analyzed in terms of commonality, typicality or predominance, the cohesiveness between plaintiffs and class members needed to justify class certification is glaringly absent."); *see also In re Bridgestone/Firestone, Inc.*, 288 F.3d at 1020 ("Differences across states may be costly for courts and litigants alike, but they are a fundamental aspect of our federal republic and must not be overridden in a quest to clear the queue in court."); *Ayala v. U.S. Xpress Enters.*, 2016 WL 7586910, *4-5 (C.D. Cal. Dec. 22, 2016)(denying class certification because individualized issues attendant to choice-of-law analysis).

## C. Plaintiffs' Motion fails to satisfy commonality

Because an employment relationship is a threshold requirement for application of the AMWA, Plaintiffs must demonstrate this question is capable of classwide adjudication. *E.g., Carter*, 2015 WL 11120563 at *3 (recognizing in lawsuit claiming entitlement to recovery under the AMWA that individual must first demonstrate company employed him).[19] Arkansas courts use the economic reality test to determine "whether an individual is an employee" in cases such as this involving both allegations of FLSA and AMWA minimum wage and overtime violations. *Id.* at *2-3 (opining that the Arkansas Supreme Court would interpret the AMWA in unison with the FLSA because both "impose similar minimum wage and overtime requirements on employers and, in cases involving claims brought under both acts, the courts have concluded that their parallel provisions should be interpreted in the same manner.").

---

[19] *See also Helmert v. Butterball, LLC,* 805 F. Supp. 2d 655, 663 n.8 (E.D. Ark. July 27, 2011); *Meinke v. Southern Paramedic Svc., Inc.*, 2017 WL 157737, at *1 (E.D. Ark. Jan. 10, 2017)(concluding that AMWA and FLSA "statutes provide the same overtime requirements, and are interpreted similarly.").

Answering Plaintiffs' alleged common question—"whether class members and Defendant had an employer-employee relationship" (*Pls.' Mem*. at 19)— first requires that Plaintiffs demonstrate common answers to the economic realities test exist. Plaintiffs do not address this test at all.

Instead, Plaintiffs suggest that this Court use the Section 203(6) Definition of independent contractor as the framework for the employment classification analysis. *Pls.' Mem*. at 20-21 (citing Ark. Code Ann. § 11-4-203(6)).  Plaintiffs cite no cases that have applied the Section 203(6) Definition to resolve AMWA minimum wage or overtime claims. And with good reason: both the AMWA overtime and minimum wage statutes predicate recovery on an individual being an "employee" as defined by the AMWA, which mirrors the FLSA's definition of "employee."  Ark. Code Ann. § 11-4-211 (stating overtime requirement in terms of requirement that "no employer shall employ any of his or her *employees*" for hours worked over 40) (emphasis added); Ark. Code Ann. § 11-4-210 (requiring "every employer [to] pay each of his or her *employees*" minimum wage)(emphasis added); *and compare* Ark. Code Ann. § 11-4-203(3)(stating in relevant part that "'employee' means any individual employed by an employer"), *with* 29 U.S.C. § 203(e)(1)(stating in relevant part that "the term 'employee' means any individual employed by an employer").

Consistent with these parallel definitions, courts apply the economic realities test to resolve employment status questions under the AMWA, just as courts do in analyzing employment classification under the FLSA. *E.g., Carter,* 2015 WL 11120563 at *2 (string citing cases for proposition that "[t]he FLSA and the AMWA impose similar minimum wage and overtime requirements on employers and, in cases involving claims brought under both acts, the courts have concluded that their parallel provisions should be interpreted in the same manner.").

Plaintiffs' failure to demonstrate compliance with Rule 23's requirements in the context of the proper legal framework—the economic realities test—warrants denial

17

of certification. *McClaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 228 (2d Cir. 2008) ("when a claim cannot succeed as a matter of law, the Court should not certify a class on that issue"), *abrogated on other grounds by Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639, 128 S.Ct. 2131, 170 L.Ed.2d 1012 (2008).

### D. Plaintiffs' Motion makes no showing regarding their ability to satisfy Rule 23's requirements with respect to the liability elements of their AMWA overtime or minimum wage claims

Leaving aside Plaintiffs' failure to demonstrate that the propriety of their classification can be resolved on a classwide basis, Plaintiffs' Motion makes no effort to demonstrate that *any* of the liability elements of their AMWA overtime or minimum wage claims can be resolved on a classwide basis. *Blades*, 400 F.3d at 575 (affirming district court's denial of certification and concluding a plaintiff must propose "a method to prove injury" as well as show that the method "could work to prove classwide injury with common evidence"). Plaintiffs fail to offer any proof, let alone the requisite "significant proof" required to certify a class, that would allow this Court to conclude that they can demonstrate which Contractors, who in the first instance were misclassified, also did not receive overtime or minimum wage in a given week. *See Wal-mart*, 564 U.S. at 349. Plaintiffs' request for certification of their AMWA overtime and minimum wage claims must be denied. *See Hillis v. Equifax Consumer Services, Inc.,* 237 F.R.D. 491, 517 n. 4 (N.D. Ga. 2006)(denying certification of claim because plaintiff "never identifies the elements of that claim and offers no argument as to how it meets the requirements of Fed. R. Civ. P. 23"); *In re Ford Motor Co.*, 2012 WL 379944, at *11 (D.N.J. Feb. 6, 2012), *leave to appeal denied* No. 12-8018 (3d Cir. June 6, 2012) (concluding class certification brief lacking distinct argument to support claims justified denial of certification).

For the overtime claim, Plaintiffs fail to proffer any argument or evidence demonstrating how they can prove the amount of time worked each week by the

purportedly misclassified Contractors. Without evidence that class members worked more than 40 hours in a week, there is no basis to demonstrate entitlement to overtime. *See Douglas*, 888 F. Supp. 2d at 934 ("to establish liability under the FLSA for any particular week, plaintiffs must demonstrate they worked more than forty hours that week.  Thus, the determination of the number of hours worked by each class member each week is a threshold issue of liability").[20]

The same evidentiary hole sinks Plaintiffs' minimum wage claim. Plaintiffs' Motion offers no explanation of how they will introduce foundationally firm evidence to establish the number of hours each Plaintiff and the absent class worked, how much LSO paid them for that work, what expenses they each incurred, and whether the comparison of these amounts resulted in any class member being paid less than the Arkansas minimum wage. These are liability issues. That is, no liability can attach to LSO for weeks in which a Contractor received wages that exceeded the minimum wage (determined by dividing total compensation by the number of hours worked), net of any work related expenses an employer is obligated to pay. *Hensley,* 786 F.2d at 357)("so long as the total weekly wage paid by an employer meets the minimum weekly requirements of the statute, such minimum weekly requirement being equal to the number of hours actually worked that week multiplied by the minimum hourly statutory requirement" no violation of FLSA's minimum wage provision occurs).

As discussed above, Plaintiffs' testimony provides the only evidence of the hours they worked and expenses they incurred. Without evidence to establish these facts for the absent class, adjudicating their claims would require each class member to testify at trial to provide the evidence necessary to establish whether LSO violated

---

[20] *See* Ark. Admin. Code 010.14.1–112 (recognizing the Arkansas Department of Labor "may rely on the interpretations of the U.S. Department of Labor and federal precedent established under the Fair Labor Standards Act in interpreting and applying the provisions of [the AMWA] ... except to the extent a different interpretation is clearly required.").

the AMWA by failing to compensate them at least the minimum wage. *See Bennett v. Hayes Robertson Group, Inc.*, 880 F. Supp. 2d 1270, 1280-83 (S.D. Fla. 2012)(denying class certification on minimum wage claim because "absent some evidence beyond" conclusory allegations of an unlawful policy "the Court is unable to determine whether the minimum wage claims raise issues common to the class.").

Just last year, the Eighth Circuit's *Ebert* decision denounced efforts to certify elements of a claim that are "merely preliminary to matters that *necessarily* must be adjudicated to resolve the heart of the matter." *Ebert*, 823 F.3d at 479-80 (emphasis in original). Plaintiffs in *Ebert* believed they and other residents were harmed by chemicals used at a General Mills industrial facility, and proceeded to file a complaint with five claims asserted on behalf of a class. Despite filing a complaint seeking recovery for the five claims asserted, plaintiffs moved for Rule 23(b)(3) certification of a lone issue—"whether General Mills is liable to owners of the properties in defined Class Area"—that plaintiffs advocated would resolve the class liability issue. *Id.* at 476-77. The district court agreed with plaintiffs and certified the class.

Concluding the district court abused its discretion in granting certification, the Eighth Circuit identified "the deliberate limiting of issues by this district court in this case [as] problematic." *Id.* at 479. By "narrowing the question for which certification was sought, the district court limited the issues and essentially manufactured a case that would satisfy" Rule 23(b)(3). *Id.* This approach inappropriately "complicate[d] the litigation of the elements necessary to resolve the plaintiffs' claims" and did not comport with the requirements of Rule 23. *Id. Ebert* likewise requires a rebuke of Plaintiffs' attempt at certifying just the employment classification issue here.

### E. Plaintiffs have not demonstrated that any aspect of the Section 203(6) Definition is susceptible to classwide adjudication

As discussed above, Plaintiffs' request for certification should be denied without the need to address the employment classification issue, which is an element of Plaintiffs' claims, not a separate cause of action. *See Amador v. Logistics Express, Inc.*, 2010 WL 3489038, at *1 (C.D. Cal. Aug. 27, 2010)(recognizing employment misclassification issue is additional prima facie element to individual recovery on substantive claims).

Were the Court to analyze the employment question under the Section 203(6) Definition, Plaintiffs' testimony and the absence of any common policy or practice that would resolve the employment classification issue "in one stroke" still renders certification inappropriate. *Wal-Mart*, 564 U.S. at 349.

The Section 203(6) Definition provides that an "'independent contractor' means any individual who contracts to perform certain work away from the premises of his or her employer, uses his or her own methods to accomplish the work, and is subject to the control of the employer only as to the result of his or her work consideration." The very facts Plaintiffs claim support their misclassification contention have no connection to the experiences of other Contractors nor do they establish a common policy or practice. For example, Plaintiffs claim the putative class members:

1.  *"[W]ere required to follow Defendant's procedures on how to track deliveries, and to use communication equipment or scanners that were compatible with Defendant's operating system." Pls.' Mem*. at 8.  Contrary to Plaintiffs' assertion that all drivers were required to use communication equipment or a scanner, Plaintiff Ketcham testified that he completed his deliveries without a scanner. *Ketcham* 93:25-94:2. Plaintiff Roper testified that she used a scanner for a period of time but switched to a mobile app to reduce expenses. *Roper* 18:3-15, 20:9-22.  Other Plaintiffs testified regarding varying experiences with use of communication equipment. *Harris* 119:7-17, 120:20-121:20 (constantly communicated with LSO and was tracked by LSO via a GPS scanner); *Burns* 47:21-48:19 (for the past "six, seven years or more" has not

used a scanner or any other device to communicate with LSO during the day regarding deliveries); *Brewer* 32:3-7, 41:11-18 (was provided a scanner and paper manifest that was used to keep all of her delivery records); *Carpenter* 39:25-40:3 (never used a scanner); *Davis* 67:13-68:3 (used a scanner in the past but customer he currently drove for did not require a scanner); *Appendix A § 3*.[21]

2.    *"[W]ere trained to meet all customers' exacting requirements regardless of location." Pls.' Mem*. at 10. The Springdale Plaintiffs who were deposed each gave different testimony on the amount of training they received. *Ketcham* 98:1-3; 106:22-25 (no training); *Harris* 148:13-20 (training took only a few minutes and a few words to explain); *Manske* 97:13-21 (two hours of training spread over three days).  Tulsa-Plaintiff Roper, who drove in Arkansas, gave yet another view of training.  *Roper* 92:12-19 (completed two days of training).  Plaintiffs provided numerous other examples across a broad spectrum of experience from extensive and specialized training to limited training on use of equipment to no training at all.  *B. Thompson* 160:25-161:15, 162:11-164:21 (trained and completed ride-along for two-week period for medical specimen route, but did not receive training for office supply deliveries); *Renne* 99:8-21 (watched an online training video for separating medical specimens); *Davis* 68:20-69:11 (received training on how to use palm pilot); *McHargue* 21:7-9 (no training); Appendix A § 9.

3.    *"[R]equired to follow Defendant's Uniform and Grooming Policy, as well as Defendant's professionalism and harassment policy." Pls.' Mem*. at 6. Plaintiffs

---

[21] While LSO includes citations to deposition excerpts from Plaintiffs who may not have worked in Arkansas, according to Plaintiffs' theory of the case, the location of the work is irrelevant given their assertion that across the spectrum of Contractors, regardless of where they lived or worked, there exists "uniformity of Defendant's control over and treatment of drivers" derived from an alleged "uniform set of rules and policies."  *Pls.' Mem*. at 11, 21.  If a Plaintiff in Florida had a disparate experience than an individual based out of Arkansas there can be no such uniformity of control and treatment of Contractors, nor any uniform rules that were applied by LSO to all Contractors.

provided no consistent testimony regarding uniform and grooming requirements.[22] *See* [*Appendix* A § 13](#).

Plaintiff Harris testified that "all drivers have to wear khaki pants, clean shoes, clean close toed shoes, you have to wears socks and you have to wear royal blue pullover T-shirt and if you wear a cap, it has to be an Express cap." *Harris* 127:7-18. Plaintiff Manske described a different uniform that included a blue polo with logo, black slacks and black boots. *Manske* 42:17-43:7. In contrast, Plaintiff Ketcham described the uniform as including a logo shirt, but he did not wear the shirt for about a month. *Ketcham* 99:8-21. Finally, Plaintiff Roper described the most relaxed uniform standard that only required a logo shirt with any bottoms, so long as they did not have holes because LSO "didn't want us to look like we just rolled out of bed." *Roper* 18:16-19:25. The lack of consistency in description of the alleged uniform belies that Contractors operating in Arkansas were subject to any universal standard. *See also Davis* 70:12-21 (not aware of any grooming standards other than logo shirt and cap); *Renne* 94:12-23 (received no standards for appearance other than logo shirt).

The existence of a "professionalism and harassment policy" would come as a surprise to every Plaintiff that has testified, none of whom referenced such a policy. *E.g., Carpenter* 40:22-25 ("Q: Were there any policies or procedure documents that were given to you from [LSO] other than the Owner-Operator Agreement?; A: Not as far as I remember.").[23]

4. *Were subject to an Owner-Operator Agreement that "contains a uniform system for determining driver pay rates." Pls.' Mem.* at 22. Plaintiffs' testimony reveals no

---

[22] When present, uniform requirements are generally afforded little emphasis because they typically emanate from customer mandates and are "ancillary to [a contractor's] independent driving." *E.g., FedEx Home Delivery*, 563 F.3d at 492 (D.C. Cir. 2009); *DeSouza v. EGL Eagle Global Logistics LP*, 596 F. Supp. 2d 456, 464-65 (D. Conn. 2009).

[23] Plaintiffs' only support for this assertion is a citation to LSO's corporate witness who, over an objection that the question was outside the scope of the Rule 30(b)(6) topics, testified in his personal capacity that it is the intent of LSO that "professionalism is expected and that harassment is not" by Contractors. *Moyer* 111:24-112:19.

"uniform" pay policy.  Plaintiff Harris admitted during his deposition that he knows that at least one driver was paid more than him for the same work, but denies that drivers negotiated their pay.  *Harris* 74:23-78:11, 80:25-82:24; DEF000982-983, ¶4.  Although Plaintiff Harris testified that "it wasn't possible" to negotiate with LSO on a delivery rate because of "corporate policy," he also admitted that he spoke with a district manager to get an increase in his route pay from $3.79 to $15.00.  *Harris* 76:24-78:16; 94:20-96:5.  Others testified that they attempted to negotiate with LSO regarding their pay.  *Ketcham* 70:21-25; *Manske* 23:10-11.  Plaintiff Henderson testified that he asked for rate increases and when declined by LSO, would simply not accept the work.  *Henderson* 63:11-25.

Moreover, LSO compensated Plaintiffs differently.  *Ketcham* 75:18-76:10 (paid per stop); *Harris* 97:1-98:15 (paid by piece for office products, paid flat rate plus per stop for pharmaceutical deliveries, stop plus arrangement for post office deliveries and returns); *Manske* 60:24-61:17 (paid per piece for office products, flat rate for pharmaceutical route); *Roper* 37:11-23 (paid flat rate for in-town deliveries and per mile for out-of-town deliveries); *Davis* 51:15-21 (paid by the piece for weekly route and paid flat rate for hotshot); *Renne* 107:10-20 (paid based on a percentage of the job plus a portion of the fuel reimbursement); *see also Appendix A § 10*.

5. *Were subjected to LSO's retention of "the right to place and maintain any lettering, advertisement, slogans or designs on all class members' vehicles" and "required drivers to keep their vehicles in a clean appearance." Pls.' Mem.* at 6. As with their other assertions, Plaintiffs' papers do not match the experience the *actual Plaintiffs* reported, which varied depending on the Plaintiff testifying.  While Harris, Ketcham, and Manske all had magnetic signs that they say LSO required, Roper testified that no sign was required for her vehicle.  *Harris* 149:11-150:8; *Ketcham* 107:3-15; *Manske* 92:1-25; *Roper* 20:5-8.  Harris, Ketcham, and Roper described no vehicle appearance requirements, but Manske testified that LSO required him to

have a white cargo van. *Manske* 24:23-25:2. Plaintiff Harris testified that his vehicle had to be clean, but Plaintiff Roper did not identify any requirement about cleanliness of the vehicle. *Harris* 150:12-13; *Roper* 83:15-84:22. Other non-Arkansas Plaintiffs echoed the absence of uniformity with regard to alleged policies for vehicle appearance or placarding. *Blassingame* 35:2-36:13 (placard in dash when made deliveries, noting some vehicles had magnetic signs but he never received them); *Davis* 85:11-13 ("Did you ever have to – did Express ever inspect your vehicle?; A: No."); *Mulloy* 44:8-24 (corporate policy "to have van washed. They had to inspect it. It had to be clean."); *Williams* 66:13-67:8 (no signage required for vehicle, but told could not drive her vehicle she used as a taxi because the taxi sign was painted on the side).

6.    *"[D]id not submit competitive bids for routes or deliveries"* (*Pls.' Mem.* at 8) *and were prohibited "from using their vehicles for any other carriers without written permission from"* LSO. *Pls.' Mem.* at 6. Bid sheets from a branch location belie the contention that a common policy exists prohibiting the submission of bids for deliveries. DEF010591-94. Testimony from other Contractors working outside of Arkansas, who Plaintiffs nonetheless have asserted are subject to the same policies, eviscerates the notion that Contractors either could not provide services for other companies or that permission to do so was required. *Renne* 112:4-114:24 (unsure if he informed LSO that he was driving for other companies, but none ever told him he could not do so); *McHargue* 33:10-20 (free to drive for another company while he contracted with LSO and, in fact, did so); *see also Appendix A § 7.*

Other facts Plaintiffs identify as common evidence of control, such as delivery timing requirements, are nothing more than a Potemkin Village to be disregarded.[24]

---

[24] *E.g., Wilson-McCray v. Stokes*, 2003 WL 22901569, at *6 (N.D. Ill. De. 9, 2003)(defendant "had an interest in making sure that its customers received their goods in a timely manner, and that the fact that it monitored this process to ensure prompt delivery no more creates an

Similarly, LSO is aware of no case finding that the contractual retention of the right to address issues arising with delivery delays or product damage, or an agreement between parties as to how payment is received, has any bearing on the independent-contractor classification analysis. *Pls.' Mem.* at 21; *FedEx Home Delivery v. NLRB,* *563 F.3d 492, 501 (D.C. Cir. 2009)* (rules based on concern for customer service generally do "not create an employee relationship"). Nor in the context of transportation regulated by the Federal Motor Carrier Safety Administration do requirements regarding a drug and alcohol testing program evidence control indicative of an employment relationship. 49 C.F.R. § 382.301; *see also N. Am. Van Lines, Inc. v. NLRB, 869 F.2d 596, 599 (D.C. Cir. 1989)* ("[E]mployer efforts to ensure the worker's compliance with government regulations, even when those efforts restrict the manner and means of performance, do not weigh in favor of employee status"); *Reed v. Industrial Comm'n, 534 P.2d 1090, 1094 (Ariz. Ct. App. 1975)* (requirements to complete paperwork and reports required by the ICC (an agency that preceded the FMCSA) do not support employee status).

These variations are an insurmountable hurdle to Plaintiffs' class certification request. As one court noted when denying certification "beyond indicating Defendant's drivers were subject to similar contracts and payment, Plaintiff has not indicated how the analysis of his claims would lead to answers for other drivers who

---

agency relationship than does the designation of overnight delivery on a Federal Express package"); *Penn v. Va. Int'l Terminals, Inc., 819 F. Supp. 514, 524 (E.D. Va. 1993)* (customer's requirements as to the time of delivery do not indicate control by motor carrier); *Lockett v. Allstate Ins. Co., 364 F. Supp. 2d 1368, 1377-78 (M.D. Ga. 2005)* (monitoring results and insuring accuracy do not equate to controlling manner and means of work); *C.C.E., Inc. v. NLRB, 60 F.3d 855* (D.C. Cir. 1995) (finding that steps taken to "monitor, evaluate, and improve" the results of work without supervision over manner and means by which work is done indicates independent contractor status); *see also Ware v. U.S., 67 F.3d 574, 578 (6th Cir. 1995)* (holding plaintiff was an independent contractor and that provisions in "a contract dictating the details of a business down to the color of its napkins and pens may be more an indicator of bargaining power or business practice than of an actual employer-employee relationship").

drove different routes for different customers in various industries and were paid at different rates based upon the route." *E.g., Jones*, 2015 WL 12733475 at *4 (denying class certification in driver reclassification lawsuit).[25] Vague allegations of "uniform" policies created by the thin declarations presented by a handful of Contractors do not alter this conclusion. The hallmark of the independent-contractor-misclassification analysis selected is the need to weigh evidence of numerous factors. *See, e.g., Edwards v. Publrs. Circulation Fulfillment, Inc.*, 268 F.R.D. 181, 184-86 (S.D.N.Y. 2010) (denying class certification in a case governed by New York state law, where the court rejected an outright "right to control" analysis in favor of a test considering multiple factors, applied on an individual basis to determine independent contractor status). To show that Contractors used "his or her own methods to accomplish the work" and were controlled "only as to the result[s] of his or her work" in satisfaction of the Section 203(6) Definition, LSO is entitled to present evidence of circumstances attendant to the actual performance of the work for each class member, which necessarily turns on questions that will produce answers unique to each of them. *See, e.g., David v. Bankers Life & Cas. Co.*, 2015 WL 3994975 at *7 (W.D. Wash. June 30, 2015) (denying class certification on predominance ground, finding that although

---

[25] *Oplchenski v. Parfums Givenchy, Inc.*, 254 F.R.D. 489, 500-01 (N.D. Ill. 2008) (predominance prong not satisfied where class members' eligibility for employee benefit plan required individualized inquiry into class member's employment status); *Walker v. Bankers Life & Cas. Co.*, 2008 WL 2883614, at *11 (N.D. Ill. July 28, 2008) (determining whether the employer controlled each agent's work, as required to establish an employer-employee relationship, depended on an individualized inquiry); *Edwards v. Publishers Circulation Fulfillment*, 268 F.R.D. 181, 185-89 (S.D.N.Y. 2010) (denying motion to certify a class of newspaper delivery drivers who claim they were misclassified as independent contractors instead of employees); *Narayan v. EGL, Inc.*, 285 F.R.D. 473 (N.D. Cal. 2012) (denying motion to certify last-mile delivery drivers class action); *Spencer v. BeavEx, Inc.*, 2006 WL 6500597 (S.D. Cal. Dec. 15, 2006) (denying motion to certify class because each driver's case would be required to be relitigated after the determination of the common issue of fact and law); *Saleem v. Corporate Transp. Group, Ltd.*, 2013 WL 6061340 (S.D.N.Y. Nov. 15, 2013) (denying Rule 23 certification of driver wage claims); *Scott v. NOW Courier*, 2012 WL 1072751, at *11 (S.D. Ind. Mar. 29, 2012) (denying certification of employment misclassification claim based on "myriad of dissimilarities among all the drivers" that did not support commonality finding).

agents all had common contract, there existed "variations" in experiences that made it "insufficient to support a classwide finding in light of agents' varied experiences"); *Walker v. Bankers Life & Cas. Co.*, 2008 WL 2883614, at \*10-12 (N.D. Ill. July 28, 2008) (denying certification, finding lack of predominance where "discovery record now reflects that a liability determination will require an individualized evaluation of each agent's relationship with [purported employer]"). Resolving the propriety of Plaintiffs' classification under the Section 203(6) Definition is an individual question that fails to satisfy the issue of predominance under Rule 23(b)(3).

## IV.   CONCLUSION

If this were a traditional suit to recover AMWA overtime and minimum wage payments by each Plaintiff, adjudicating their individual claims would require: (1) each Plaintiff would need to demonstrate that Arkansas law applied to him and, if able to make this showing, would take the stand to testify about his experiences, hours worked each week, wages paid, and expenses incurred that LSO should purportedly have responsibility for paying; (2) LSO would cross-examine each Plaintiff to test the veracity of this testimony, and would call  its own witnesses to dispute each Plaintiff's contentions; and (3) the jury would return a verdict in which it determined whether each Plaintiff had demonstrated by a preponderance of the evidence each element of his claims and, if he was successful on any of his claims, the amount of damages owed.

Rule 23 neither reduces any class member's burden to prove each element of his individual claims nor deprives LSO of the right to present individualized defenses, challenges to individual claims; nor does it allow a liability finding unless actual violations of the minimum wage and overtime laws are proven. The Rules Enabling Act forbids anything less. Plaintiffs have offered no evidence and no plan for adjudicating any of the elements of each class member's AMWA claims. And the

evidence proffered on the employment classification element alone is neither common to the class nor sufficient to establish liability. This failure prohibits a finding a commonality, typicality, and adequacy, along with any finding of predominance. Class certification must be denied as a result.

Respectfully submitted,

**EXPRESS COURIER INTERNATIONAL, INC.**

By:*/s/ Andrew Butcher*
      Adam C. Smedstad
      *Pro Hac Vice*
      asmedstad@scopelitis.com
      Andrew Butcher
      *Pro Hac Vice*
      abutcher@scopelitis.com
      SCOPELITIS, GARVIN, LIGHT,
      HANSON
         & FEARY, P.C.
      1850 M Street, N.W., Suite 280
      Washington, DC 20036-5804
      Telephone: 202-551-9030
      Facsimile: 202-296-9433

      Emily A. Quillen
      *Pro Hac Vice*
      equillen@scopelitis.com
      SCOPELITIS, GARVIN, LIGHT,
      HANSON
         & FEARY, P.C.
      801 Cherry Street, Suite 1075
      Fort Worth, Texas 76102
      Telephone: (817) 869-1700
      Facsimile: (817) 878-9472

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on May 12, 2017, upon electronically filing the foregoing document, a copy of same was served on all counsel of record via the court's ECF system.

/s/ Emily A. Quillen
Emily A. Quillen

**Appendix A: Example comparison of testimony of Arkansas Contractors**

| Section | Example Discovery Response |
|---------|---------------------------|
| § 1 (example comparison on frequency of communication with LSO) | *Harris* 26:19-27:13, 40:8-16, 49:23-50:5, 62:24-63:17, 111:23-112:7, 119:7-17 (every day he had to report to the LSO warehouse in the morning and evening, constantly communicated with LSO and was tracked by LSO via a GPS scanner); *Ketcham* 74:3-14 (communicated with branch once a day if there was a discrepancy on the route or unable to delivery product); *Manske* 20:12-17, 57:15-56:11, 87:19-88:5 (required to call branch manager if running late and with progress reports throughout the day branch manager called at least three times a week to check up on route when he was late leaving the warehouse or had a lot of deliveries); *Roper* 28:4-12, 29:25-30:20 (had contact with dispatch on daily basis to receive assignments and coordinate routes). |
| § 2 (example comparison of testimony on freedom to turn down work) | *Harris* 92:15-93:24 (declared "if you refused to take [a delivery] you would be terminated" during his deposition, a position at odds with his prior written statements that other drivers did refuse deliveries without repercussion); *Ketcham* 32:20-33:15 (might be found insubordinate for turning down work); *Roper* 41:17-20 (she could give her run to another driver). |
| § 3 (example comparison of testimony on use of scanners or other handheld devices) | *Harris* 70:5-71:15 (used a scanner to keep track of hours, obtain his manifest, and track packages); *Ketcham* 93:25-94:2 (never used a scanner); *Manske* 64:22-65:7, 38:23-39:11 (required to rent a scanner, used it every day, never given option to use cell phone to scan packages); *Roper* 18:3-15, 20:9-22 (scanner was required for pharmaceutical hot shots, switch to an app on her cell phone to save cost). |
| § 4 (example comparison of testimony/discovery responses on hours worked) | *See **Barrett Ans. to Rog. No. 1** (40 hours per week); **R. Blue Ans. to Rog. No. 1** (50-60 hours per week); **Bracamonte Ans. to Rog. No. 1** (47.5 hours per week); **Cash Ans. to Rog. No. 1** (40-50 hours per week); **Craig Ans. to Rog. No. 1** (80 hours per week); **Holliday Ans. to Rog. No. 1** (45-50 hours per week); **Moreno Ans. to Rog. No. 1** (70-80 hours per week); **S. Martin Ans. to Rog. No. 1** (40-50 hours per week).* |

31

| | |
|---|---|
| § 5 (example comparison on mileage driven) | ***R. Blue Ans. to Rog No. 1*** (400 miles per week); ***Bracamonte Ans. to Rog No. 1*** (750 miles per week); ***Cash Ans. to Rog No. 1*** (75-100 miles per week); ***Craig Ans. to Rog No. 1*** (2,000 miles per week); ***Holliday Ans. to Rog No. 1*** (1,500 miles per week); ***Ketcham*** 88:7-11 (700-800 miles per week); ***Manske*** 52:21-53:1 (270-400 miles per week); ***Moreno Ans. to Rog No. 1*** (1,000 miles per week); ***S. Martin Ans. to Rog No. 1*** (500 miles per week); ***S. Shope*** (1,500 miles per week). |
| § 6 (example comparison of testimony in Contractor's investment in the business) | ***Harris*** 135:7-25, 114:2-18 (drove three different sedans while contracting with LSO, but knew of another driver who operated a box truck); ***Ketcham*** 26:5-8, 65:24-68:5 (had van from prior delivery work when he began contracting with LSO, purchased van initially "so I could more haul the pharmaceutical stuff when I was in Joplin that required more room than a small van. I wouldn't have to make so many trips back to the warehouse" and ability to haul more product with van resulted in higher pay possibilities, did not use van for personal use); ***Manske*** 24:24-25:2 (required by LSO to have a white cargo van); ***Roper*** 13:6-13 (drove a Ford Mustang to make her pharmaceutical hot shot deliveries). |
| § 7 (example comparison of testimony on Contractor's ability to work for other companies while contracting with LSO) | ***Harris*** 29:18-30:1, 75:14-21 (55 hours he averaged per week left no time to do so and "[i]t wouldn't have been profitable to" work for another company while driving for LSO but he was aware of another contractor installed tennis courts as a side business); ***Roper*** 46:3-18 (could not have done anything but be on-call for hotshot pharmaceutical deliveries); ***Moreno Ans. to Rog. No. 5*** (drove for Uber while contracted with LSO). |
| § 8 (example testimony on degree of supervision and instructing the Contractor on how to perform duties) | ***Harris*** 26:19-27:13, 40:8-16, 49:23-50:5, 62:24-63:17, 111:23-112:7, 119:7-17 (every day he had to report to the LSO warehouse in the morning and evening, constantly communicated with LSO and was tracked by LSO via a GPS scanner); ***Ketcham*** 74:21-24, 92:6-93:1, 101:1-102:21 (branch manager wrote rules on white board and email 2-3 times per week with instructions, communicated directly with customers when running late); ***Manske*** 20:12-22, 57:2-14 (required to call-in to branch manager with progress reports throughout the day, not allowed to communicate directly with customers); ***Roper*** 32:22-33:18, 38:3-39:15 (point of contact with LSO was a lead driver she met once a week, but only went to an LSO facility twice – once to turn in her contract paperwork and once for a hot-shot delivery to Little Rock, Arkansas). |
| § 9 (example testimony on degree of control over the | ***Harris*** 124:3-7, 148:13-20 (training took only a few minutes and a few words to explain, instructed on how to handle drugs and spills and how to load product); ***Ketcham*** 35:23-36:4, 40:23-41:20, 98:1-3, 107:1-2 (reported early to warehouse to beat traffic, left warehouse earlier than other drivers |

| | |
|---|---|
| Contractor's schedule and training) | because office product routes were not "as strict", no training); **Manske** 32:13-33:13, 97:13-98:24 (told by branch manager that client wanted pharmaceuticals delivered by 10am while other contractors could deliver until 3pm, training lasted total of two hours spread over three days, had no ride along); **Roper** 92:12-93:10 (had a two-day ride-along with another driver and a separate training for airport deliveries). |
| § 10 (example testimony on differences in pay terms) | **Harris** 74:22-75:25, 94:20-96:5 (aware of at least one other driver who was paid differently for same route, was able to get a rate increase from district manager)**; Ketcham** 69:9-70:9, 75:18-76:10, 83:15-84:2 (paid per stop on a range of $50 to $100 per stop, other driver received better paying routes based on favoritism, per mileage for computer parts), *id.* at 81:19-82:1 ("Q. Did you have a preference for transporting one product over the other? A. It's not as heavy for one thing. Q. You make more money doing pharma? A. Yes. Q. Is that another reason you would prefer doing pharmaceutical work? A. Yes."); **Manske** 60:24-61:17 (paid per piece for office products, flat rate for pharmaceutical route); **Roper** 37:11-23 (paid flat rate for in-town deliveries and per mile for out-of-town deliveries); **DEF000982** ¶4 (statement from Harris that his branch manager "paid me about $26.37 for that 5 hours of work" and "paid Zack [another Contractor] at least $78.00 for the same route and probably more. According to my information, she pays Bob $78.00, but then Zack <u>always</u> gets more")(emphasis in original). |
| § 11 (example testimony on skill and initiative required in performing the job) | **Harris** 56:22-58:2, 129:9-23 (order of deliveries were designated and not possible to deviate from the order due to timed delivery window, given turn-by-turn directions on how to get to some locations, specific customer took priority); **Ketcham** 26:5-8, 49:10-19, 57:12-25 (applied for position because it was the kind of work he had been doing and had a van, determined efficient delivery sequence for office supply products but told to deliver in order of deliveries on manifest for pharmaceutical products); **Manske** 74:23-76:3 (he determined efficient order of deliveries but branch manager had the "final say" to disapprove order of deliveries when he tried to incorporate residential deliveries before commercial deliveries were complete); **Roper** 30:11-31:17 (able to determine order of deliveries for out-of-town runs, but not in-town runs). |
| § 12 (example testimony on permanency of relationship) | **Harris** 29:18-30:14, 64:2-16, 122:16-17 (provided services exclusively for LSO for 20 months, never experienced a "slow period"); **Ketcham** 27:1-6 (worked 6-7 months for LSO, hired to fill a specific route opening); **Manske** 11:9-10 (worked for LSO for 4-6 months); **Roper** 12:2-6 (worked 8 months, experienced slow seasons, as well as slow weeks when worked "kept dwindling and dwindling"). |

| | |
|---|---|
| § 13 (example testimony on uniforms and grooming) | ***Harris*** 127:7-18 ("Q.   And what was that dress code? A   Well, all drivers have to wear khaki pants, clean shoes, clean close toed shoes, you have to wears socks and you have to wear royal blue pullover T-shirt and if you wear a cap, it has to be an Express cap.  You cannot wear a Cardinals cap or any other type of cap.  You have to buy one from Express and wear theirs.  And if you don't wear the blue shirts, they will order from – that they have, the ones with Express printed on them, they will order them for you and charge you for them even though you don't want them because they were very poor quality."); ***Ketcham*** 99:8-21 (logo shirt and cap, did not wear shirt he contends was required for about a month while on order); ***Manske*** 42:17-43:7 (blue polo shirt with logo, black slacks, black boots, logo cap were required); ***Roper*** 18:16-19:25 (logo shirt, any bottoms if no holes, closed toed shoes, "[t]hey didn't want us to look like we just rolled out of bed."). |
| § 14 (example testimony on vehicle appearance standards) | ***Harris*** 149:11-150:8 (magnetic sign required and would be written up by LSO in an inspection for not having a sign); ***Ketcham*** 107:3-15 (had a magnetic sign for sign of cargo van); ***Manske*** 24:23-25:2, 92:1-25 (magnetic sign was required for all drivers, and "[i]t was required for the job to have a white cargo van"); ***Roper*** 20:5-8 (no signage required). |

4826-3140-1543, v. 22