IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

JAMES HARRIS; RICK KETCHAM; and
ADAM MANSKE, Each Individually
and on Behalf of Others Similarly Situated                    PLAINTIFFS

V.                          Case No. 5:16-CV-05033

EXPRESS COURIER INTERNATIONAL, INC.
n/k/a LSO FINAL MILE                                          DEFENDANT

## MEMORANDUM OPINION AND ORDER

Before the Court are Defendant Express Courier International, Inc. n/k/a LSO Final Mile's ("LSO") Motion to Decertify FLSA Collective Action (Doc. 108) and Brief in Support (Doc. 109); Plaintiffs James Harris's, Rick Ketcham's, and Adam Manske's Response in Opposition (Docs. 114-115); and LSO's Reply (Doc. 118) and Notice of Supplemental Authority (Doc. 120). Also before the Court are Plaintiffs' Motion for Rule 23 Class Certification (Doc. 112) and Brief in Support (Doc. 113); LSO's Response in Opposition (Doc. 116); Plaintiffs' Reply (Doc. 117); LSO's Notice of Supplemental Authority (Doc. 121); and Plaintiffs' Notice of Supplemental Authority (Doc. 122).

After the issues were fully briefed, the Court held a hearing on the two Motions on August 21, 2017, at which time the parties presented oral argument. The Court took the matter under advisement. Then, Plaintiffs filed another Notice of Supplemental Authority on October 9, 2017 (Doc. 127), to which LSO filed a Response (Doc. 128). LSO next filed a separate Notice of Supplemental Authority on October 26, 2017 (Doc. 129). The Court considered all supplementary authority submitted by the parties, the briefing on the two Motions, and the oral arguments made during the hearing. Now that the Motions are ripe,

1

the Court is prepared to rule and finds, for the reasons explained in further detail below, that the Motion to Decertify FLSA Collective Action is **GRANTED**, and the Motion for Rule 23 Class Certification is **DENIED**.

## I. BACKGROUND

Plaintiffs are former couriers of Defendant LSO, which is a company that facilitates the delivery of products for the medical, financial, and retail industries, through the work of couriers who actually perform these deliveries. LSO offers same-day, on-demand, and scheduled delivery services in ten different states. According to Plaintiffs, LSO has misclassified its couriers as independent contractors, when they really should be classified and paid as employees, and LSO has failed to pay their couriers a minimum wage and overtime compensation for all hours worked over 40 per week.

Plaintiffs argue that they share with their fellow LSO couriers the following characteristics: (1) they were uniformly classified by LSO as independent contractors and were not paid minimum-wage and/or overtime compensation; (2) they were required to sign the same "Owner-Operator Agreement"—which specified that couriers were to be considered independent contractors—before they were permitted to make deliveries for the company; (3) they were subject to the same corporate-level policies, procedures, and training programs; (4) they were subject to a common policy of local control; and (5) they were subject to common policies regarding pay.

For its part, LSO denies that it has wrongly classified its couriers as independent contractors. Further, LSO contends that its couriers are not similarly situated to one another, such that it would be inefficient and inappropriate to group them into a single class

2

for collective action purposes and for class action purposes.

On September 19, 2016, the Court conditionally certified this case as an opt-in, Fair Labor Standards Act ("FLSA") collective action, and approved Plaintiffs' proposed notice for mailing to the putative class. *See* Doc. 34, pp. 10-11. The conditionally-certified collective action includes:

> Each individual who (a) worked for Express Courier International, Inc. ("Express"), as a driver, courier, or owner-operator any time after February 11, 2013, (b) never subcontracted any of his or her work for Express, and (c) contracted directly with Express under Express's standard "Owner-Operator Agreement."

*Id.* at 2.

On April 14, 2017, after the parties engaged in at least six months of discovery related to class-certification issues, *see* Phase One Case Management Order, Doc. 35, p. 1, LSO filed a Motion to Decertify the FLSA Collective Action. At approximately the same time, Plaintiffs filed a Motion to Certify a Rule 23 Class Action under the Arkansas Minimum Wage Act ("AMWA"). The proposed Rule 23 class includes:

> Each individual who (a) worked for Express Courier International, Inc. ("Express"), as a driver, courier, or owner-operator in Arkansas any time after February 11, 2013, (b) never subcontracted with anyone, or otherwise never hired anyone, to perform any of his or her work for Express, and (c) contracted directly with Express under Express's standard "Owner-Operator Agreement."

(Doc. 112, p. 2).

Below, the Court will begin its discussion by setting forth the legal standards that it must consider when ruling on the pending Motions. Next, the Court will analyze each side's arguments on the issue of decertification of the collective action. Last, the Court will consider the possible certification of a Rule 23 class.

3

## II. LEGAL STANDARD

### A. Motion to Decertify FLSA Collective Action

Certifying a collective action under the FLSA is a two-step process:

> The first determination is made at the so-called "notice stage." At the notice stage, the district court makes a decision—usually based only on the pleadings and any affidavits which have been submitted—whether notice of the action should be given to potential class members.
>
> Because the Court has minimal evidence, this determination is made using a fairly lenient standard, and typically results in "conditional certification" of a representative class. If the district court "conditionally certifies" the class, putative class members are given notice and the opportunity to "opt-in." The action proceeds as a representative action throughout discovery.
>
> The second determination is typically precipitated by a motion for "decertification" by the defendant usually filed after discovery is largely complete and the matter is ready for trial. At this stage, the court has much more information on which to base its decision, and makes a factual determination on the similarly situated question. If the claimants are similarly situated, the district court allows the representative action to proceed to trial. If the claimants are not similarly situated, the district court decertifies the class, and the opt-in plaintiffs are dismissed without prejudice. The class representatives—i.e. the original plaintiffs—proceed to trial on their individual claims.

*Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1213-14 (5th Cir. 1995), *overruled on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003).

This case is currently at the second step of the two-step process, the so-called "decertification" phase. Without making any decisions as to the merits of the case, the Court will be tasked with looking more critically at whether the collective-action mechanism is an effective way to resolve the claims. *See Smith v. Heartland Automotive Servs., Inc.*, 404 F. Supp. 2d 1144, 1148 (D. Minn. 2005). In making this assessment, the Court must examine the purposes of § 216(b) actions under the FLSA, which are: "(1) reducing the

burden on plaintiffs through the pooling of resources, and (2) efficiently resolving common issues of law and fact that arise from the same illegal conduct." *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1264 (11th Cir. 2008) (citing *Hoffmann–La Roche, Inc. v. Sperling*, 493 U.S. 165, 170 (1989)). If the Court determines that the case is not suitable for collective-action disposition, the collective action will be decertified, and the merits decision will proceed on an individual basis, rather than a classwide basis.

In the case at bar, at least 18 named Plaintiffs and opt-in class members were deposed during the initial period of discovery ordered by the Court. The parties agree that the key to determining whether LSO is liable to the class members for a violation of law turns on whether LSO misclassified them as independent contractors. If LSO did misclassify them, then the next issue is whether LSO failed to pay them appropriate minimum and/or overtime wages, to which they are entitled under the FLSA and AMWA. LSO disputes that any class member was misclassified, and it further disputes that any class member would be entitled to damages even if they were misclassified.

In order to decide the classification issue, the fact-finder must consider a six-factor test known as the "economic realities" test. The six factors of the test are:

> (1) the degree of control exercised by the alleged employer;
> (2) the worker's investment in the business;
> (3) the degree to which the worker's opportunity for profit and loss is determined by the alleged employer;
> (4) the skill and initiative in performing the job;
> (5) the permanency of the relationship; and
> (6) the extent to which the work is an integral part of the alleged employer's business.

*Krupicki v. Eagle One, Inc.*, 2014 WL 1271053 (E.D. Ark. Apr. 3, 2014) (citing to *United States v. Silk*, 331 U.S. 704, 716 (1947)); *see also Karlson v. Action Process Serv. &*

*Private Investigations, LLC*, 960 F.3d 1089, 1092 (8th Cir. 2017) (citing to these factors and acknowledging that "many courts have adopted" them as a "multi-factor 'economic realities' test"). On LSO's Motion to Decertify, the Court must consider whether the factual variations in the class members' work conditions and methods of pay are so great that a fact-finder would be unable to apply the economic-realities test and make a one-size-fits-all decision on liability.

### B. Motion for Rule 23 Class Certification

Plaintiffs moved to certify a new Rule 23, opt-out class, limited to Arkansas LSO drivers with wage and hour claims brought pursuant to the AMWA. The parties advise that there are approximately 260 Arkansas drivers who worked for LSO and would be included in the proposed class.[1]

There are several differences between the FLSA collective action and the proposed Rule 23 class action. First, as previously explained, the FLSA action requires members to opt into the class; but the Rule 23 class, once certified, would immediately be composed of all eligible class members, and class members would be required to affirmatively opt out in order to be removed from the class. Another difference is that the legal standard for certifying a collective action is different than the standard for certifying a Rule 23 class action. Under the FLSA, the Court inquires whether class members are or were subject to a single, FLSA-violating policy that renders them similarly situated to one another. By contrast, under Rule 23, the Court must analyze a number of factors, including whether: (1) the class is so numerous that joinder of all members is impracticable; (2) there are

---

[1] By contrast, the FLSA collective action is composed of an opt-in, nationwide class of more than 1000 individuals.

6

questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a)(1)-(4). The Court must also consider under Rule 23 whether questions of law or fact common to class members predominate over questions affecting only individual members, and whether a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Fed. R. Civ. P. 23(b)(3). Finally, an implicit requirement for any class certification inquiry under Rule 23 involves the ascertainability of the class. This means that a proposed class must be sufficiently definite to permit class members to be identified by objective criteria. *See Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 996–97 (8th Cir. 2016).

Despite the differences between the two proposed classes, the FLSA and AMWA afford class members essentially the same relief. *See Karlson v. Action Process Serv. & Private Investigations, LLC*, 860 F.3d 1089, 1092 n.3 (8th Cir. 2017). This is because "[t]he definition of employee in the AMWA tracks the FLSA—'any individual employed by an employer.'" *Id.* (quoting Ark. Code Ann. § 11-4-203(3)). Moreover, "[t]he Arkansas Administrative Code provides that the Department of Labor 'may rely on . . . federal precedent established under the Fair Labor Standards Act in interpreting and applying the provisions of [the AMWA] . . . except to the extent a different interpretation is clearly required.'" *Id.* (quoting Ark. Admin. Code § 010.14.1-112).

In deciding whether to decertify an FLSA collective action and/or certify a Rule 23 class action, the district court retains discretion to choose the procedural mechanism that

would most efficiently and effectively resolve the underlying claims. See *Smith*, 404 F. Supp. 2d at 1149 ("Determining whether such a collective action is the appropriate means for prosecuting an action is in the Court's discretion." (citation omitted)); *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 616 (8th Cir. 2011) (noting that the district court retains "broad discretion in determining whether to certify a [Rule 23] class, recognizing the essentially factual basis of the certification inquiry and . . . the district court's inherent power to manage and control pending litigation." (internal quotations and citations omitted)).

### III. DISCUSSION

#### A. Motion to Decertify FLSA Collective Action (Doc. 108)

The Court's obligation at the second stage of the FLSA certification process is to determine whether the Plaintiffs and putative class members are factually similarly situated, based on the evidence gathered in discovery. To be similarly situated, Plaintiffs must adduce evidence to show that they were all victims of a company-wide decision, plan, or policy that violated the FLSA.

According to the deposition testimony taken in the case, it appears that even though LSO considers all of its couriers to be independent contractors, it exerts control over these couriers in different ways, and it pays them differently, as well. Plaintiffs choose to focus on the similarities the couriers share, while characterizing the disparities in their treatment and pay as "insignificant differences that have no meaningful impact on the analysis . . . ." (Doc. 114, p. 3). Plaintiffs further argue that "it is the **right to control**, as opposed to the amount of control that is actually exercised, that is significant," *id.* at 39 (emphasis in

8

original), and they urge the Court to look to the written agreements between the parties, as well as the official policies of LSO—rather than the testimony of the couriers as to the way the business was actually run—to decide whether the class should remain certified. See id. at 43-44.

Plaintiffs' argument about right to control, versus actual control, strains common sense. In the first place, Plaintiffs cannot help but acknowledge the fact that 18 current or former LSO couriers testified about their differing experiences working for the company. Plaintiffs do their best to minimize these differences and draw the Court's attention to what the couriers have in common; but the couriers' testimony speaks for itself. Furthermore, the operative term in "economic reality" is, of course, *reality*, and courts across the country agree that the actual control a putative employer exerts over its workers is far more important in the misclassification analysis than the employer's right to control. See *Dole v. Snell*, 875 F.2d 802, 808 (10th Cir.1989) ("[I]t is not what the [workers] *could* have done that counts, but as a matter of economic reality what they actually *do* that is dispositive.") (alterations in original) (quoting *Brock v. Mr. W. Fireworks, Inc.*, 814 F.2d 1042, 1047 (5th Cir.1987)); *Donovan v. Sureway Cleaners*, 656 F.2d 1368, 1371 (9th Cir. 1981) (agreeing with the district court that "in evaluating control, the test is not what the agent could do but what in fact the agent does do") (quotation marks and citation omitted); *Spellman v. Am. Eagle Exp., Inc.*, 2013 WL 1010444, at *3 (E.D. Pa. Mar. 14, 2013) ("Thus, to the extent Plaintiffs argue these 'policies' reflect AEX's control over its drivers, . . . an alleged employer's degree of control over its alleged employees is determined by examining the employer's *actual* control, not its *right* to control.") (emphasis in original).

9

In order to determine whether LSO misclassified its couriers, the fact-finder will be asked to consider the six factors of the economic-realities test and decide whether the couriers are, in fact, independent contractors or employees. At this stage in the litigation, however, the Court is not asked to take that ultimate dive into the merits of the case. Instead, on a motion for decertification, the Court's task is simply to consider whether the economic-realities inquiry may be performed by the fact-finder on a classwide basis. If there are too many differences among class members, particularly with respect to how they were treated and paid by LSO, then the Court will conclude that it will be inefficient, if not impossible, to attempt to try all the class members' claims at once in a collective action.

Once again, the six factors of the economic-realities test are: (1) the degree of control exercised by the alleged employer; (2) the worker's investment in the business; (3) the degree to which the worker's opportunity for profit and loss is determined by the alleged employer; (4) the skill and initiative in performing the job; (5) the permanency of the relationship; and (6) the extent to which the work is an integral part of the alleged employer's business. *Krupicki v. Eagle One, Inc.*, 2014 WL 1271053 (E.D. Ark. Apr. 3, 2014) (citing to *United States v. Silk*, 331 U.S. 704, 716 (1947)). For the reasons explained below, the Court finds that the first and third factors of the test are not capable of being decided on a classwide basis, and therefore, the ultimate decision as to whether LSO's couriers were misclassified cannot be made except on an individual basis. Further, the fact that LSO paid its couriers in different ways and at different rates makes it impossible to establish on a classwide basis that LSO violated the FLSA by failing to pay an appropriate minimum wage and/or overtime compensation.

Beginning with the first factor, which is the degree of control exercised by LSO, the

couriers' testimony widely varies. It appears that some couriers rarely interacted with management members and never used the scanners or other monitoring devices that LSO provided for their vehicles, while other workers testified that they were required to report to LSO's warehouse each morning and evening, communicate with LSO's management, and be tracked with a GPS device. One class member testified that he had to check in and check out daily with a dispatcher, while another testified that he did not check in with anyone at the warehouse. Still another courier testified that he picked up deliveries directly from a customer, and the *customer's* supervisor would check his delivery paperwork. *See* Docs. 108-4, pp. 11-12; 108-6, p. 13; 108-7, pp. 37-39; 108-11, pp. 8-9; 108-15, p. 31; 108-16, pp. 7-8; 108-18, pp. 21-22; 108-20, pp. 19-20.

With regard to training, the couriers' testimony shows dissimilar treatment. Some class members claimed they received minimal training, while others testified they received several days or weeks of training. *See* Docs. 108-3, pp. 29-30; 108-7, p. 49; 108-8, pp. 16-17; 108-9, p. 32; 108-14, p. 23; 108-18, pp. 27-28, 29-31. As for the exclusivity of the work relationship between the couriers and LSO, those workers who were deposed widely disagreed about whether LSO limited their ability to work for other delivery companies, such as FedEx, and whether LSO imposed discipline when a courier would refuse to take a delivery. For example, one courier testified that LSO removed him from the "call list" when he turned down a run on one occasion, while another courier testified that LSO did not object to her giving her delivery runs to another driver. Still another courier testified that he took delivery requests directly from customers and ignored LSO's texts requesting that he take on extra work, and he was never disciplined for this behavior. *See* Docs. 108-4, pp. 14-15; 108-6, pp. 18-20; 108-7, pp. 7, 32; 108-9, pp. 16-17; 108-11, pp. 11-12, 15-17,

22-23; 108-14, pp. 6, 11, 15; 108-15, pp. 11, 43; 108-16, p. 11; 108-18, pp. 19-20. The facts show that the degree to which LSO exercised control over the class members cannot be established on a classwide basis.

The Court also finds that the third economic-realities test factor—the degree to which the worker's opportunity for profit and loss is determined by the alleged employer—cannot be decided on a classwide basis in this case, due to the fact that LSO's treatment of its couriers was so disparate that a fact-finder would not be able to make ultimate decisions about how much the class members' collective opportunity for profit and loss was determined by LSO. For example, one courier testified that LSO paid him one amount for certain deliveries, but paid a different courier another, higher amount for the exact same route. *See* Doc. 108-32, p. 1. Another courier testified that LSO offered to pay him more if he obtained an SUV; so the courier bought the SUV, and was, in fact, paid more. *See* Doc. 108-5, pp. 16-17. Other class members testified that they were paid "by the piece," while some testified they were either paid a "flat rate" for certain routes or stops or a "percentage-rate," plus some amount of reimbursement for fuel costs. *See, e.g.*, Docs. 108-3, pp. 19-20; 108-8, pp. 12-13; 108-9, pp. 23-24; 108-14, p. 24; 108-15, p. 11; 108-17, p. 10; 108-20, pp. 10-12. It appears these rates of pay also varied for some couriers depending on the product delivered or the customer being serviced. *See* Docs. 108-7, pp. 33-34; 108-10, pp. 14-15; 108-18, pp. 17-18, 25. Indeed, some class members testified they were paid a certain rate for all in-town deliveries, but a different rate for out-of-town deliveries. *See* Doc. 108-16, p. 10. And while most couriers testified that LSO completely controlled the manner in which they were paid, one courier claimed that he was

able to negotiate a pay raise from LSO on his own behalf. *See* Doc. 108-4, pp. 17-18. From all of this evidence, it is quite clear to the Court that LSO's treatment of its couriers varied so greatly, from location to location, and even from courier to courier, such that there would be no way for a fact-finder to decide on a classwide basis the degree to which LSO affected the couriers' collective opportunity for profit and loss.

Along the same lines, even if a fact-finder *could* determine the misclassification issue on a classwide basis, Plaintiffs have not presented the Court with a feasible method for establishing which, if any, class member was paid below the minimum wage or was denied overtime pay in violation of the FLSA. Instead, multiple individual inquiries would be needed in order to determine how many hours each courier worked when driving for LSO, and how much each courier was paid for that work.

Because LSO couriers were paid in so many different ways (*e.g.*, "by the piece," at a "flat rate" for certain routes, according to a "percentage-rate" plus fuel reimbursement, or on a "per-mile" system for certain deliveries), calculating the number of hours the couriers worked per week would necessitate individualized inquiries. Discovery has revealed that for at least some couriers, if not most of them, the vehicles they used to deliver packages were also the vehicles they used for their personal needs, and in some cases, for other driving-related jobs (*e.g.*, driving for FedEx, Uber, or a taxi company). Trying to reconstruct the mileage logs and convert the work-only mileage into an hourly rate of pay—given the differing ways that the couriers were paid—would require individual proof and would likely be a highly speculative endeavor. The Court is mindful that in FLSA cases, the worker has the burden of proving "that he has in fact performed work for which he was not properly compensated . . . ." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S.

680, 687 (1946), *superseded by statute on other grounds*, 29 U.S.C. § 254(a). The Court therefore finds that it will be impossible to meet this burden of proof at trial on a classwide basis.

Accordingly, the Court in its discretion finds that maintaining the collective action will not provide an efficient and cost-effective mechanism to resolve the liability questions in this case, as compared to proceeding with individual actions. In particular, the Court finds that the liability issues cannot be resolved on a classwide basis without significant individual inquiry. Therefore, LSO's Motion to Decertify FLSA Collective Action is **GRANTED**. The opt-in plaintiffs will be dismissed by operation of this Order, but the matter will be stayed and the opt-in class members' claims tolled for a period of 60 days to allow them to file their individual claims in the appropriate courts. During this 60-day stay, Plaintiffs' counsel will be required to send a copy of this Order and an instructional letter to all opt-in class members, advising them of their legal rights going forward.

### B. Motion for Rule 23 Class Certification (Doc. 112)

Plaintiffs propose certifying a Rule 23 class of approximately 260 couriers who drove for LSO in Arkansas. The purported class's claims for relief would arise under the AMWA, rather than the FLSA. Thus, the threshold question that Plaintiffs bring in their Motion for Class Certification is: Should the economic-realities test be applied in the AMWA context? Plaintiffs believe that when a fact-finder is called upon to determine whether the couriers were misclassified as independent contractors, it will use the definition of "independent contractor" from the AMWA and judge whether the class members meet that definition, rather than employ the economic-realities test.

The AMWA defines an independent contractor as "any individual who contracts to perform certain work away from the premises of his or her employer, uses his or her own methods to accomplish the work, and is subject to the control of the employer only as to the result of his or her work." Ark. Code Ann. § 11-4-203(6). LSO contends—correctly—that no case law supports Plaintiffs' position that it would be illegal or improper to analyze the misclassification issue under the AMWA using the economic-realities test. The AMWA's minimum-wage and overtime rules predicate recovery on a worker being classified as an "employee"—and the AMWA's definition of "employee" is exactly the same as the FLSA's. *Compare* Ark. Code Ann. § 11-4-203(3) to 29 U.S.C. § 203(e)(1). Furthermore, other district courts in the Western District of Arkansas have applied the economic-realities test in the AMWA context. *See, e.g., Carter v. Primary Home Care of Hot Springs, Inc.*, 2015 WL 11120563, at *3 (W.D. Ark. May 14, 2015). There does not appear to be any good reason to limit the misclassification inquiry to the AMWA's definition of "independent contractor," when the economic-realities test affords a more nuanced and thorough approach to the issue and does not contravene the AMWA in any respect.

Next, the Court considers whether the purported class will be sufficiently numerous and readily ascertainable enough to weigh in favor of class certification; whether questions of law or fact are common to the members of the purported class and whether the claims of the named Plaintiffs are typical of those of the rest of the class—in light of the fact that the economic-realities test will be employed by a fact-finder to decide the key issue of misclassification; whether questions of law or fact common to class members predominate over questions affecting only individual members; and whether a class action is superior

to other available methods for fairly and efficiently adjudicating the controversy.[2]

### 1. Numerosity and Ascertainability

Plaintiffs represent that there are approximately 260 individuals who would be included in the Rule 23 opt-out class. There does not appear to be any meaningful opposition to the notion that the class is sufficiently numerous to warrant certification and that these 260 individuals' identities are readily ascertainable. These factors therefore weigh in favor of certification.

### 2. Commonality and Typicality

Turning to the factors of commonality and typicality, Plaintiffs in their briefing point to the similarities that LSO couriers share, while LSO points to their differences—primarily those that would show the degree of control exerted by LSO, as well as the couriers' differing opportunities for profit and loss. Interestingly, Plaintiffs are quite up-front with the Court about the fact that they only want a "liability class" to be certified, and not a "damages class," presumably because they recognize that individualized inquiries will be inevitable when attempting to calculate how many hours each courier worked and how much they earned per hour, considering the different ways in which they were paid by LSO.

Plaintiffs urge the Court to postpone its discussion of how the class members' hourly wages will be calculated, and certify a liability-only class that focuses on the question of whether the couriers are employees or independent contractors under the AMWA. As previously explained, the crucial first and third factors of the economic-realities test are not susceptible to classwide proof. *See supra*, Section III.A. Further, the fact that LSO

---

[2] The Court will assume, for purposes of this analysis, that the named Plaintiffs would adequately represent the interests of the class, if one were certified.

couriers are not subject to a common pay policy destroys the possibility of proceeding with a class action. LSO would not be automatically liable for wage and hour violations if it misclassified its couriers. Instead, to prove liability, Plaintiffs would also have to prove that the couriers were not paid an appropriate weekly minimum wage and/or that they were not paid overtime when they worked in excess of 40 hours per week. Although Plaintiffs are correct that a precise method for calculating damages is not generally expected at the time of certification, their failure to supply the Court with any viable method for calculating the number of hours worked and amount of wages paid—on a classwide basis—means that liability cannot be ultimately determined except as to each individual courier. In other words, the question of *how much* the couriers are owed by LSO is a question that can be put aside until later; but the question of *whether* the couriers are owed anything due to a failure to comply with the AMWA is a liability question that cannot be set aside.

Because Plaintiffs and the purported class lack commonality with regard to how they will prove they are employees, rather than independent contractors, this factor weighs against certification. Further, because Plaintiffs' claims differ from one another's—and from those of the other purported class members—with respect to the degree of control LSO exerted over their work and their ability to profit, and with respect to the ways in which they were paid for their work, Plaintiffs' claims are not sufficiently typical of those of the rest of the class to weigh in favor of certification.

### C. Predominance and Superiority

Plaintiffs argue that questions of law and fact regarding the exempt/non-exempt status of the couriers predominate over individual questions. Although the exempt/non-exempt question is common to all the class members and is, in fact, the threshold question

that must be answered with respect to liability, a classwide determination on this very issue will be extremely onerous, if not impossible, for the reasons already discussed in this Order. Accordingly, the Court finds that the class action mechanism is not superior to holding individual trials on the issue of liability. The lack of uniformity in how the couriers were paid, in and of itself, is fatal to achieving effective and efficient classwide consideration of LSO's alleged liability. Plaintiffs' Motion for Rule 23 Class Certification is **DENIED**.

## IV. CONCLUSION

In consideration of the Court's discussion above, **IT IS ORDERED** that Defendant Express Courier International, Inc. n/k/a LSO Final Mile's Motion to Decertify FLSA Collective Action (Doc. 108) is **GRANTED**, and the collective action is hereby **DECERTIFIED**.

**IT IS FURTHER ORDERED** that Plaintiffs James Harris's, Rick Ketcham's, and Adam Manske's Motion for Rule 23 Class Certification (Doc. 112) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiffs' counsel is **DIRECTED** to provide a copy of this Order and an instructional letter to all opt-in collective action members, explaining their legal options in light of the Court's decision to decertify.

**IT IS FURTHER ORDERED** that the claims of the opt-in collective action members are **TOLLED FOR A PERIOD OF 60 DAYS FROM TODAY'S DATE** in order to allow them to receive notice of this Court's Order regarding decertification and, if desired, to file their individual claims in the appropriate court or courts.

**IT IS FURTHER ORDERED** that Plaintiffs James Harris's, Rick Ketcham's, and

Adam Manske's individual claims will proceed, and a case management order will issue forthwith, granting a limited time-period for the parties to conduct merits discovery, setting a deadline to file dispositive motions, and fixing a date for trial.

**IT IS SO ORDERED** on this 21st day of November, 2017.

TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE